## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re                                   :          **Chapter 11**
                                        :
**CHL, LTD.,** *et al.,*[1]             :          **Case No. 12-12347 (KJC)**
                                        :
            **Debtors.**                :          **(Joint Administration Requested)**
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF LAWRENCE YOUNG
## IN SUPPORT OF CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS AND APPLICATIONS

I, Lawrence Young, hereby certify and declare as follows:

1.      I am the Chief Executive Officer and Chief Restructuring Officer of the above-referenced debtors and debtors in possession (collectively, the "Debtors" or the "Company") in these proceedings.  I am generally familiar with the Debtors' day-to-day operations, business affairs, books, and records, as well as the Debtors' restructuring efforts.

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

3.      To minimize the adverse effects of filing for chapter 11 protection and to enhance their prospects of a successful reorganization, the Debtors will file a number of motions requesting various types of "first day" relief (collectively, the "First Day Motions").  I am

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, where applicable, are:  CHL, Ltd., a Delaware corporation (9198) ("Parent"); Contec Holdings, Ltd., a Delaware corporation (0443); Contec Acquisition Corp., a Delaware corporation (9196); Contec, LLC, a Delaware limited liability company (9576); Contec Licenses, LLC, a Delaware limited liability company (2264); WorldWide Digital Company, LLC, a Delaware limited liability company (9617); Contec de Mexico, S. de R.L. de C.V., a Sociedad de Responsabilidad Limitada de Capital Variable (a Mexico-based Debtor that does not have a federal tax identification number), and Ensambladora de Matamoros, S. de R.L. de C.V., a Sociedad de Responsabilidad Limitada de Capital Variable (a Mexico-based Debtor that does not have a federal tax  identification number).  The Debtors' mailing address is 1023 State Street, Schenectady, New York 12307.

familiar with the contents of each First Day Motion (including the exhibits and other attachments to such motions) and believe the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption; (ii) is critical to the Debtors' achievement of a successful reorganization; and (iii) best serves the Debtors' estates and creditors' interests.

4.      I submit this declaration (the "Declaration") in support of the First Day Motions. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge, (ii) information supplied to me by other members of the Debtors' management or their professionals, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.  I am authorized by the Debtors to submit this Declaration.

5.      Part I of this Declaration describes the Debtors' business and their capital structure.  Part II describes the circumstances surrounding the commencement of these chapter 11 cases (the "Chapter 11 Cases").  Part III sets forth the relevant facts in support of each First Day Motion.

## I.      OVERVIEW OF THE DEBTORS' BUSINESS

### A.      The Company

6.      The Company is a leading provider of repair and other services for customer premise equipment—*i.e.*, equipment provided by cable and broadband operators to their customers to allow them to receive cable and/or internet service— including digital cable set-tops, voice-over-internet-protocol ("VoIP") modems, data modems, and satellite receivers. Since 1978, the Company has grown and expanded its service offerings to cable operators throughout North America and into and throughout South America.  The Company repairs

- 2 -

millions of units of customer premise equipment annually.  The Company also provides "screen and clean" services to their customers, which involve screening customer premise equipment for problems and cleaning and refurbishing the equipment to "new" condition.

7.      The Company primarily serves multiple system operators and original equipment manufacturers.  The Company generates approximately 72% of their revenues, or $110.5 million in 2011, from providing repair and related services to multiple system operators, and approximately 14% of their revenues, or $21.5 million in 2011, from providing licensed repair and related services to original equipment manufacturers.

8.      The Company also sells parts for customer premise equipment to its multiple system operator customers, along with QuickTest™ benches. A QuickTest™ bench is a machine, developed by the Company, that performs a series of diagnostic tests on set-top boxes to detect and identify faults with the boxes. A single QuickTest™ bench can test up to 24 set-top boxes at once, or up to 900 boxes in a single day. QuickTest™ benches assist multiple system operators by helping them identify, prior to sending a box out for repair, what faults are present, and assist the Company by providing earlier information on what services will be required for the set-top boxes provided by customers.

9.      The Company, headquartered in Schenectady, New York, maintains a screen and clean facility in Edison, New Jersey and major repair facilities in Seattle, Washington, Matamoros, Mexico, and Mexico City, Mexico. The Company operates its largest repair facility, in Matamoros, Mexico, through debtor Ensambladora de Matamoros, S. de R.L. de C.V. ("Ensambladora"), a Mexican subsidiary. The Matamoros facility performs screen and clean services and also specializes in repairing certain set-top models, data and VoIP modems, and satellite receivers. The Company also operates smaller repair facilities in Seattle, Washington,

28279571_18
#16630321 v1

and through its other Mexican Subsidiary, Contec De Mexico, S. de R.L. de C.V. ("Contec De Mexico"), in Mexico City, Mexico. The Seattle facility specializes in various types of electronic rework projects. Through the Mexico City facility, the Company remanufactures and repairs set-top boxes for customers located in Mexico and South America.

10.     The Company also employs a sales force of eighteen employees in Schenectady. This sales force is responsible for all facets of account management, including new product introduction, marketing programs, technical training, and customer service functions.

11.     The Company employs a number of engineers at its Schenectady headquarters who research and develop new repair and servicing technologies and work with original equipment manufacturers to develop methodologies to assess and repair new models of set-top boxes and other customer premise equipment. The Company's engineers also developed and help service QuickTest™ machines.

12.     As of July 28, 2012, the Debtors directly employed 177 employees in the United States and 2,134 employees in Mexico. 72% of the Debtors' employees are union employees and 28% are non-union employees. 61% of the U.S. Debtors' employees are hourly employees and 39% are salaried employees. All of Contec De Mexico's and Ensambladora's employees are compensated on a *per diem* basis. Approximately 1,668 of the Mexican employees are unionized, and their compensation and benefits are governed pursuant to collective bargaining agreements and applicable law. In addition, the Debtors also retain the services of 80 contractors that are arranged through various agencies and other third-party providers.

**B.      Corporate Structure**

13.     Since 1978, the Company has continually grown and expanded its service offerings to cable operators throughout North America, and more recently has expanded into

serving South America.  In 2002, the Company acquired WorldWide Digital, formerly Motorola Broadband Communications Sector in Matamoros, Mexico.  In August 2008, certain funds affiliated with Bain Capital Partners, LLC (the "Sponsor") acquired a controlling share of the equity in the Company from certain funds affiliated with American Capital, Ltd. ("American Capital") in an equity transaction.

14.    CHL, Ltd. ("CHL") is the holding company parent in the Company's corporate structure.  Each Prospective Debtor (other than CHL) is either a direct or indirect wholly-owned subsidiary of CHL.  CHL is the direct parent and 100% owner of Contec Acquisition Corp., ("Acquistion").    Acquisition is the direct parent and 100% owner of Contec Holdings, Ltd. ("Holdings").   Holdings is the direct parent, and 100% owner, of Contec, LLC ("Contec").  Contec is the direct parent, and 100% owner, of each of WorldWide Digital Company, LLC ("WWD") and Contec Licenses, LLC, and 99.9% owner of Contec de Mexico.  Ensambladora is 99% owned by WWD and 1% owned by Contec.  Below is a current organizational chart for the Debtors:



15.    The vast majority of the equity interests in CHL are held by the Sponsor.  Certain of the Company's current and former employees also have holdings in or options to purchase CHL's equity.

**C.    Prepetition Indebtedness**

16.    On August 1, 2008, the Debtors entered into certain senior secured credit facilities totaling $201 million pursuant to that certain Amended and Restated Credit and Guaranty Agreement (the "Senior Credit Agreement"), by and among Contec, as borrower, and the other Debtors and certain non-debtor subsidiaries, as guarantors, Barclays Capital, as sole lead arranger, sole lead bookrunner and syndication agent, Barclays Bank PLC ("Barclays" or the

"Senior Agent"), as administrative agent, collateral agent, issuing lender and swing line lender, and the lenders party thereto (the "Senior Lenders").

17.     The term loan under the Senior Credit Agreement has a maturity date of July 28, 2014 and bears interest at the rate of LIBOR plus 4.75% or Federal Funds Rate plus 3.75% per annum.  The revolving and swing line loan commitments thereunder have a maturity date of July 28, 2013 and bear an interest rate of LIBOR or Federal Funds Rate plus 4.5% per annum.

18.     Each Debtor other than CHL is a borrower or guarantor under the Senior Credit Agreement. The Debtors' obligations under the Senior Credit Agreement are secured by a first priority lien, held by the Senior Agent, as collateral agent, for the benefit of the Senior Lenders, on substantially all of the Debtors' assets (other than CHL's), including a pledge of all the equity interests of each of their respective domestic and foreign subsidiaries. As of the Petition Date, approximately $201 million is outstanding under the Senior Credit Agreement.

19.     On August 1, 2008, the Debtors, other than CHL, issued (i) $67.5 million aggregate principal amount of unsecured Senior Subordinated Notes due September 30, 2015 (the "Senior Subordinated Notes"), and (ii) $67.5 million aggregate principal amount of unsecured Junior Subordinated Notes due September 30, 2016 (together with the Senior Subordinated Notes, the "Subordinated Notes"), pursuant to the Amended and Restated Note Purchase Agreement (the "Note Purchase Agreement"), with American Capital as administrative agent and American Capital and certain of its affiliates as note purchasers thereunder (collectively, "ACAS").  Each Debtor, other than CHL, is the issuer or a guarantor under the Note Purchase Agreement.  The Debtors obligations under the Note Purchase Agreement are unsecured, and, pursuant to that certain Intercreditor and Subordination Agreement, dated as of

- 7 -

July 28, 2008 (the "Intercreditor Agreement"), subordinated in priority to the Debtors'

obligations under the Credit Agreement.  As of the Petition Date, approximately $159 million

was outstanding under the Note Purchase Agreement.

## II.    EVENTS LEADING UP TO THE CHAPTER 11 CASES

20.    Demand for the Company's products is directly related to the customer premise

equipment repair needs of the Company's major customers, which is directly contingent upon the

needs of consumers of cable and internet services. The demand for customer premise equipment

repairs can be affected by general economic or industry conditions, labor relations issues,

regulatory requirements, government initiatives, and other factors. Due to fast-paced and drastic

technological and economic changes, consumer demand for traditional cable services has

declined, which has resulted in an extremely challenging environment for the Company.

21.    The Company's business has suffered eroding revenues and profits margins over

the last few years as a result of both macroeconomic and industry-specific factors.  Consumer

spending has slowed significantly in the wake of the biggest recession since the Great

Depression, forcing pay-TV providers (who are some of the Company's largest customers) to

change their business models to court increasingly cash-strapped and cost-conscious consumers.

Moreover, pay-TV providers have not only been forced to compete aggressively on price against

each other, but also against new and emerging technologies such as internet-based streaming

video that have made "cord-cutting"—a term used to describe the growing trend of consumers

disconnecting their cable and satellite based pay-TV services—an increasingly viable cost-saving

option for consumers.  The resulting pressure these forces have put on pay-TV providers' bottom

lines has resulted in consolidation in the cable and satellite TV provider business, thereby

shrinking the Company's customer base.  As the relatively few major remaining cable and pay-

TV providers in North and South America look to cut costs and preserve their own margins, they have forced the Company and their competitors in the digital cable set-top box repair, remanufacture, and sale markets to compete more aggressively for business, putting significant downward pressure on their bottom lines as well. These economic headwinds, coupled with the Company's significant indebtedness and corresponding debt service obligations, resulted in the Company's breaching a financial covenant in the Senior Credit Agreement in the second quarter of 2011 and ultimately necessitated the commencement of these Chapter 11 Cases to effectuate a comprehensive balance sheet restructuring.

22.     After extensive negotiations, the Company entered into initial standstill agreements with both a steering committee of the Senior Lenders (the "Steering Committee") and ACAS on August 19, 2011. The initial standstill agreements provided, among other things, for an eight-week standstill until October 12, 2011, while the Company stabilized its business and engaged in discussions with the Steering Committee and ACAS.

23.     During this initial standstill period, the Company provided substantial information and access to the Steering Committee and ACAS regarding the Debtors' financial situation and strategy. Barclays retained a financial advisor, FTI Consulting, LLC ("FTI"), and the Company provided FTI with full access to their business and finances.

24.     During this initial standstill period, the Company also engaged in negotiations with the Steering Committee and ACAS regarding a further extension of the standstill period and various restructuring options, both out of court and through chapter 11.

25.     As the negotiations between the various parties progressed, the Steering Committee, ACAS, and the Company entered into a series of amendments to the standstill agreements that repeatedly extended the standstill period, ultimately extending it through July

27, 2012.  During this time, the Company provided diligence information to the Steering

Committee and ACAS, and the parties exchanged various term sheet proposals and held

numerous in-person and telephonic negotiating sessions.

26.     On August 23, 2012, the Company, members of the Steering Committee

(including the Senior Agent), ACAS, and the Sponsor entered into a plan support agreement

containing the agreed-upon terms of this consensual restructuring to be effectuated through a

"prepackaged" chapter 11 (the "Plan Support Agreement").  In accordance with the Plan Support

Agreement, the Debtors commenced a solicitation of the *Joint Prepackaged Plan of*

*Reorganization of CHL, Ltd. and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code*

(the "Prepackaged Plan") on August 23, 2012.  The Senior Lender parties to the Plan Support

Agreement have bound themselves to vote to accept the Prepackaged Plan pursuant to the Plan

Support Agreement and collectively hold approximately 60% in amount of the claims in the

voting class and represent over half in number of the prepetition secured lenders. The Debtors

expect that the class of Senior Credit Agreement claims will accept the Prepackaged Plan.

Additionally, because ACAS has bound itself to vote to accept the Prepackaged Plan pursuant to

the Plan Support Agreement and holds 100% of the Subordinated Notes, the Debtors expect that

the class of Subordinated Notes claims will also vote to accept the Prepackaged Plan.

27.     The Prepackaged Plan provides for a dramatic balance sheet restructuring that

will, among other things, discharge 100% of the Debtors' Subordinated Notes obligations and

convert the Debtors' secured obligations under the Senior Credit Agreement into the majority of

the Debtors' equity upon emergence and $27.5 million in new second lien term notes.  Under the

Prepackaged Plan, the Senior Lenders have also agreed to carve out a portion of their collateral

to ensure that all holders of general unsecured trade claims against the Debtors receive a full cash

recovery.  The Debtors believe that this aspect of the Prepackaged Plan, in particular, will prove

instrumental in allowing them to continue their operations with minimal disruption and preserve

the value of their estates for the benefit of their creditors and other stakeholders.

### III.    FIRST DAY MOTIONS[2] [3]

A.    **Administrative Matters**

      i.    **Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

28.    The Debtors are requesting joint administration of these chapter 11 cases for

procedural purposes only.  Joint administration avoids the preparation, service, and filing of

duplicative notices, pleadings, and orders in each individual Debtor's case. This will save

considerable expense, time and resources, and facilitate the ability of parties in interest to

monitor these Chapter 11 Cases.

29.    I believe joint administration of these Chapter 11 Cases is in the best interests of

the Debtors, their estates, and all parties in interest.

B.    **Business Matters**

      ii.    **Motion of the Debtors for an Order (A) Confirming the Administrative Expense Priority Status of the Debtors' Undisputed Obligations to Suppliers for the Postpetition Delivery of Goods, (B) Confirming the Debtors' Authority to Pay Vendors in the Ordinary Course of Business, (C) Confirming that Customer Property is Not Property of the Estate, and (D) Enforcing Section 362 of the Bankruptcy Code (the "Comfort Motion")**

30.    By the Comfort Motion, the Debtors seek entry of an order: (a) confirming that

amounts owed for goods delivered and services provided to the Debtors postpetition are entitled

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the relevant First Day Motions.

[3] Certain information regarding the Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, and (IV) Granting Liens and Superpriority Claims (the "DIP and Cash Collateral Motion") is provided in the *Declaration of Mark Hootnick*.

to administrative priority status, (b) confirming the Debtors' authority to pay vendors in the

ordinary course of business for goods and services provided postpetition pursuant to section

363(c) of the Bankruptcy Code, (c) confirming that customer property in the Debtors' physical

possession is not property of the estate pursuant to section 541 of the Bankruptcy Code, and

(d) confirming the protection afforded the Debtors under section 362 of the Bankruptcy Code.

31.     In the ordinary course of the Debtors' business, numerous suppliers (collectively,

the "Suppliers") provide the Debtors with goods that are integral to the Debtors' ongoing

business operations.  For example, prior to the Petition Date, the Debtors ordered millions of

dollars of goods and component parts in the ordinary course of business for which delivery will

not occur until after the Petition Date (the "Outstanding Orders").

32.     As a result of the commencement of the Chapter 11 Cases, the Suppliers may be

concerned that amounts owed for goods ordered prior to the Petition Date, but delivered after the

Petition Date, will be treated as general unsecured claims against the Debtors' estates.   Suppliers

may refuse to ship or transport such goods (or recall shipments of such goods) with respect to

Outstanding Orders unless the Debtors issue substitute purchase orders postpetition or obtain an

order of the Court clarifying the administrative expense priority of payments for such goods.

The Debtors therefore seek a "comfort" order confirming that goods delivered postpetition are

entitled to administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.

33.     Issuing substitute purchase orders on a postpetition basis and addressing

numerous requests for assurance of payment would be administratively burdensome, time-

consuming, and counterproductive to the Debtors' reorganization efforts.  Such requirements

could delay the Debtors' receipt of essential goods and disrupt the flow of the Debtors'

operations.  I believe that, absent entry of the order, the Debtors would be required to expend

substantial time and resources to reissue the Outstanding Orders or seek replacement suppliers without any assurances that essential goods would be available in the short term to avoid a substantial business disruption.  Loss of access to critical goods—even temporarily—could undermine the Debtors' ability to fill their customer orders on a timely basis, resulting in potentially irreparable damage to customer confidence and harming the Debtors' enterprise value.  The Debtors anticipate that entry of the order will significantly alleviate the Suppliers' concerns, particularly those who are unfamiliar with the chapter 11 process.

34.     Although the Debtors believe that section 363(c) expressly permits the payment of undisputed obligations arising from goods and services provided postpetition and accepted by the Debtors in the ordinary course of business, the Debtors believe an order confirming the Debtors' authority to make ongoing payments to the Suppliers is essential to assure the Suppliers that they will not suffer additional losses by doing business with the Debtors.

35.     In support of this request, the Debtors represent that the proposed $35 million debtor-in-possession financing, if approved, will provide the Debtors with sufficient liquidity to pay for goods delivered and services provided postpetition in the ordinary course, as such amounts become due.

36.     In the ordinary course of business, the Debtors' customers (the "Customers") send consumer equipment, such as digital cable set-tops, modems, and satellite receivers (any such equipment, the "Customer Property"), to the Debtors and the Debtors repair and return the Customer Property to the Customers.  The Debtors are currently in physical possession of certain Customer Property.  The Debtors merely have physical possession of the Customer Property to repair and return it to Customers.

37.     I have been advised that as a result of the commencement of the Chapter 11

- 13 -

Cases, the Customers may be concerned that Customer Property will be considered property of the Debtors' estates pursuant to section 541 of the Bankruptcy Code and, therefore, subject to the automatic stay provided for in section 362 of the Bankruptcy Code.  Consequently, the Customers may needlessly try to seek relief from the automatic stay to recover the Customer Property.  Also the Customers may be reluctant to send Customer Property to the Debtors postpetition for repair.  The Debtors therefore seek a "comfort" order confirming that the Customer Property is not property of the estates solely by virtue of being in the Debtors' physical possession pursuant to section 541 of the Bankruptcy Code and is, therefore, not subject to the automatic stay.

38.    Many of the parties the Debtors do business with are unfamiliar with the workings of the Bankruptcy Code and chapter 11 in particular, particularly creditors and other entities not based in the United States.  Accordingly, notwithstanding the self-executing and global nature of the Automatic Stay, some parties affected or potentially affected by these Chapter 11 Cases may not be aware of the Automatic Stay.

39.    The Debtors respectfully request that this Court confirm the broad applicability of the Automatic Stay in these Chapter 11 Cases.  The Debtors are concerned that, absent the order to show certain entities, the Debtors may be forced to engage in multiple expensive proceedings involving foreign parties to enforce the Automatic Stay.  Once the order is entered, however, the Debtors believe they can avoid the need for such proceedings by providing copies of the order to their business counterparties.

40.    I believe that the relief requested in the Comfort Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

- 14 -

Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Comfort Motion.

       **iii.**    **Motion of The Debtors for an Order Authorizing, But Not Directing, the Payment of Prepetition Sales, Use, Franchise And Other Taxes and Government Charges, Duties and Fees (the "Tax Motion")**

41.      By the Tax Motion, the Debtors seek authority to pay all accrued and outstanding sales, use and franchise taxes and certain other governmental charges, duties and fees to various Taxing Authorities.

42.      In the ordinary course of business, the Debtors incur certain sales, use, franchise, value-added, income and other taxes that are payable directly to various federal, state and local Taxing Authorities as such payments become due.  Although the Debtors' records reflect that they are current on all Taxes that have become due as of the Petition Date, because there is a lag between the time when the Debtors incur an obligation to pay the Taxes and the date such Taxes become due, various Taxing Authorities may therefore have claims against the Debtors for Taxes that accrued prepetition but remain unpaid as of the Petition Date.  Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date.

43.      I have been advised that the total amount of prepetition Taxes owing to the various Taxing Authorities will not exceed $245,000 and that the Debtors' Prepackaged Plan provides for payment in full of the Taxes.  I believe that any amount that will be determined to be actually due, but has not yet been paid to the Taxing Authorities because of the bankruptcy filings, represents a small fraction of the Debtors' total assets.  Moreover, I have been advised that some of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Taxing Authorities; such funds do not constitute property of the estate and could not otherwise be used by the estates.

- 15 -

44.     The Debtors' failure to pay the Taxes could have a material adverse impact on the Debtors' ability to operate in the ordinary course of businesses.  Some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes are not paid timely, which would divert the attention of the Debtors' management team away from the reorganization process. Further, if the Debtors do not pay the Taxes in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates.

45.     Because the Debtors' Prepackaged Plan provides for payment in full of the Taxes, payment in the ordinary course of business will therefore affect only the timing of the payments and not the amounts that the applicable Taxing Authorities will ultimately receive.  Thus, such payment will not prejudice the rights of the Debtors' general unsecured creditors.  I believe that the Debtors' failure to pay the prepetition Taxes could have a material adverse effect on the Debtors' operations, because the Taxing Authorities could take actions (which could include the initiation of audits, lien filings, and lift-stay motions) against the Debtors for such non-payment which could cause significant administrative problems for the estates and consume the Debtors' valuable time and resources.  I believe that prompt and regular payment of the prepetition Taxes will avoid those unnecessary and distracting governmental actions.

46.     I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Customer Tax Motion.

      **iv.**    **Motion of the Debtors for an Order Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition, (B) Renew or Purchase New Insurance Policies in the Ordinary Course of Business, and (C) Pay All Prepetition Obligations Relating Thereto (the**

- 16 -

**"Insurance Motion"**)

47.     By the Insurance Motion, the Debtors seek entry of an Order authorizing the

Debtors to: (a) continue to perform under the Insurance Policies, including, but not limited to,

those specifically identified on **Exhibit B** of the Insurance Motion,[4] (b) pay all Brokerage Fees

due in the ordinary course, (c) renew or purchase new insurance policies in the ordinary course

of their businesses, and (d) honor any undisputed prepetition obligations, including Deductibles

relating thereto (the "Insurance Obligations").  Although the Debtors are not aware of any

obligations owed under the Insurance Policies other than those specifically enumerated herein,

the Debtors request authority to comply with any such obligations if and when they become

known to ensure continuous insurance coverage.

48.     The Debtors are required to pay insurance premiums (the "Premiums") under the

Insurance Policies, based on a rate established and billed by each insurance carrier (the

"Insurers").  The Premiums total approximately $916,000 on an annual basis, plus finance

charges and interest.  The Debtors maintain approximately 20 active Insurance Policies, which

provide coverage for, among other things, crime, director and officer liability, transportation and

storage of cargo, umbrella, and various other product- and property-related and general

liabilities, through their Insurers.

49.     I have been advised that as of the Petition Date, the Debtors had no Premiums

---

[4] In addition to the Insurance Policies listed on **Exhibit B**, which are the Insurance Policies most central to the
Debtors' operations, the Debtors maintain numerous Insurance Policies with respect to, among others, employee
health, dental, disability, life insurance benefits, and workers' compensation.  These policies were addressed in the
*Motion of the Debtors for Entry of an Interim and Final Order (I) Authorizing, But Not Directing, the Debtors to (A)
Pay Prepetition Employee Wages, Salaries, and Other Compensation; (B) Make Payments for Which Prepetition
Payroll Deductions Were Made; (C) Continue Vacation and Other Paid Leave Benefits in the Ordinary Course; (D)
Contribute to Prepetition Employee Benefit Programs and Continue Such Programs in the Ordinary Course of
Business; (E) Pay Workers' Compensation Obligations; and (F) Pay all Costs and Expenses Incident to the
Foregoing Payments; and (II) Authorizing and Directing the Debtors' Banks and Other Financial Institutions to
Process and Honor Checks and Transfers Related to Such Obligations* (the "Wage Motion") filed
contemporaneously with the Motion.

outstanding.  Nonetheless, if the Debtors are not authorized to pay the Premiums in the ordinary

course, the Debtors' insurance coverage may lapse, forcing the Debtors to obtain new insurance

coverage on an emergency basis potentially at a significantly increased cost.  Accordingly, the

Debtors request authority to pay the Premiums as they become due.

50.    Under certain Insurance Policies, the Debtors are also required to pay deductibles

(the "Deductibles"), depending upon the type of claim asserted and insurance policy involved.  I

have been advised that as of the Petition Date, there are no open claims under the Insurance

Policies, and the Debtors do not yet have an estimate with respect to any outstanding liability

they may have on account of these claims.

51.    The Debtors seek the authority of the Court to maintain and renew the Insurance

Policies postpetition, without need to seek leave of Court, in recognition of the critical necessity

of keeping the Insurance Policies in effect, and out of concern that the passage of time while the

Debtors seek and obtain Court authority for such maintenance and/or renewal may have adverse

consequences for the Debtors.  I believe that if the Debtors were forced to obtain replacement

insurance on an expedited basis, it could come at a tremendous cost to their estates.

52.    In connection with the Insurance Policies, the Debtors are party to certain

insurance brokerage agreements under which the Debtors obtain services from certain third-party

insurance brokers (collectively, the "Insurance Brokers").  The Insurance Brokers assist the

Debtors in obtaining comprehensive insurance coverage for the Debtors' operations in the most

cost-effective manner.  In particular, the Insurance Brokers assist the Debtors with the

procurement and negotiation of Insurance Policies from Insurers, enabling the Debtors to obtain

coverage on the most advantageous terms and competitive rates.

53.    As of the Petition Date, the Insurance Brokers include: Marsh USA, Inc. and

Marsh Brockman y Schuh, Agente de Seguros y de Fianzas S.A. de C.V.  The Insurance Brokers

provide services to, and receive compensation (the "Brokerage Fees") from, the Debtors pursuant

to the terms of brokerage agreements.  In 2011, the Debtors paid approximately $229,000 in

Brokerage Fees related to policies procured within the year.  I have been advised that as of the

Petition Date, the Debtors do not believe that they owe any Brokerage Fees.

54.    The Debtors believe that honoring obligations under their brokerage agreements,

including payment of Brokerage Fees, is necessary to assure the ability of the Debtors to secure

all necessary insurance coverage at advantageous terms and for the proper maintenance of the

coverage.  Accordingly, the Debtors also seek the authority of the Court to continue satisfying

such obligations during these Chapter 11 Cases, without need to seek leave of Court, in

recognition of the critical necessity of maintaining the Insurance Policies and of continuing to

secure adequate insurance coverage in connection with the Debtors' operations.

55.    It is critical that the Debtors continue their Insurance Policies in full force and

effect.  The Insurance Policies provide a comprehensive range of coverage for the Debtors'

employees, businesses, and property. If the Insurance Policies were allowed to lapse, the Debtors

would be exposed to substantial liability for any damage resulting to persons and property of the

Debtors and others. Failure to maintain the Insurance Policies, therefore, would be detrimental to

the Debtors' reorganization efforts and adversely affect the value of their estates by exposing

them to unnecessary risks of loss.

56.    The Debtors also seek authority to pay any unpaid Premiums and other charges

arising under, and related to, the Insurance Policies and to perform any other obligations owed in

connection with the Insurance Policies, including Deductibles, Brokerage Fees, and any other

obligations that may have arisen prepetition, as are reasonably necessary to maintain the

28279571_18
#16630321 v1

Insurance Policies (and as such obligations may become known).  I believe that it is essential that the Debtors are authorized to make these payments without delay to avoid cancellation, default, alteration, assignment, attachment, lapse, or any other form of impairment to the coverage, benefits, or proceeds provided under any Insurance Policy.  Any lapse in insurance coverage for failure to pay prepetition obligations or honor obligations coming due during the Chapter 11 Cases could expose the Debtors to substantial liability for damages and negatively impact the Debtors' ability to successfully reorganize.  Moreover, in such circumstances the Debtors may be required to obtain replacement policies on an expedited basis at a significant cost to their estates

57.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Insurance Motion.

> **v.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Payments of Prepetition Claims of Shippers, Customs Duties and Related Brokerage Fees, and Granting Related Relief (the "<u>Shippers Motion</u>")**

58.    By the Shippers Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to: (a) continue to pay, in the ordinary course of business, prepetition claims of (i) Shippers who have or may have state law remedies available to secure payment of their respective claims, and (ii) Customs Duties and related Brokerage Fees; and (b) granting related relief.

59.    In their operations and customer relationships, the Debtors seek to foster and maintain a reputation for reliably transporting, repairing, and delivering their customers' equipment, which is critical to the Debtors' business operations.  The Debtors' pricing policies

- 20 -

and marketing strategies revolve around that reputation, which depends in substantial part on the timely and secure transportation of customers' equipment to the Debtors' repair facilities and delivery of refurbished or repaired equipment to the Debtors' customers.

60.    To meet their logistics needs, the Debtors have implemented and depend upon an efficient transportation system for the receipt of repair shipments, component parts, and equipment, and the delivery of repaired or refurbished equipment to their customers. The Debtors use freight shippers, freight forwarders, and truckers to make the necessary deliveries. The Debtors receive components, parts, and customer products for their repair business from various customers and suppliers located in Asia, Canada, and the Caribbean, at multiple ports in the United States via ocean freight carriers and a network of freight truck operators.

61.    After the shipments clear customs in Brownsville, Texas, they are delivered to the Debtors' facilities in Matamoros, Mexico, for repair or refurbishment.  After the Debtors repair or refurbish their customers' equipment, the Debtors ship the equipment back to customers located throughout North America, Asia, South America and the Caribbean via the Freight Truck Operators and Ocean Carriers.

62.    The Debtors' facilities in Mexico City also receive Shipments of components and parts from the United States through Matamoros, Mexico, and a small percentage through Nueva Laredo, Mexico, via Laredo, Texas, and the Mexico City International Airport.  Various trucking companies based in Mexico deliver the components and parts to CDM.  After CDM repairs or refurbishes customers' equipment, such equipment is shipped to customers located in South America or the Caribbean.

63.    The Debtors pay an average of approximately $1.5 million per month to the Shippers on account of their transportation and logistics services, and that the Debtors estimate

28279571_18
#16630321 v1

that as of the Petition Date, they owe approximately $1.8 million to the Shippers.  I believe that

honoring all obligations to the Shippers is essential to ensure uninterrupted coordination of the

Debtors' business during these Chapter 11 Cases.

64.     I have been advised that, under some state laws, Shippers may have statutory liens

on the goods in their possession that secure the charges or expenses incurred in connection with

the transportation or storage of the goods.  I have also been advised that the Shippers, as bailees,

may be entitled to adequate protection of a valid possessory lien.

65.     In the event of non-payment, the Shippers may argue that they have possessory

liens for transportation or storage costs and may refuse to deliver or release goods in their

possession until their claims are satisfied in full and their liens redeemed.  Even absent a valid

lien, however, a Shipper's possession and retention of the Debtors' goods and supplies would

severely disrupt, and potentially cripple, the Debtors' operations.  The Debtors' operations are

structured to receive shipments of customer equipment to be repaired on a "just-in-time" basis;

accordingly, the Debtors maintain few or no equipment orders on their factory floors.  Under

normal operating circumstances, a significant amount of goods and components, including

customer equipment, could be in transit at any one time between and/or among the Debtors, their

suppliers and their customers, and, therefore, in the Shippers' possession.  I believe that the

Shippers' refusal to deliver or relinquish these goods would not only disrupt the Debtors'

operations, but would deprive customers of their equipment, with potentially disastrous

consequences to the Debtors' business.

66.     I submit that the total amount to be paid to the Shippers if the requested relief is

granted is minimal compared to the importance and necessity of the Shippers and the losses the

Debtors may suffer if their operations are disrupted.  Moreover, in most cases, the Debtors do not

28279571_18
#16630321 v1

believe that they could quickly replace their existing Shippers.  I therefore believe that if the Debtors were not authorized to pay prepetition claims to Shippers, it would unduly disrupt the Debtors' businesses.

67.    In the ordinary course of their business, the Debtors satisfy Customs Duties incurred in connection with the Shipments through several Customs Brokers.  The Customs Brokers remit payment for any customs Duties owed by the Debtors directly to U.S. Customs and Mexican Customs, and then invoice the Debtors for such duties.  The Debtors incur approximately $90,000 in Customs Duties per month (including fees paid to Customs Brokers). As of the Petition Date, the Debtors estimate that approximately $100,000 in Customs Duties remained outstanding, including customs brokerage fees.

68.    I believe that if the Debtors cannot timely pay amounts owed to the Customs Brokers, the Customs Brokers could refuse to continue to provide the Debtors with critical customs brokerage services, including payment of Customs Duties.  In such an event, U.S. Customs and the Mexican Customs may demand liquidated damages, assess interest or impose other sanctions against the Debtors.  Even if the Debtors are able to contest these measures, doing so would require time, effort and expense and would distract the Debtors' management from stabilizing operations while quickly moving these Chapter 11 Cases.  Furthermore, absent payment, the Customs Brokers may, in some instances, assert liens against the Shipments or U.S. Customs and/or Mexican Customs may assert liens against such goods or take other action against the Debtors in their respective jurisdictions.

69.    By the Shippers Motion, the Debtors propose conditioning payment of the claims of Shippers upon their agreement to continue supplying goods and services to the Debtors postpetition on normal and customary trade terms, practices and programs (including, without

- 23 -

limitation, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix, availability and other applicable terms and programs), that were most favorable to the Debtors and that were in effect within 180 days before the Petition Date, or such other trade terms that are acceptable to the Debtors.

70.     Accordingly, I submit that it is in the best interests of their estates and creditors to be authorized to pay such Customs Duties and Brokerage Fees in the ordinary course of business, even if such payments were incurred prepetition, to ensure a smooth transition into Chapter 11.

71.     I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Shippers Programs Motion.

> **vi.     Motion of the Debtors for Interim and Final Orders (A) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Assurance (the "Utilities Motion")**

72.     By the Utilities Motion, the Debtors seek entry of an Interim Order and Final Order: (a) prohibiting the Utility Companies from discontinuing, altering, or refusing service to the Debtors except as set forth in this Motion; (b) determining that the Utility Companies have been provided with adequate assurance of payment on the basis of the establishment of the Utility Deposits; and (c) approving the Debtors' proposed procedures for Utility Companies to request additional assurance of payment.  Although the Debtors seek the continued provision of utility services from the Utility Companies, the Debtors are not seeking authority or direction to pay any specific claim.

73.     In the operation of their facilities, the Debtors incur utility expenses for

electricity, gas, waste management, and telecommunication services in the ordinary course of business.[5]  These utility services are provided by the Utility Companies, a non-exhaustive list of which is attached to the Utilities Motion as **Exhibit C**.  Prior to the Petition Date, the Debtors spent approximately $37,579 each month for utility expenses.  The Debtors anticipate that the average postpetition monthly cost for utility services during the Debtors' Chapter 11 Cases will also be approximately $37,579.  The Debtors have an established history of timely paying their utility expenses.  Accordingly, the Debtors do not believe that they owe any past due amounts to the Utility Companies.

74.     I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization efforts.  Should one or more of the Utility Companies refuse or discontinue service even for a brief period, it would severely disrupt the Debtors' operations, resulting in significant losses.  Such an interruption would damage the Debtors' business to the detriment of their estates, creditors, and employees.  I believe that it is critical that utility services provided to the Debtors continue uninterrupted.

75.     To provide adequate assurance of payment for future services to its Utility Companies, the Debtors propose to provide a deposit to each of the Utility Companies equal to approximately 50% of the Debtors' estimated cost of monthly utility consumption for such Utility Company, approximately $18,790 in the aggregate (the "Utility Deposits").  If the Debtors identify an Added Utility Company, the Debtors will provide a deposit to the Added Utility Company by an amount equal to the value of two weeks of services used by the Debtors, based on a yearly average, from such Added Utility Company.

---

[5] The Debtors' business includes operation of facilities in Mexico, which require utility services.  The Utilities Motion does not address the treatment of Utility Companies providing services to the Debtors' Mexican facilities.  Such Utility Companies are addressed in the Motion of the Debtors for Entry of Interim and Final Orders Authorizing Them to Pay Prepetition Claims of Foreign Vendors, filed contemporaneously.

- 25 -

76.     In addition, the Debtors seek to establish reasonable procedures (the "Adequate Assurance Procedures"), as set forth in the Utilities Motion, by which a Utility Company may request additional assurance of future payment, if such Utility Company believes that the Utility Deposit and the proposed reinstatement of its claims under the terms of the Plan do not provide it with satisfactory adequate assurances.

77.     I believe that the relief requested in the Utilities Motion is necessary to continue the Debtors' normal business operations and to preserve the Debtors' ability to restructure its business in an orderly manner.  The Debtors could face a severe cash drain if the Utility Companies condition the provision of postpetition services to the Debtors upon the payment of exorbitantly burdensome and/or unreasonable deposits or other forms of adequate assurance.

78.     If the Utility Companies are permitted to terminate utility services on the thirty-first day after the Petition Date, a substantial disruption to the Debtor's operations will occur, and the Debtors' businesses will be irreparably harmed.  If faced with imminent termination of utility services, the Debtors would be forced to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of essential utility services and a severe disruption of the Debtors' business.

79.     I believe that establishing the Utility Deposits, a substantial cash reserve relative to the Debtors' estimated monthly consumption, provides adequate assurance to its Utility Companies.  In addition, the Debtors submit that the Adequate Assurance Procedures set forth in this Motion, whereby any Utility Company can request additional adequate assurance if it believes there are facts and circumstances that would merit greater protection, provide an orderly process for giving adequate assurance of payment to the Utility Companies without risking irreparable harm to the estate.

28279571_18
#16630321 v1

80.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Utilities Motion.

      **vii.**      **Motion of the Debtors for an Order Authorizing The Debtors to Continue Using Debtors' Bank Accounts, Business Forms, and Cash Management System (the "<u>Cash Management Motion</u>")**

81.     By the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to: (i) maintain their existing bank accounts; (ii) continue to use their existing business forms; and (iii) continue their existing Cash Management System, including making Intercompany Transfers among the various Debtors in the ordinary course of business.

82.     The Debtors, other than Contec de Mexico, S. de S.R. de C.V. ("<u>CDM</u>"), use a centralized cash management system to collect funds from and for, and to pay expenses incurred by, their operations (the "<u>Primary Cash Management System</u>").  The Primary Cash Management System is illustrated in overview form in the chart attached to the Cash Management Motion as **<u>Exhibit B</u>**.  CDM uses a cash management system that is separate from, but linked to, the Primary Cash Management System, to collect funds, to pay expenses incurred by its operations, and to invest certain of its funds (the "<u>CDM Cash Management System</u>," and together with the Primary Cash Management System, the "<u>Cash Management System</u>").  The CDM Cash Management System is illustrated in overview form in the chart attached to the Cash Management Motion as **<u>Exhibit C</u>**.

83.     The Cash Management System includes 14 bank accounts, a list of which is attached to the Cash Management Motion as **<u>Exhibit D</u>** (the "<u>Bank Accounts</u>"), held at (i) Bank of America, N.A. ("<u>BofA</u>"), (ii) JPMorgan Chase Bank, National Association ("<u>JPM</u>"), (iii) Key

Bank National Association ("KeyBank"), (iv) HSBC México, S.A. Banco ("HSBC"), (v) Banco

Monex, S.A., Institución de Banca Múltiple ("Monex"), and (vi) Banco Mercantil del Norte,

S.A. ("Banorte," and together with BofA, JPM, KeyBank, HSBC, and Monex, the "Banks").

       84.    I have been advised that the principal components of the Cash Management

System and the flow of funds among the Bank Accounts are as follows:

    a.   Contec U.S. Operating Account: Contec, LLC ("Contec U.S.") maintains its operating account with BofA (the "Contec U.S. Operating Account").[6]  The Contec U.S. Operating Account funds the cash requirements for the Debtors' operations, including in connection with remanufactured products, remote controls and special projects, and payroll, through Automatic Data Processing, Inc. ("ADP").  The Contec U.S. Operating Account is also used to transact business with CDM for the purchase and sale of products and inputs through the CDM Concentration Account.  The Contec U.S. Operating Account also funds certain disbursements on account of WorldWide Digital Company, LLC ("WWD") and is then reimbursed from the WWD Operating Account (as defined below) through intercompany transfers.  Prior to the Petition Date, the Contec U.S. Operating Account was funded from customer deposits, periodic intercompany transfers from the CDM Concentration Account (as defined below), and a daily sweep of the WWD Operating Account (as defined below).

    b.   Contec U.S. Checking Account: Contec U.S. maintains a checking account at KeyBank (the "Contec U.S. Checking Account").[7]  The Contec U.S. Checking Account is used for miscellaneous disbursements, primarily relating to the Debtors' repair facility in Seattle, Washington.  Prior to the Petition Date, the Contec U.S. Checking Account was funded by the Contec U.S. Operating Account.

    c.   WWD Checking Account: WWD maintains one checking account at JPM (the "WWD Checking Account").[8]  The WWD Checking Account is maintained for use in the event of a disaster or catastrophic event affecting the Debtors' facilities and operations in either Brownsville, Texas, or Matamoros, Mexico. Prior to the Petition Date, the WWD Checking Account was funded by the WWD Operating Account.

---

[6] Account No. XXXXXXXX8011.

[7] Account No. XXXXXX0294.

[8] Account No. XXXXXXX8323.

28279571_18
#16630321 v1

d.  <u>WWD Operating Account</u>:  WWD maintains its operating account with BofA (the "<u>WWD Operating Account</u>").[9]  The WWD Operating Account is used to (i) transact business for the Debtors' primary repair business, (ii) fund payroll through ADP, (iii) fund Ensambladora de Matamoros, S. de R.L. de C.V.'s ("<u>EDEMSA</u>") operations through the EDEMSA MXP Operating Account (as defined below) and the EDEMSA USD Operating Account (as defined below), and (iv) transact business with CDM through the CDM Concentration Account.  Prior to the Petition Date, the WWD Operating Account was funded from customer receipts and intercompany transfers from the CDM Concentration Account and the Contec U.S. Operating Account.

e.  <u>EDEMSA Operating Accounts</u>:  EDEMSA maintains two operating accounts with Banorte, one denominated in Mexican pesos (the "<u>EDEMSA MXP Operating Account</u>")[10] and one denominated in U.S. dollars (the "<u>EDEMSA USD Operating Account</u>,"[11] and together with the EDEMSA MXP Operating Account, the "<u>EDEMSA Operating Accounts</u>")).  The EDEMSA MXP Operating Account is used to (i) fund payroll for EDEMSA's employees, (ii) pay for certain of EDEMSA's tax, insurance, and other miscellaneous charges and fees denominated in Mexican pesos, and (iii) fund contributions to a segregated employee savings account maintained with Banorte (the "<u>Banorte Employee Savings Account</u>").[12]  The EDEMSA USD Operating Account is used to fund (i) certain of EDEMSA's payables denominated in U.S. dollars and (ii) contributions to a segregated savings account maintained with BofA (the "<u>BofA Savings Account</u>").  Prior to the Petition Date, the EDEMSA Operating Accounts were funded from the WWD Operating Account.

f.  <u>CDM Concentration Account</u>:  CDM maintains a concentration account with HSBC (the "<u>CDM Concentration Account</u>") denominated in Mexican pesos.[13]  The CDM Concentration Account is used to (i) collect customer receipts denominated in Mexican pesos, (ii) contribute to Investment Account No. 1 (as defined below),[14] and (iii) conduct intercompany transfers with WWD and

---

[9] Account No. XXXXXXXX8024.

[10] Account No. XXXXXXXX1822.

[11] Account No. XXXXXXXX2075.

[12] Account No. XXXXXXXX8295.  As more fully set forth in the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Employee Wages, Salaries, and Other Obligations and (B) Pay Related Costs and Expenses, and (II) Authorizing and Directing the Debtors' Banks and Other Financial Institutions to Process and Honor Checks and Transfers Related to Such Obligations* (the "<u>Employee Wage and Benefits Motion</u>"), filed concurrently herewith, the Banorte Employee Savings Account is administered by EDEMSA pursuant to the Employee Savings Program (as defined in the Employee Wage and Benefits Motion).  As of the Petition Date, the Banorte Employee Savings Account held approximately 2.4 million Mexican pesos.  I am advised that the funds held in such account, however, are property of EDEMSA's employees under Mexican law and thus do not constitute property of EDEMSA's estate.

[13] Account No. XXXXXXXX7433.

[14] Account Nos. XXXXXXXX6753.

- 29 -

Contec U.S. through the WWD Operating Account and the Contec U.S. Operating Account, respectively.  Prior to the Petition Date, the CDM Concentration Account was funded primarily from customer receipts and, as needed, by intercompany transfers from the WWD Operating Account and the Contec U.S. Operating Account.

g.    <u>CDM Operating Account</u>:  CDM also maintains an operating account with HSBC denominated in U.S. dollars (the "<u>CDM USD Operating Account</u>") and an operating account with HSBC denominated in Mexican pesos (the "<u>CDM MXP Operating Account</u>," and together with the CDM USD Operating Account, the "<u>CDM Operating Accounts</u>").[15]  The CDM USD Operating Account is used to (i) pay for certain of CDM's tax, insurance, and other miscellaneous charges and fees denominated in U.S. dollars, (ii) contribute to one of the CDM Investment Accounts (defined below),[16] and (iv) contribute to a segregated savings account maintained with BofA (the "<u>CDM Savings Account</u>").  The CDM MXP Operating Account is used to (i) pay for certain of CDM's tax, insurance, and other miscellaneous charges and fees denominated in Mexican pesos, (ii) fund CDM's payroll, and (iii) contribute to another of the CDM Investment Accounts. Prior to the Petition Date, the CDM Operating Accounts were funded from customer receipts.

h.    <u>CDM Investment Accounts</u>:  CDM maintains two short-term investment accounts, one with HSBC ("<u>Investment Account 1</u>")[17] and the other with Monex ("<u>Investment Account 2</u>,"[18] and together with Investment Account 1, the "<u>CDM Investment Accounts</u>").

(1)    Investment Account 1 is funded from the CDM Concentration Account and provides funds for the CDM MXP Operating Account. Investment Account 1 is not invested in securities and earns interest similar to a savings account.  Funds from Investment Account 1 are returned to the CDM Concentration Account as needed to fund CDM's operations.

(2)    Investment Account 2 is funded from the CDM Operating Accounts and provides funds to the Investment Disbursement Account.  Investment Account 2 is not invested in securities and earns interest similar to a savings account.  This account also provides the added service to CDM of issuing payments to vendors who receive payments in a denomination other than U.S. dollars or Mexican pesos.

---

[15] Account No. XXXXXXXX2970 and Account No. XXXXXXXX1166.

[16] Account No.  XXXXXXXX3418.

[17] Account no. XXXXXXXX675.

[18] Account no. XXXXXXXX3418.

- 30 -

85.     In addition, the Debtors customarily transfer funds among the various Debtor entities, including the Mexican Debtors, in the ordinary course of business (the "Intercompany Transfers").  The Debtors account for each Intercompany Transfer with intercompany debts that are recorded as bookkeeping entries.  The Debtors' customary cross-border Intercompany Transfers to the Mexican Debtors are set forth below in greater detail:

a.   WWD makes Intercompany Transfers to EDEMSA, in the ordinary course of business, to enable EDEMSA to continue its operations.  EDEMSA operates the Debtors' largest repair facility serving customers in the United States and is critical to the Debtors' continuing operations and their successful restructuring.  EDEMSA depends on the other Debtors for funding to continue its operations and is funded on an as-needed basis in the ordinary course of business.

b.   Contec U.S. and WWD routinely transact business with CDM in connection with the purchase and sale of products and production inputs.  Although CDM generates its own revenues and typically does not require funding from the other Debtors for its operations, it is critical that Contec U.S. and WWD be authorized to continue to make Intercompany Transfers to CDM, if necessary, to avoid disruption in the Debtors' operations.  All Intercompany Transfers between CDM and WWD or Contec U.S. are settled in cash.

86.     In the Cash Management Motion, the Debtors seek authority, but not direction, to continue making ordinary course Intercompany Transfers between the various Debtors, including the Mexican Debtors.  Further, the Debtors request that the Court grant any intercompany claims arising from postpetition Intercompany Transfers administrative priority status under sections 507(a)(2) and 503(b) of the Bankruptcy Code.

87.     Given the Debtors' use of a centralized Cash Management System, the Intercompany Transfers among the Debtors are a necessary aspect of the Debtors' operations.  Absent the ability to continue the Intercompany Transfers, the Debtors would be unable to meet their obligations as they come due, to the detriment of all Debtors, their estates, and their stakeholders.

88.     I have been advised that, to supervise the administration of chapter 11 cases, the

- 31 -

U.S. Trustee has established certain operating guidelines for debtors in possession.  Those guidelines, among other things, require chapter 11 debtors to immediately:  (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes, and (iii) maintain a separate debtor in possession account for cash collateral.

89.    The Debtors seek a waiver of the requirements that they close the Bank Accounts and open new postpetition bank accounts.  Pursuant to the Prepackaged Plan, the Debtors intend to emerge from bankruptcy in less than two months.  I believe that, if enforced in these prepackaged Chapter 11 Cases, the guideline requirements would disrupt the Debtors' business, causing delays in payments to vendors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates. As described above, the Bank Accounts are central to the Debtors' Cash Management System, which the Debtors need to maintain to ensure smooth collections and disbursements in the ordinary course of business.  I belief that disrupting the Cash Management System would serve no legitimate or rehabilitative purpose and would be destructive to the Debtors' value as a going concern.

90.    The Debtors request the authority to continue to use the Bank Accounts with the same account numbers, styles, and business forms as the Debtors used prepetition.  The Debtors also seek authority to open new accounts whenever needed, provided that the Debtors give the U.S. Trustee adequate notice of such newly-opened accounts.  The Debtors represent that, if the relief requested in this Motion is granted, they will not pay, and will direct each of the Banks not to pay,[19] any debts incurred before the Petition Date, other than as authorized by this Court.[20]

---

[19] The Debtors' Banks located in Mexico are subject to Mexican law.  I have been advised that in certain instances the Debtors may be, under Mexican law, unable to direct a Mexican Bank to stop payment on a prepetition check. The Debtors have endeavored to manage their accounts in Mexico prepetition to avoid a circumstance where a prepetition check drawn on a Mexican Bank will be outstanding on the Petition Date.   Further, the Debtors have

28279571_18
#16630321 v1

91.    In connection with continuing the use of the Bank Accounts, the Debtors request

the authority to pay prepetition Bank fees and charges to the extent of the amount of the Debtors'

cash held by such Bank.  I have been advised that each Bank may have setoff rights with respect

to any of the Debtors' cash it holds and could request authority from this Court to exercise those

setoff rights.  The Debtors seek authority to pay the prepetition Bank fees and charges to the

extent the Debtors determine, in their good faith business judgment, that the Banks have valid

setoff claims pursuant to Section 553 of the Bankruptcy Code (but only to the extent of such

claims).  I believe that this relief will save the Debtors the time and expense of responding to

such Bank requests and/or negotiating to allow the Banks to exercise setoff rights.  The Debtors

further submit that such relief requested would not prejudice the interests of any other creditors

or other parties-in-interest.

92.    Further, I believe that authorization to continue ordinary course Intercompany

Transfers among the Debtors, particularly to EDEMSA, is critical to the Debtors' reorganization,

and is in the best interests of the Debtors and their estates.  The funds provided to EDEMSA are

used by EDEMSA to satisfy numerous ordinary course obligations necessary to operate the

Matamoros repair facility, including building lease rent, utilities expenses, local taxes, material

and equipment related to operations and support,[21] and miscellaneous items such as food and

supplies for EDEMSA's cafeteria.

93.    EDEMSA keeps limited funds on hand, and it is funded on an as-needed basis

when obligations arise.  If the Debtors do not receive authorization to continue making

---

sought relief in various motions to pay the limited types of prepetition claims that are typically paid using Mexican Banks.

[20] The Debtors have sought authority to pay certain of their prepetition obligations in various motions filed contemporaneously herewith.

[21] While most parts and equipment for the Matamoros facility are sourced by the Debtors, EDEMSA does source some materials and equipment directly.

Intercompany Transfers to EDEMSA, the Debtors may be forced to abruptly halt operations at the Matamoros, Mexico, facility. Such a disruption in operations would cause immediate, severe, and irreparable harm to the Debtors' business and operations and would likely force the Debtors into liquidation.

94.    As noted above, the Debtors account for Intercompany Transfers by establishing intercompany debts through bookkeeping entries, and the Debtors will continue such practice during these Chapter 11 Cases. This will enable all parties in interest to trace the flow of funds among the Debtors and will ensure that no creditors of any Debtor are harmed by the Intercompany transfers.

95.    The Debtors should be granted further relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, I have been advised that the U.S. Trustee operating guidelines require that all receipts and disbursements of the estates funds occur by check with a notation representing the reason for the disbursement.

96.    I submit that the complexity of the Debtors' operations requires the Debtors to conduct transactions by debit, wire, and other similar methods. I believe that preventing the Debtors from conducting transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

97.    I submit that the Debtors' Cash Management System constitutes a customary and essential business practice and is similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to all of the Debtors, including the ability to control corporate funds centrally and to ensure the availability of funds to all of the

- 34 -

Debtors as necessary.

98.    I believe that compelling the Debtors to adopt a new cash management system would be expensive and create unnecessary administrative problems, impeding the Debtors' ability to reorganize.  Consequently, I believe that the Debtors' ability to continue using its Cash Management System is essential and is in the best interests of all the Debtors, their estates, and their stakeholders.

99.    To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.

100.    I have been advised that Local Rule 2015-2(a) already permits the Debtors to, subject to Court approval, continue to use their existing Business Forms without imprinting "DIP" or "Debtor in Possession" thereon until such forms run out.  The Debtors seek the further authority to, as needed, re-order new Business Forms without such legends during their Chapter 11 Cases.  I believe that changing Business Forms in the middle of the prepackaged Chapter 11 Cases would be needlessly expensive and burdensome to the Debtors' estates and disruptive to their business operations.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors' provision of notice of the commencement of these chapter 11 cases, the press releases issued by the Debtors, and information circulating within the Debtors' industry.  Further, the Debtors anticipate that they will emerge from chapter 11 shortly, at which point Business Forms with "DIP" imprinted on them would need to be discarded.  Accordingly, I believe that adding the required legend would

- 35 -

have little practical effect and is inappropriate under the circumstances.

101.    I have been advised that section 345(b) of the Bankruptcy Code requires that any deposit or other investment made by a debtor, except those (a) insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or (b) backed by the full faith and credit of the United States, be secured by either (i) a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee for the relevant district or (ii) the deposit of securities of the kind specified in 31 U.S.C. § 9303.

102.    I believe that any funds held in the Bank Accounts in excess of the amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds is unnecessary in light of the facts and circumstances of these Chapter 11 Cases.  Specifically, I submit that (i) the vast majority of the Banks are highly rated, federally-chartered, and subject to supervision by federal banking regulators; (ii) the Debtors retain the right to remove funds held at the Banks and establish new bank accounts as needed; (iii) the cost associated with satisfying the requirements of section 345 would be burdensome; and (iv) the Debtors will likely be out of bankruptcy within 60 days.

103.    During the extension period, I submit that the Debtors will continue to engage the U.S. Trustee in discussions over what modifications to their current practices, if any, would be appropriate under the circumstances, should the Debtors remain in chapter 11 longer than expected.  I believe that the benefits of the requested extension far outweigh any harm to the estates.

104.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Cash

Management Motion.

> **viii.    Motion of the Debtors for an Order Authorizing, But Not Directing, the Debtors to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business (the "<u>All Trade Motion</u>")**

105.    The Debtors are requesting authority, but not direction, to pay all fixed,

liquidated, noncontingent, and undisputed prepetition claims of General Unsecured Creditors (as

defined in the Prepackaged Plan) in the ordinary course of business, to the extent that such

authorization is not requested in the Debtors' other first day motions filed in these Chapter 11

Cases (the "<u>Payable Claims</u>").

106.    The Debtors are further requesting authority to condition the payment of a

Payable Claim on the agreement of each recipient of such payment (the "<u>Affected Supplier</u>") to

continue supplying goods and/or services to the Debtors (a) on terms that are at least as favorable

to the Debtors as the most favorable trade terms in effect between such supplier and the Debtors

in the twelve months before the Petition Date or (b) such other trade terms as are agreed to by the

Debtors and such Affected Supplier.

107.    To implement the relief requested, the Debtors are further requesting that all

banks and other financial institutions on which checks were drawn or electronic payment

requests were made in connection with the amounts described herein be authorized and directed

to (i) receive, process, honor, and pay all such checks and electronic payment requests when

presented for payment (assuming the availability of sufficient funds) and (ii) rely on the Debtors'

designation of any particular check or electronic payment request in respect of the relief

- 37 -

requested herein.   The Debtors also seek authorization to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment where such method of payment has been dishonored postpetition.

108.     In the ordinary course of business, the Debtors incur numerous obligations to suppliers that provide, among other things, replacement parts, utility services, equipment, packaging, information technology services, employee benefits and other goods and services necessary for the operation of the Debtors' business.  The Debtors estimate that, as of the Petition Date, they owe a total of approximately $11 million on account of General Unsecured Claims (as defined in the Prepackaged Plan).

109.     The Debtors estimate that payment of approximately 70% of the General Unsecured Claims are covered by the Debtors' other first-day pleadings.  The remaining 30% of the General Unsecured Claims represents the Payable Claims.

110.     I am advised that some of the Payable Claims may be entitled to administrative priority treatment because, among other reasons, they were incurred as a result of the shipment of goods received by the Debtors within the twenty days prior to the Petition Date.

111.     Although a portion of the Payable Claims are not entitled to administrative priority treatment, they are nonetheless a critical component of the Debtors' business and are unimpaired under the Prepackaged Plan.  These General Unsecured Claims include claims of vendors that are needed by the Debtors to repair cable box units, such as replacement parts suppliers, packing suppliers, equipment suppliers, shipping service providers, and equipment repair providers.

112.     In light of the overwhelming support of the Prepackaged Plan, the Debtors seek authority to pay the General Unsecured Creditors, in the ordinary course of business, amounts

- 38 -

that they would otherwise be entitled to receive upon consummation of the Prepackaged Plan.

113.    I believe that the relief requested in the All Trade Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the All Trade Motion.

> **ix.    Motion of the Debtors for an Order Authorizing, But Not Directing, the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business (the "Customer Programs Motion")**

114.    By the Customer Programs Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their good faith business judgment, to (a) perform prepetition obligations related to the Customer Programs, as the Debtors deem appropriate and (b) continue, renew, implement, and/or modify the Customer Programs in the ordinary course of business, as the Debtors deem appropriate, without further application to this Court.

115.    To assist in implementing the relief requested, the Debtors further request that their banks be authorized to honor:  (a) prepetition checks or electronic transfers and (b) all other checks or electronic transfers issued for payments approved by this Motion, regardless of whether such checks or electronic transfers were drawn prior to or after the Petition Date.  The Debtors also seek authorization to reissue prepetition checks or wires for payments approved by this Motion that are dishonored notwithstanding the foregoing authorizations. The Debtors request that all such banks be authorized and directed to rely on the Debtors' designation of any particular check or electronic transfer as approved pursuant to this Motion.

116.    Although the Debtors seek the authority to make the requested payments, they do not believe the Court should direct them to pay any specific claim.  Additionally,

28279571_18
#16630321 v1

notwithstanding anything in this Motion to the contrary, the payment of any claims pursuant to

the Order (if entered by this Court) shall not (a) make such obligations administrative expenses

of the estates entitled to priority status under sections 503 and 507 of the Bankruptcy Code, or

(b) constitute the assumption or assignment of any contract under section 365 of the Bankruptcy

Code.

117.    The Debtors' customer base is primarily comprised of two types of customers:

(a) multiple system operators (the "MSO Customers"), which include cable television

companies and other pay-tv providers; and (b) original equipment manufacturers (the "OEM

Customers" and together with the MSO Customers, the "Customers"), *i.e.*, the companies that

manufacture cable set-top boxes, modems, and other consumer electronics.  In the ordinary

course of business, the Debtors engaged in certain practices to maintain and strengthen positive

relationships with their customers.  Such practices include royalty programs, warranty programs

and customer incentives and setoffs/payments for the Customers (collectively, the "Customer

Programs").  The goal of the Customer Programs is to meet competitive pressures, ensure

customer satisfaction, and generate valuable goodwill for the Debtors.

118.    In the ordinary course of business, the Customers send consumer equipment (most

commonly cable television set-top boxes) to the Debtors, and the Debtors repair and return the

equipment to the Customers.  In some cases, the equipment is covered by an OEM Customer's

warranty program, and the Debtors receive payment from such OEM Customers for the cost of

in-warranty repairs.  The Debtors generate a majority of their revenues from providing repair

and related services to Customers, whether in-warranty (with OEM Customers) or out-of-

warranty (with MSO Customers).

119.    The Debtors provide warranty programs to the Customers that cover various

- 40 -

aspects of the repairs that the Debtors make (the "Warranties," and the Debtors' obligations with respect thereto, the "Warranty Obligations").  The time period and scope of the Warranties are specific to each customer.  The Debtors typically incur Warranty Obligations when an end-user returns a repaired product to a Customer within a specified timeframe after the initial repair work was completed.  The Customer then returns the repaired product to the Debtors, at which point the Debtors satisfy their Warranty Obligations by again repairing the defective product and shipping it back to the Customer at no additional charge.

120.    I have been advised that from an accounting perspective, the Debtors recognize anticipated warranty costs for repaired consumer equipment monthly.  The warranty accrual is based on management's estimate of the dollar amount that eventually will be required to settle the Warranty Obligations.  During the period January 1, 2012 through July 28, 2012, the Debtors incurred $507,000 of Warranty Obligations.  I have been advised that as of the Petition Date, the Debtors estimate their accrued balance for aggregate Warranty Obligations to be approximately $444,000.[22]

121.    The Debtors provide licensed repair services for the OEM Customers for consumer equipment covered under the OEM Customers' warranties.  The Debtors periodically offer certain incentives (collectively, the "Customer Incentives") to encourage the OEM Customers to continue using the Debtors as a preferred license repair service provider.  Although the Customer Incentives are specific to each OEM Customer, they typically include (but are not limited to) rebates and volume discounts which may be paid in cash or issued in the form of credits against OEM Customer invoices.  I have been advised that as of the Petition Date, the Debtors estimate the amount of the Customer Incentives to be approximately

---

[22]  This amount reflects an estimate of the Debtors' likely exposure under Warranties for consumer equipment repaired on or prior to the Petition Date.  It does not reflect the Debtors' maximum potential liability under such Warranties, which could be significantly larger.

28279571_18
#16630321 v1

$600,000.

122.    Certain OEM Customers also supply certain equipment and parts for electronic devices that the Debtors use as inventory for both warranty and non-warranty repairs.  The Debtors also pay certain royalties to certain OEM Customers based on the number of set-top boxes repaired.  Therefore, such OEM Customers may, at times, also be creditors of the Debtors.  In the ordinary course of business, the Debtors may settle amounts owed to certain OEM Customers by paying for the parts in cash (the "Cash Settlements") or by permitting certain OEM Customers to set off amounts owed by the Debtors to such OEM Customers against the amounts owed by such OEM Customers to the Debtors (the "Customer Setoffs").  Both the Cash Settlements and Customer Setoffs permit the Debtors to secure parts, equipment, and services essential to their repair business on favorable payment terms while maintaining good customer relationships.  I have been advised that as of the Petition Date, the Debtors estimate the aggregate amount of potential Customer Setoffs and unpaid Cash Settlements to be approximately $2.4 million.

123.    I have been advised that the Debtors seek to honor and continue the Customer Programs because such programs have been successful in the past and are directly responsible for generating goodwill and increased revenue, margins, and profitability for the Debtors.  I have been advised that in some cases Customer Programs also represent an effective means to help secure the Debtors' market share.  I have been further advised that the Debtors believe that maintaining these benefits throughout their Chapter 11 Cases is essential to the continued operation of their business and, ultimately, to their prospects for a successful reorganization.

124.    I believe that the relief requested by this Motion is essential to mitigate any negative attitudes Customers may have regarding the Debtors' commencement of these Chapter

11 Cases and to limit any negative effect thereof on their Customers' behavior.  I have been advised, in particular, that the Debtors' goodwill and ongoing business relationships are likely to suffer if their Customers perceive that the Debtors are unable or unwilling to fulfill the prepetition promises made through the Customer Programs − particularly those relating to Warranties and Customer Incentives.  I have been further advised that the same would be true if Customers believe the Debtors will no longer offer the full package of services and benefits that Customers expect and demand.

125.    I have been advised that the Debtors believe the Customer Programs benefit customer development and retention, solidify customer relationships, and bolster use of the Debtors' repair services.  I have been further advised that the market for consumer equipment repairs is highly competitive, and potential customers will be less likely to use the Debtors' services if there are interruptions in the Customer Programs.  I believe that without the continued support of their customers, the Debtors' business would suffer significant harm.

126.    I have been advised that unless the customer obligations relating to the Customer Programs are satisfied, the Debtors' goodwill and going concern value will suffer severe harm.  I have been further advised that the MSO Customers and OEM Customers are both critical to the Debtors' business and are under, in many instances no obligation to continue doing business with the Debtors.  Accordingly, I believe that such obligations should be entitled to postpetition payment.  I have been advised that maintaining the Debtors' revenue streams will be crucial to the Debtors' ability to reorganize and produce long term success and profitability for the benefit of all their constituencies.  I have been further advised that the damage to the Debtors' prospects for rehabilitation if the Debtors failed to honor the Customer Programs is disproportionate to the relatively small cost of maintaining the Customer Programs.

127.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.  Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Customer Programs Motion.

> **x.    Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, and Other Obligations and (B) Pay Related Costs and Expenses, and (II) Authorizing and Directing the Debtors' Banks and Other Financial Institutions to Process and Honor Checks and Transfers Related to Such Obligations (the "Wage Motion")**

128.    By the Wage Motion, the Debtors request authority to pay all obligations to the Employee Benefits, including (i) all prepetition wages, salaries, and other accrued compensation to employees; (ii) all reimbursable prepetition employee business expenses; (iii) all payments for which prepetition payroll deductions, withholdings or matching employer contributions were made; (iv) all contributions to prepetition employee benefit programs (v) all vacation and other paid leave benefits; (vi) all workers' compensation program obligations; and (vii) all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.

129.    I have been advised that the Debtors participate in numerous compensation, business expense reimbursement, and benefits programs on behalf of their Employees.

130.    I have been advised that, as of July 28, 2012, the Debtors directly employed 177 employees in the United States and 2,134 employees in Mexico, that  72% of the Debtors' employees are union employees and 28% are non-union employees, and that  61% of the U.S. Debtors' employees were hourly employees and 39% were salaried employees.  All Mexican

- 44 -

employees are compensated on a *per diem* basis. I have further been advised that approximately 1,668 of the Mexican Employees are unionized, and that their compensation and benefits are governed pursuant to collective bargaining agreements and applicable law. In addition, the Debtors also retain the services of approximately 80 contractors that are arranged through Contract Personnel Suppliers.

131. I have further been advised that the Debtors' average aggregate monthly compensation to Employees for wages and salaries is approximately $2.3 million, inclusive of certain deductions. The Debtors' payroll is funded through direct deposit and check. In the United States, Hourly Employees are paid either weekly or bi-weekly, five days in arrears, and Salaried Employees are paid bi-weekly, also five days in arrears, through ADP. Payroll for U.S. Employees is funded from certain accounts, held with BofA in the amount due to U.S. Employees for the applicable pay period one day before the U.S. Employees are paid, and ADP debits such account. Checks and automatic direct deposits are subsequently issued by ADP to the applicable U.S. Employees on the date that such compensation is due.

132. I have further been advised that EDEMSA's hourly Employees are paid weekly, five days in arrears; EDEMSA's salaried Employees are paid bi-weekly, five days in arrears. EDEMSA pre-funds an account held with Banorte in the amount due to its Employees for the applicable pay period on the day prior to the date compensation is due. Banorte subsequently funds such Employees' accounts via electronic transfer the following day. Union Employees at CDM are paid weekly, and non-union Employees employed by CDM are paid bi-weekly, both five days in arrears. CDM pre-funds an account held with HSBC in the amount due to its Employees for the applicable pay period on the day prior to the date compensation is due to its

28279571_18
#16630321 v1

Employees.    HSBC subsequently funds such Mexican Employees' accounts via electronic transfer the following day.

133.    I have been advised that, because they are paid in arrears, certain Employees have not received wages for time worked prior to the Petition Date.  I have been advised that the Debtors estimate that the aggregate amount of unpaid Wages and Salaries as of the Petition Date is approximately $687,000.

134.    I have been advised that the Debtors employ a Sales Staff of approximately 18 Employees to cultivate new business opportunities and enhance services to existing customers. As is typical for employees engaged in sales functions, including those in the Debtors' industry, the Sales Staff receives Commissions in addition to their salaries under a sales incentive program. Commissions are generally paid in arrears on a quarterly basis at the end of each fiscal quarter.

135.    I have been advised that, in 2011, the Debtors paid approximately $415,000 in Commissions on over $100 million dollars of sales generated by the Sales Staff.  I believe that failure to pay the Commissions would jeopardize the Debtors' ability to retain the Sales Staff, which would impair the Debtors' ability to generate revenue in the future, as the Sales Staff service customers that generate nearly all of the Debtors' revenue.

136.    I have been advised that, as of July 31, 2012, the Debtors estimate that approximately $47,000 in prepetition Commissions have accrued but remain unpaid.  I have further been advised that, as of July 31, 2012, the Debtors estimate that the aggregate amount of Unpaid Employee Compensation is approximately $734,000.

137.    I have been advised that, in the ordinary course of business, the Debtors reimburse Employees for certain business travel and office supply expenses incurred in the scope

of their employment on the Debtors' behalf, and that, as of the Petition Date, the Debtors estimate that there remains approximately $110,000 in unpaid Reimbursable Expenses.

138.    I have been advised that, during each applicable pay period, the U.S. Debtors routinely deduct certain amounts from their Employees' paychecks, including, without limitation: (i) garnishments for child support and similar deductions required by law; (ii) pre-tax contributions to flexible health spending accounts; (iii) pre-tax contributions to health, dental, and vision plans, and (iv) other pre-tax and after-tax deductions payable pursuant to certain benefit plans discussed herein and other miscellaneous deductions.  I have been advised that these deductions total approximately $86,000 in the aggregate per month.

139.    I have been advised that the U.S. Debtors also are required by law to (i) withhold from U.S. Employees' wages amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities and (ii) make correlated payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance.  I have been advised that, in the aggregate, the U.S. Debtors withhold and pay approximately $269,000 per month on account of U.S. Payroll Taxes.

140.    I have further been advised that EDEMSA also routinely deducts certain from amounts its Employees, including, without limitation, (i) garnishments for child support and similar deductions required by law; (ii) deductions on account of government-administered housing programs (for participating Employees); (iii) deductions on account of two different government funds that provides EDEMSA Employees access to furniture credits to certain furniture stores; and (iv) union dues for its unionized Employees.  I have further been advised that the Mexican Debtors are also required by law to (i) withhold from Mexican Employees'

28279571_18
#16630321 v1

wages amounts related to, among other things, federal, state, and local income taxes, and social security taxes for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for social security taxes.

141.    I have been advised that the Debtors estimate that, as of the petition date, approximately $190,000 in Deductions and Payroll Taxes are outstanding with respect to Unpaid Employee Compensation.

142.    I have been advised that the Debtors offer or provide a variety of Employee Benefits to their Employees.  I believe that, as of the Petition Date, the total amount owed or accrued in connection with Employee Benefits is approximately $3,800,000, for an average of approximately $1,650 per Employee.

143.    I have been advised that the U.S. Debtors offer insurance coverage for healthcare and prescription drugs (and certain other related benefits), flexible spending accounts, and a medical deductible reimbursement program to their eligible Employees (and their dependents), and, in certain instances, have funding obligations to former employees related thereto pursuant to applicable law.  I believe that the aggregate amount due and owing on account of the U.S. Medical Benefits as of the Petition Date is approximately $22,100.

144.    I have been advised that the U.S. Debtors provide health coverage to their Employees on a partially-insured basis through a plan offered by Blue Shield and J&F.  The U.S. Health Plan is funded, in part, by the U.S. Debtors and, in part, through Employees' contributions.  The U.S. Debtors make a monthly premium payment of approximately $100,000 to Blue Shield.  I have further been advised that, because the U.S. Debtors pay the U.S. Health Plan Charges at the beginning of each month, there are currently no outstanding amounts.

28279571_18
#16630321 v1

145.    I have been advised that the U.S. Debtors offer health care flexible spending accounts.  The FSA Program is administered by J&F in exchange for a monthly administrative fee of approximately $250.   Approximately 22 U.S. Employees and Former Employees are enrolled in the FSA Program.  The FSA Program allows U.S. Employees, through pre-tax payroll Deductions, to contribute up to $2,500 per year for eligible out-of-pocket medical, dental, or vision expenses.  The U.S. Debtors hold funds contributed by Employees and Former Employees under the Flexible Spending Program in trust for the benefit of such Employees.  I have been advised that, as of the Petition Date, the FSA Contributed Funds amounted to approximately $7,900.  I have further been advised that, as of the Petition Date, the U.S. Debtors estimate that approximately $500 in accrued but unpaid administrative fees are due to J&F on account of the FSA Program.

146.    I have been advised that Former Employees are entitled to continue to participate in the U.S. Health Plan and the FSA Program pursuant to the COBRA.  As of the Petition Date, the Debtors estimate that approximately five Former Employees either have elected or are eligible for COBRA Coverage.   In addition, Former Employees may elect COBRA Coverage for the FSA Program until the end of the plan year in which they were terminated.  I have been advised that failure to comply with COBRA can subject the U.S. Debtors to civil penalties of up to $100 per day per qualified beneficiary (with a minimum penalty of $15,000 for more than *de minimis* violations), excise tax penalties of up to $100 per day per qualified beneficiary, actions by the Department of Labor and Internal Revenue Service, and civil lawsuits brought by the Former Employees to recover their benefits.

147.    I have been advised that the U.S. Debtors also offer their Employees a healthcare Deductible Reimbursement Program, and that, as of the Petition Date, approximately two-thirds

- 49 -

of the U.S. Employees were enrolled in the Deductible Reimbursement Program.  I have been advised that the Deductible Reimbursement Program is administered by J&F in exchange for a monthly administrative fee of approximately $500 and that the U.S. Debtors reimburse approximately $3,000 of deductibles per month on account of the Deductible Reimbursement Program.  I have been advised that the U.S. Debtors estimate that approximately $3,000 in obligations to U.S. Employees remain outstanding under the Deductible Reimbursement Program and that the U.S. Debtors estimate that approximately $500 in accrued but unpaid administrative fees are due to J&F on account of the Deductible Reimbursement Program.

148.   I have been advised that the U.S. Debtors provide U.S. Employees with a U.S. Dental Plan, administered by Delta Dental Insurance Company.  The U.S. Dental Plan provides approximately 114 participating U.S. Employees with coverage for various preventive and restorative dental care procedures.  I have been advised that the U.S. Debtors pay Delta Dental a $600 monthly administrative fee and that, as of the Petition Date, the Debtors estimate that they owe approximately $9,000 (inclusive of claim amounts and administrative amounts owed to Delta Dental) on account of the U.S. Dental Plan.

149.   I have further been advised that the U.S. Debtors offer a vision plan through EyeMed Vision, which provides approximately 90 participating U.S. Employees with coverage for various vision-care services.  I have been advised that the U.S. Debtors remit monthly fees and premiums of approximately $1,200 to EyeMed Vision and that, as of the Petition Date, the Debtors estimate that they hold approximately $1,200 in payroll deductions on account of the U.S. Vision Plan.

150.   I have been advised that EDEMSA provides health coverage to its non-union Employees on a partially-insured basis through a plan offered and administered by SMNYL.

28279571_18
#16630321 v1

The EDEMSA Health Plan is fully funded by EDEMSA, which makes a single annual premium and administrative fee payment of approximately 4,915,000 Mexican pesos (approximately $373,077)[23] to SMNYL.  I have further been advised that, because EDEMSA prepays all charges relating to the EDEMSA Health Plan for each calendar year, there were no outstanding amounts owing in respect thereof as of the Petition Date.

151.    I have been advised that EDEMSA provides vision coverage to its Employees. Employees who receive prescription for eyeglasses from such facilities are eligible to receive a voucher of 365 Mexican pesos (approximately $28) which may be used toward a pair of prescription eyeglasses.  I have been advised that, as of the Petition Date, EDEMSA estimates that it owes approximately 15,000 Mexican pesos (approximately $1,129) on account of the EDEMSA vision Plan.

152.    I have been advised that the U.S. Debtors provide most U.S. Employees with paid time-off benefits (including vacation time, sick days, holidays, personal time, jury duty, and bereavement) based on the Employee's job title and length of employment.    All U.S. Employees are entitled to a cash payout for accrued and unused vacation days upon termination of employment with the U.S. Debtors.  I have been advised that, as of July 31, 2012, the U.S. Debtors estimate that accrued but unpaid U.S. Leave Benefits that are potentially convertible into cash payment obligations in the event of employment termination are approximately $718,000.

153.    I have further been advised that the Mexican Debtors also provide some form of paid leave in connection with vacation time, sick days, holidays, marriage, and bereavement. Mexican Employees are typically paid for accrued and unused vacation days on a yearly basis or upon termination of employment with the Mexican Debtors.

---

[23] All U.S. Dollar amount approximations were calculated as of August 24, 2012 using Google.com, with rates provided by Citibank, NA.

28279571_18
#16630321 v1

154.    I have been advised that all Mexican Employees are eligible to receive additional paid time off and compensation in connection with their marriages and funerals of a nuclear family member.   Pursuant to their collective bargaining agreement, EDEMSA's union Employees receive three days off with pay, at their base compensation, plus 800 Mexican pesos (approximately $61) when they marry.   EDEMSA's union Employees also receive three days off with pay, at their base compensation, plus 1,000 Mexican pesos (approximately $76) upon the death of a nuclear family member, also pursuant to their collective bargaining agreement. EDEMSA's non-union Employees receive five days off with pay, at their base compensation, plus 1,575 Mexican pesos (approximately $120) when they marry.   EDEMSA's non-union Employees also receive four days off with pay, at their base compensation, plus 1,500 Mexican pesos (approximately $114) upon the death of a nuclear family member.   CDM's Employees (both union and non-union) receive two days of paid leave in connection with their marriage or the death of a nuclear family member.   The Mexican Debtors collectively disburse approximately 34,000 Mexican pesos (approximately $2,581) per month on account of the Funeral and Marriage Benefits.   I have been advised that, as of the Petition Date, the estimated aggregate amount owed to Employees on account of the Funeral and Marriage Benefits is approximately 12,000 Mexican pesos (approximately $911).

155.    I have been advised that the Mexican Debtors provide benefits pursuant to a statutorily-mandated Severance Program for involuntarily terminated, non-management Employees, under which eligible Mexican Employees are paid three months of their base salary in a single payment upon termination, regardless of seniority.   I have further been advised that Mexican Employees who resign their employment on a voluntary basis are only entitled to receive their unpaid wages, unused vacation time plus vacation premium (on a prorated basis),

- 52 -

the accrued portion of their Christmas Bonus and the Seniority Premium.  All terminated eligible Mexican Employees also receive payment on account of their unused vacation and the vacation premium upon termination, on a prorated basis.  I have been advised that the Mexican Debtors paid 12,405,000 Mexican pesos (approximately $941,613) on account of the Severance Program in 2011 and that, as of July 31, 2012, the Mexican Debtors estimate they have 27,400,000 Mexican pesos (approximately $2,079,822) of accrued exposure under the Severance Program.

156.    I have been advised that all Mexican Employees in good standing receive a statutorily-mandated yearly Christmas bonus tied to an employee's seniority.

157.    I have been advised that, with the exception of accrued vacation payouts for Mexican Employees, the remainder of the Mexican Leave Benefits are ultimately satisfied in the ordinary course of business through salary and payroll continuation, and that, as of July 31, 2012, the Mexican Debtors estimate that accrued but unpaid Mexican Leave Benefits that are potentially convertible into cash payment obligations in the event of employment termination total approximately 38,500,000 Mexican pesos (approximately $2,922,377).

158.    I have been advised that the U.S. Debtors maintain a 401(k) plan for the benefit of certain eligible U.S. Employees through The Hartford that generally allows participants to make automatic pre-tax salary Deductions of eligible compensation up to the limits set by the Internal Revenue Code.  The U.S. Debtors match 25% of U.S. Employees' contributions, up to 7% of their base salary.  I have been advised that, as of the Petition Date, approximately 100 active U.S. Employees participate in the 401(k) plan, and that the Debtors estimate the amount of accrued but unpaid administrative fees associated with the 401(k) plan is approximately $2,000.

159.    I have been advised that the Mexican Debtors provide a federally-mandated retirement plan for all Mexican Employees that generally allows participants to make automatic

28279571_18
#16630321 v1

pre-tax salary Deductions of eligible compensation.  I have been advised that approximately 1,800 EDEMSA Employees and approximately 300 CDM Employees participate in the Afore Plan and that, as of the Petition Date, there were no amounts due from the Mexican Debtors for unpaid administrative fees associated with the Afore Plan.

160.    I have been advised that the U.S. Debtors provide basic life insurance and accidental death and dismemberment coverage through Hartford to eligible U.S. Employees.  As of the Petition Date, approximately 155 U.S. Employees were receiving Life and AD&D Insurance Coverage.  The U.S. Debtors pay 100% of the related premiums which cost the U.S. Debtors approximately $2,800 per month.  I have been advised that, as of the Petition Date, the aggregate amount owed on account of the Life and AD&D Insurance Coverage is approximately $5,200.

161.    I have been advised that the U.S. Debtors provide both short-term and long-term disability coverage through Hartford to eligible U.S. Employees.   The Short Term Coverage replaces 60% of wages paid, up to a maximum of $1,250 per week and the Long Term Coverage replaces 60% of monthly salary, up to a maximum of $5,000 per insured per month.  I have been advised that, although the Disability Coverage premiums are fully-funded by participating U.S. Employees, the U.S. Debtors collect such premiums from participating U.S. Employees through regular payroll deductions and hold them in trust on the U.S. Employees' behalf.  The U.S. Debtors subsequently remit such fees and premiums to Hartford at the beginning of each month.

162.    I have been advised that EDEMSA provides basic life insurance coverage with a death benefit equal to eighteen months (in cases of natural death) or thirty-six months worth of base compensation to its eligible non-union Employees through SMNYL.  As of the Petition Date, substantially all of EDEMSA's employees received the Life Insurance Coverage.

- 54 -

EDEMSA pays 100% of the premiums for the Life Insurance Coverage, which costs approximately 100 Mexican pesos (approximately $8) per year per Employee, to SMNYL.  I have further been advised that, because EDEMSA prepays the Life Insurance Coverage premiums for each calendar year in May, there were no outstanding amounts owing in respect of Life Insurance Coverage as of the Petition Date.

163.    I have been advised that EDEMSA also provides short-term disability coverage to eligible Employees on a self-insured basis.  EDEMSA compensates an eligible union Employee at 50% of his or her base compensation for the first three days of such Employee's certified disability.  EDEMSA's eligible non-union Employees are compensated at 60% of his or her base compensation for the first three days of such Employee's certified disability.  I have further been advised that EDEMSA typically disburses approximately 29,000 Mexican pesos (approximately $2,201) per month on account of the EDEMSA Disability Coverage and that, as of the Petition Date, the aggregate amount owed to Employees on account of the EDEMSA Disability Coverage is approximately 10,500 Mexican pesos (approximately $797).  The Debtors seek authority to continue the EDEMSA Disability Coverage in the ordinary course.

164.    I have been advised that EDEMSA's Employees are entitled to participate in a statutorily-mandated profit-sharing program tied to their level of seniority and the number of days worked during the calendar year.  I have further been advised that, in 2011, EDEMSA disbursed approximately 3,305,000 Mexican pesos (approximately $250,869) to its Employees on account of the Profit Sharing Program in May 2012 and that, as of the Petition Date, there were no amounts due under the Profit Sharing Program.

165.    I have been advised that EDEMSA's non-union Employees are eligible to contribute to an employee savings fund, whereby EDEMSA matches 100% of an Employee's

28279571_18
#16630321 v1

contribution, up to five percent of an Employee's base compensation.  EDEMSA contributes approximately 3,022,000 Mexican pesos (approximately $229,388) per year to the Employee Savings Fund.  I have further been advised that, as of the Petition Date, EDEMSA estimates that it owes approximately 77,800 Mexican pesos (approximately $5,905) to the Employee Savings Fund on connection with its employer match obligation.

166.    I have been advised that EDEMSA's unionized Employees receive a transportation allowance of 14 Mexican pesos (approximately $1) per working day.  EDEMSA disburses approximately 350,000 Mexican pesos (approximately $26,567) per month on account of the Transportation Allowance Program.  I have further been advised that, as of the Petition Date, EDEMSA estimates that it has accrued but not yet paid 132,000 Mexican pesos (approximately $10,020) on account of the Transportation Allowance Program.

167.    I have been advised that, pursuant to their respective collective bargaining agreements, unionized Mexican Employees are eligible to receive a punctuality and attendance bonus equal to five percent of their base salaries if they work at least 48 hours in a given week.  I have further been advised that the Mexican Debtors disburse approximately 231,000 Mexican pesos (approximately $17,534) per month on account of the Punctuality and Attendance Bonus and that, as of the Petition Date, the Mexican Debtors estimate that they owe approximately 69,600 Mexican pesos (approximately $5,283) to their unionized Employees on account of the Punctuality and Attendance Bonus.

168.    I have been advised that all Mexican Employees receive weekly food vouchers, ranging from 1 Mexican peso (approximately $.08) to $272 Mexican pesos (approximately $21) per week for union Employees and ranging from 172 Mexican pesos (approximately $13) to 436 Mexican pesos (approximately $33) per week for non-union Employees, inversely tied to the

28279571_18
#16630321 v1

amount of income and social security taxes paid by the Mexican Debtors on account of each such Employee's compensation.  I have further been advised that the Mexican Debtors disburse approximately 725,000 Mexican pesos (approximately $55,032) per month on account of the Food Voucher Program and that, as of the Petition Date, the Mexican Debtors estimate that it has accrued approximately 247,300 Mexican pesos (approximately $18,772) in obligations on account of the Food Voucher Program.

169.    I have been advised that unionized EDEMSA Employees are eligible to participate in EDEMSA's tuition scholarship program pursuant to their collective bargaining agreement.    Each year, EDEMSA awards 15 scholarships of 1,000 Mexican pesos (approximately $76) each to Employees based on their academic record at qualifying educational institutions.  I have been advised that, as of the Petition Date, there are no outstanding amounts due under the Tuition Scholarship Program.

170.    I have been advised that unionized EDEMSA Employees receive an annual bonus in January based on the Mexican federal minimum wage commission, and non-unionized EDEMSA Employees receive an annual discretionary bonus in March, based on performance appraisals.  I have been advised that, in 2012, EDEMSA disbursed approximately 2,341,700 Mexican pesos (approximately $177,749) to its Employees on account of the Annual Wage-Adjustment Bonus and that there are no amounts outstanding under the Annual Wage-Adjustment Bonus as of the Petition Date.

171.    I have been advised that New York and Washington require the Debtors to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors and that, although Texas does not require the Debtors to maintain such policies and programs, the U.S.

Debtors provide workers' compensation coverage to Employees based in Texas. I have further been advised that, as of the Petition Date, approximately 138 U.S. Employees were covered under the Zurich Workers' Compensation Program. The U.S. Debtors pay 100% of the annual premium for the Zurich Workers' Compensation Program (approximately $61,992), which was financed through Marsh USA, Inc. Pursuant to the premium financing arrangement, the Debtors paid 25% of the annual premium in January. The remaining nine monthly installments in the amounts of $5,166 per month have been paid in full. I have further been advised that, as of the Petition Date, there were no amounts due under the Workers' Compensation Program.

172.    I have been advised that the U.S. Debtors employ contract personnel provided by certain staffing agencies to perform numerous duties, including, but not limited to, shipping, receiving, and warehousing. The U.S. Debtors generally reimburse the Staffing Agencies on a monthly basis and pay approximately $300,000, on average, to the Staffing Agencies. I have further been advised that the U.S. Debtors estimate that, as of July 31, 2012, approximately $180,000 remains outstanding to Staffing Agencies.

173.    I have been advised that the Debtors use the services of numerous third-party administrators to whom the Debtors outsource tasks associated with the payment of compensation to Employees, including (a) administering or assisting in the administration of the Debtors' payroll processes; (b) facilitating the administration and maintenance of their books and records; and (c) assisting with legal compliance issues. I have further been advised that the aggregate amount of accrued Third-Party Administrative Costs that remains unpaid as of the Petition Date is approximately $5,000.

174.    I believe that it is essential that the Debtors pay all prepetition claims arising from the foregoing compensation, benefits, and administrative obligations and continue to honor all

such obligations in the ordinary course (even where there are no outstanding, prepetition amounts) to ensure the continued operation of the Debtors' business and to maintain the morale of the Employees. I have been advised that, in the ordinary course of their business, the Debtors have met their Employee Obligations in a timely manner. I further believe that any disruption in the ordinary course payment of Employee Obligations would irreparably impair the Debtors' relationship with their Employees and Contract Personnel Suppliers.

175.    I have been advised that, with regard to certain of the foregoing deduction and withholding obligations, the Debtors are required by law to continue honoring those obligations. I believe that if the Debtors do not remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments.

176.    I believe that, absent the requested relief, many Employees may be unable to meet vital personal obligations or be left without medical insurance and other benefits, and thereby suffer significant hardship. This may cause employees to seek alternative employment opportunities (perhaps even with the Debtors' competitors) and cause Staffing Agencies to refuse to provide any future services to the Debtors. I believe that neither the Debtors nor their creditor constituencies can afford to risk a precipitous decline in confidence, retention and cooperation of Employees at this critical time. Failure to pay all prepetition claims arising from the foregoing obligations and failure to continue honoring these obligations in the ordinary course would have a material adverse impact on the Debtors' day-to-day operations, which would, in turn, hinder the Debtors' restructuring.

177.    I therefore believe that the relief requested in the Consolidated Creditors Motion is necessary and appropriate and is in the best interests of the Debtors' estates,

- 59 -

creditors, and other parties in interest.

### xi. Motion of the Debtors for Interim and Final Orders (I) Authorizing, but Not Directing, the Debtors to Pay Prepetition Claims of Foreign Vendors, and (II) Authorizing and Directing the Debtors' Banks and Financial Institutions to Process and Honor Checks and Transfers Related to Such Obligations (the "Foreign Vendors Motion")

178.    By the Foreign Vendors Motion, the Debtors seek entry of the Interim Order and Final Order (i) authorizing, but not directing, the Debtors to pay, in their sole discretion, prepetition claims of certain vendors, service providers, landlords, utilities providers, regulatory agencies, and governments located outside the United States (collectively, the "Foreign Vendors")[24], including claims for goods or materials and services provided to the Debtors, as well as foreign tax obligations related to such claims (collectively, the "Foreign Claims"), and (ii) authorizing and directing the Debtors' banks and financial institutions to process and honor checks and transfers related to such obligations.

179.    In particular, the Debtors request the authority to pay up to $2.3 million in Foreign Claims as set forth below:

|  | Interim Relief Sought | Total Relief Sought |
| --- | --- | --- |
| Foreign Claims | $1.6 million | $2.3 million |

180.    To implement the relief requested, the Debtors further request that all banks and other financial institutions on which checks were drawn or electronic payment requests were made in connection with the amounts described herein be authorized and directed to (i) receive, process, honor, and pay all such checks and electronic payment requests when presented for

---

[24] The Foreign Vendors do not include foreign vendors, service providers, and other non-governmental entities to the extent such entities are known to have operations or assets within the United States that would be subject to the jurisdiction of this Court and that would be available to satisfy a judgment entered by this Court if such entities were to violate the automatic stay or otherwise take any action contrary to an order of this Court or the provisions of the Bankruptcy Code.

payment (assuming the availability of sufficient funds) and (ii) rely on the Debtors' designation of any particular check or electronic payment request in respect of the relief requested herein. The Debtors also seek authorization to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for the amounts described in this Motion where such method of payment has been dishonored postpetition.

181.    As a result of the global nature of their operations and their strong presence in Mexico, the Debtors regularly transact business with suppliers located outside of the United States, primarily in Mexico and Asia.  Annually, the Debtors purchase over $34 million of goods and services from Foreign Vendors, including utility and facility services, power packs, remote controls, and shipping and packing materials.  Many of these Foreign Vendors supply goods or materials to the Debtors that are crucial to their ongoing operations, both in the United States and Mexico.  Moreover, certain of these Foreign Vendors supply goods to the Debtors that cannot be obtained elsewhere (or at least without risk of disruption to the Debtors' operations).

182.    Based on the potentially adverse reactions of Foreign Vendors to the filing of these Chapter 11 Cases, the Debtors believe that the nonpayment of even a single invoice could cause a Foreign Vendor to stop shipping to the Debtors on a timely basis or to sever completely its business relationship with the Debtors.  I have been advised that foreign suppliers are often unfamiliar with the chapter 11 process.  Short of severing any contractual relations with the Debtors, nonpayment of prepetition claims may cause Foreign Vendors to delay shipments until they have greater clarity with respect to the Debtors' reorganization.  I believe that the Debtors can ill afford delays of this nature.

183.    I have been advised that if the Foreign Claims are not paid, the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not

28279571_18
#16630321 v1

subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  I have been advised that although the automatic stay applies extraterritorially, attempting to enforce the Bankruptcy Code in foreign jurisdictions is often a costly and drawn-out exercise.

184.    I have been advised that in the absence of enforcement of the stay, the Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors even prior to obtaining a judgment.  I have been further advised that there is a risk that foreign governmental authorities might either: (a) seize any such assets in foreign countries, including, without limitation, parts and other goods destined for the Debtors; or (b) seek civil penalties against the Debtors.  I have also been advised that payment of foreign tax, import/export fees, customs fees, or duties related to such claims is required to obtain the underlying goods or materials being imported to the United States.

185.    I have been advised that, more fundamentally, the Foreign Vendors could simply refuse to do business with the Debtors.  I have been advised that because most, if not all, of the Foreign Vendors have few or no assets or operations in the United States subject to the jurisdiction of this Court, the Debtors have no practical enforcement mechanism in this Court against these parties, even where the Debtors have contracts with them.  I have been further advised that the cumulative impact of Foreign Vendors breaching their contracts with the Debtors, or otherwise refusing to do business with the Debtors, could have a devastating effect on the Debtors' operations and ability to reorganize and continue as a going concern.  I have also been advised that without timely deliveries from their Foreign Vendors, the Debtors' repair facilities would lack the requisite component parts and materials for their business.

28279571_18
#16630321 v1

186.   I believe that payment of the Foreign Claims is essential to avoid imminent and irreparable harm to the Debtors' operations.  Indeed, the Debtors believe that the amount of Foreign Claims pales in comparison to the potential damage to the Debtors' business if the relief requested in the Foreign Vendors Motion is not granted.

187.   The Debtors propose to pay the prepetition claims of Foreign Vendors only to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to avoid disruptions to their business.  If the Court authorizes payment of the Foreign Claims, the Debtors estimate that the maximum amount they would pay to Foreign Vendors is approximately $2.3 million, $1.6 million of which the Debtors seek authority to pay on an interim basis.

188.   The Debtors propose conditioning payment of Foreign Claims to the Foreign Vendors upon the agreement of the Foreign Vendors to continue supplying goods and services to the Debtors postpetition on normal and customary trade terms, practices, and programs (including, without limitation, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs), that were most favorable to the Debtors and that were in effect within 120 days before the Petition Date, or such other trade terms that are acceptable to the Debtors (the "Customary Trade Terms").  The Debtors reserve the right to adjust normal trade terms with any Foreign Vendor as appropriate based on the particular facts and circumstances.

189.   I have been advised that with respect to each Foreign Vendor, the Debtors have examined other legal options short of payment of such vendor's prepetition claims and have determined that there exists no practical or legal alternative to payment of the Foreign Claims without significant disruption of the Debtors' business operations.  I believe that to preserve their

business, and maximize their enterprise as a going concern, the Debtors must be able to continue operating their business, and that requires that this Court permit the Debtors to maintain their supply chain.

190.    I believe that failure to pay the Foreign Claims would jeopardize the Debtors' supply chain.  I have been advised that if the Foreign Vendors are unwilling to continue to do business with the Debtors postpetition because of their outstanding prepetition claims, the Debtors' operations would suffer, compromising the value of their estates to the detriment of creditors and other stakeholders.

191.    I believe that the relief requested in the Foreign Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Foreign Vendors Motion.

> **xii.    Application of the Debtors to Retain The Garden City Group, Inc. as Claims and Noticing Agent for the Debtors (the "GCG Retention Application")**

192.    The Debtors are requesting authority to employ and retain The Garden City Group, Inc. ("GCG") as the claims and noticing agent for the Debtors in these Chapter 11 Case and to appoint GCG as agent of this Court.

193.    The Debtors estimate that they have thousands of creditors.  Noticing necessary parties and receiving, docketing and maintain proofs of claim from creditors may be unduly time consuming and burdensome for the Clerk of the Court.

194.    I am advised that GCG is a bankruptcy administration provider that specializes in comprehensive chapter 11 administrative services including noticing, claims processing,

balloting and other related services critical to the effective administration of chapter 11 cases. I am advised that GCG has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest.  Further, I am advised that GCG will work with the Clerk of the Court to ensure that such methodology comports with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

28279571_18
#16630321 v1

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____

Lawrence Young
Chief Restructuring Officer
CHL, Ltd.

Executed On:_____August 29, 2012_____