**SOLICITATION AND DISCLOSURE STATEMENT**

**CHL, LTD. AND THE COMPANIES LISTED ON ANNEX I HERETO HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, OR APPROVED BY, THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION. IF THESE COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN, THIS SOLICITATION AND DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.**

**SOLICITATION AND DISCLOSURE STATEMENT**

**Solicitation of Votes with Respect to the**
**Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of:**

**CHL, LTD.**
**AND**
**EACH OF THE ENTITIES LISTED ON ANNEX I HERETO**

**From the Lenders under the Debtors' Amended and Restated Credit and Guaranty Agreement, dated as of August 1, 2008**

**and**

**Holders of Senior Subordinated Notes due September 30, 2015 and Junior Subordinated Notes due September 30, 2016 under the Note Purchase Agreement, dated as of July 28, 2008**

**THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 24, 2012, UNLESS EXTENDED**

The Prospective Debtors hereby solicit from the Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims votes to accept or reject the Joint Prepackaged Plan of Reorganization of CHL, Ltd. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code. All capitalized terms used herein shall have the meanings ascribed to them in Annex II hereto.[1] A copy of the Plan is attached hereto as Exhibit A.

---

[1] The Prospective Debtors, as defined in Annex II, shall be referred to herein collectively either as the "Debtors," the "Prospective Debtors," or the "Company." The terms "we," "our" and "us" refer to the Company, the Debtors or the Prospective Debtors, as the context requires.

**ONLY HOLDERS OF SENIOR CREDIT AGREEMENT CLAIMS, SUBORDINATED NOTE CLAIMS, FORMER EXECUTIVE COMPENSATION CLAIMS, SUBORDINATED SECURITIES CLAIMS AND PARENT EQUITY INTERESTS ARE IMPAIRED UNDER THE PLAN.**

**HOLDERS OF GENERAL UNSECURED CLAIMS, CUSTOMERS, AND MOST EMPLOYEES WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT THEIR RIGHTS TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS ARE NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO CERTAIN OF OUR TRADE CREDITORS, CUSTOMERS AND EMPLOYEES OF AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

**VOTES ON THE PLAN ARE BEING SOLICITED ONLY FROM HOLDERS OF ALLOWED SENIOR CREDIT AGREEMENT CLAIMS AND HOLDERS OF ALLOWED SUBORDINATED NOTE CLAIMS – ONLY HOLDERS OF SUCH CLAIMS AS OF THE AUGUST 23, 2012 VOTING RECORD DATE ARE ENTITLED TO VOTE ON THE PLAN. VOTES ARE NOT BEING SOLICITED FROM HOLDERS OF FORMER EXECUTIVE COMPENSATION CLAIMS, SUBORDINATED SECURITIES CLAIMS, HOLDERS OF PARENT EQUITY INTERESTS OR FROM ANY OF THE PROSPECTIVE DEBTORS' OTHER CREDITORS.**

**THE BOARD OF DIRECTORS OF EACH OF THE PROSPECTIVE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE BOARD OF DIRECTORS OF EACH OF THE PROSPECTIVE DEBTORS RECOMMENDS THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SUBMIT BALLOTS TO ACCEPT THE PLAN.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY A HOLDER FOR THE PURPOSE OF AVOIDING ANY UNITED STATES FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The date of this Solicitation and Disclosure Statement is August 23, 2012.

**TABLE OF CONTENTS**


GENERAL BACKGROUND ........ 1

SUMMARY OF THE SOLICITATION AND PLAN ........ 7

I. VOTING PROCEDURES AND REQUIREMENTS ........ 18

A. Ballots ........ 18

B. Procedures for Casting Votes and Deadlines for Voting on the Plan ........ 18

C. Parties Entitled to Vote on the Plan ........ 19

D. Counting of Ballots for Determining Acceptance of the Plan ........ 19

II. RISK FACTORS ........ 20

A. Risks Relating to the Chapter 11 Cases ........ 20

1. General ........ 20

2. Failure to Satisfy Vote Requirement ........ 20

3. Method of Solicitation ........ 21

4. Risks Associated with Resolicitation ........ 21

5. Classification and Treatment of Claims and Equity Interests ........ 21

6. Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down" ........ 22

7. Certain Risks of Nonconfirmation or Delay of Confirmation ........ 22

8. Alternatives to Confirmation and Consummation of the Plan ........ 23

9. Risk of Nonoccurrence of the Effective Date ........ 23

10. Expiration or Termination Rights Under Material Restructuring Agreements ........ 24

11. Failure to Close DIP Facility; Event of Default ........ 25

12. Failure to Close the Exit Facility ........ 26

13. Inability to Assume Certain Contracts ........ 26

B. Factors Affecting the Value of the Plan Distributions to Be Issued Under the Plan of Reorganization ........ 26

1. Capital Requirements ........ 26

2. Variances From Projections ........ 26

3. Recovery Percentages May Differ From Estimates ........ 27

4. Lack of Trading Market for Reorganized Parent Common Stock and Restrictions on Transfer of Reorganized Parent Common Stock ........ 27

5. Dividends on Reorganized Parent Common Stock ........ 27

6. Ownership of Voting Stock ........ 27

7. Issuance of Equity Interests Pursuant to the New Management Equity Incentive Plan May Dilute the Reorganized Parent Common Stock ........ 28

8. Ranking of Reorganized Parent Common Stock ........ 28

9. Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Adversely Affect the Reorganized Debtors ........ 28

10. Impact of Interest Rates and Foreign Exchange Rates ... 28

C. Risks Relating to the Company ... 28

1. Leverage and Debt Service ... 28

2. Floating Rate Indebtedness ... 29

3. Liquidity ... 29

4. Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business ... 29

5. Competition ... 30

6. Customer Issues ... 30

7. Disruption of Operations and Retention of Key Customers and Employees ... 30

8. New Technologies in the Cable Television Space ... 31

9. Product Development and Technology ... 31

10. Litigation ... 31

11. Asset Sales and Other Major Transactions ... 31

12. Environmental and Health and Safety Liabilities and Requirements ... 32

13. Warranty Issues ... 32

14. The Debtors' Tax Attributes May be Eliminated or Significantly Reduced Following Their Emergence from Bankruptcy ... 32

15. Decline in the Demand for Repairs from the Debtors' Major Customers Could Harm the Debtors' Profitability ... 33

16. The Debtors' International Operations Make Them Vulnerable to Risks Associated with Doing Business in Foreign Countries ... 33

17. Potential for the Loss of Key Members of the Executive Management Team ... 33

III. BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION ... 33

A. Background ... 33

B. Events Leading to Financial Distress and the Proposed Financial Restructuring ... 34

C. Equity Ownership and Debt Structure ... 34

1. Equity Ownership Structure ... 34

2. Debt Structure ... 34

IV. THE BUSINESS ... 35

A. General ... 35

B. Employees ... 35

C. Corporate History ... 35

D. Repair Services ... 35

E. Sales ... 36

F. Facilities ... 36

G. Recent and Future Strategy ... 37

H. Environmental, Health and Safety Matters ... 37

I. Executive Officers ..... 37

V. THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION ..... 37

A. Overview of Chapter 11 ..... 37

B. Administrative Claims, Priority Tax Claims and Other Unclassified Claims ..... 38

1. Administrative Claims ..... 38

2. Priority Tax Claims ..... 38

3. Professional Fees ..... 38

4. DIP Credit Agreement Claims ..... 38

C. Classification of Claims and Equity Interests ..... 39

D. Treatment and Voting Rights of Claims and Equity Interests ..... 40

1. Treatment of Claims and Equity Interests Against Parent ..... 41

2. Treatment and Voting Rights of Claims and Equity Interests Against Parent Subsidiaries. ..... 42

3. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ..... 46

E. Means of Implementation of Plan ..... 46

1. Compromise of Controversies. ..... 46

2. Substantive Consolidation for Plan Purposes Only ..... 47

3. Vesting of Assets ..... 47

4. Continued Corporate Existence ..... 47

5. Cancellation of Notes, Instruments, Debentures and Equity Interests ..... 48

6. Cancellation of Liens ..... 48

7. New Constituent Documents ..... 48

8. New Officers ..... 48

9. Directors of the Reorganized Debtors ..... 48

10. Corporate Action ..... 49

11. Sources of Cash for Plan Distribution ..... 49

12. Restructuring Transactions ..... 49

13. Direction Letters; Stockholders' Agreement; Registration Rights Agreement ..... 50

14. Issuance of Second Lien Notes, Reorganized Parent Common Stock, and Warrants ..... 50

15. Settlement of Sponsor's Claims Against the Debtors ..... 51

VI. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN ..... 51

A. Description of Exit Financing ..... 51

B. Description of Second Lien Notes ..... 52

C. Description of New Intercreditor Agreement ..... 52

D. Description of Reorganized Parent Common Stock, Certificate of Incorporation, Stockholders' Agreement, and Registration Rights Agreement ..... 52

1. Description of Reorganized Parent Common Stock ..... 52

2. Description of Reorganized Parent Certificate of Incorporation .......... 53
3. Description of Stockholders' Agreement & Registration Rights Agreement .......... 53
E. Description of Warrants .......... 55
F. Description of New Management Incentive Plans .......... 56

VII. FINANCIAL PROJECTIONS AND VALUATION ANALYSIS .......... 56
A. Financial Projections .......... 56
B. Going Concern Valuation .......... 57
1. In General .......... 57
2. Valuation Methodologies .......... 58
3. Valuation Considerations .......... 59

VIII. LIQUIDATION ANALYSIS .......... 60

IX. CERTAIN OTHER LEGAL CONSIDERATIONS .......... 61
A. Solicitation of Votes Prior to Commencement of Chapter 11 Cases .......... 61
B. Section 1145 of the Bankruptcy Code .......... 62
1. Initial Offer and Sale of Securities .......... 62
2. Subsequent Transfers of Securities .......... 62
3. Subsequent Transfers Under State Law .......... 63

X. THE PLAN – OTHER PROVISIONS .......... 63
A. Treatment of Executory Contracts and Unexpired Leases .......... 63
1. Rejection of Executory Contracts and Unexpired Leases .......... 63
2. Claims Based on Rejection of Executory Contracts or Unexpired Leases .......... 64
3. Indemnification of Directors, Officers and Employees .......... 65
4. Indemnification of Senior Agent .......... 65
5. Compensation and Benefit Programs .......... 65
6. Termination of Prepetition Equity Agreements .......... 65
B. Provisions Governing Distributions .......... 66
1. Date of Distributions .......... 66
2. Disbursing Agent .......... 66
3. Distribution Record Date .......... 66
4. Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 66
5. Setoff and Recoupment .......... 67
6. Surrender of Cancelled Instruments or Securities .......... 67
7. Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities .......... 67
8. Fractional Distributions .......... 68
9. Manner of Payment Under Plan of Reorganization. .......... 68

10. Withholding and Reporting Requirements. 68
11. No Proofs of Claim Required. 68
C. Procedures for Resolving Disputed Claims 68
1. Prosecution of Objections to Claims. 69
2. Estimation of Claims. 69
3. Payments and Distributions on Disputed Claims 69
4. Adjustment to Claims and Equity Interests Without Objection 69
D. Conditions Precedent to Confirmation and Effective Date of the Plan 69
1. Conditions Precedent to the Effective Date 69
2. Waiver of Conditions 71
3. Modification of Plan 71
4. Effect of Withdrawal or Revocation 71
5. Reservation of Rights 71
6. Substantial Consummation of Plan 71
E. Effect of Plan Confirmation 71
1. Binding Effect 71
2. Discharge of Claims 72
3. Releases 72
4. Exculpation and Limitation of Liability 73
5. Injunction 74
6. Term of Bankruptcy Injunction or Stays 74
7. Termination of Subordination Rights and Settlement of Related Claims 74
8. Preservation of Rights of Action 74
F. Retention of Jurisdiction 75
G. Miscellaneous Provisions 76
1. Payment of Statutory Fees 76
2. Section 1145 Exemption 76
3. Governing Law 76
4. Severability 77
5. Inconsistency 77
6. Filing of Additional Documents 77
7. Service of Documents 77
8. Section 1125(e) of the Bankruptcy Code 78
9. Exemption from Certain Transfer Taxes 78
10. Determination of Tax Liability 78
11. Schedules and Exhibits 78
12. No Prejudice 78

13. Allocation of Payments ..... 79

14. Dissolution of Statutory Committees ..... 79

XI. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS ..... 79

A. U.S. Federal Income Tax Consequences of the Restructuring to the Debtors ..... 80

1. Cancellation of Indebtedness Income ..... 80

2. Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions ..... 81

3. Alternative Minimum Tax ..... 83

B. U.S. Federal Income Tax Consequences of the Restructuring to Holders of Senior Claims and Subordinated Claims ..... 83

1. In General ..... 83

2. U.S. Federal Income Tax Consequences of the Restructuring to U.S. Holders of Senior Claims ..... 83

3. U.S. Federal Income Tax Consequences of the Restructuring to U.S. Holders of Subordinated Claims ..... 86

3. U.S. Federal Income Tax Consequences of Owning and Disposing of Restructuring Consideration to U.S. Holders ..... 86

4. U.S. Federal Income Tax Consequences of the Restructuring to Non-U.S. Holders ..... 89

5. U.S. Federal Income Tax Consequences of Owning and Disposing of Restructuring Consideration and Warrants to Non-U.S. Holders ..... 89

6. Information Reporting and Backup Withholding ..... 91

C. Importance of Obtaining Professional Tax Assistance ..... 92

XII. THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS ..... 92

A. Proposed Debtor in Possession Financing ..... 92

B. First Day Orders ..... 93

1. Employees' Wages and Benefits ..... 93

2. Trade Vendors and Other Unsecured Creditors ..... 93

3. Cash Management ..... 93

4. DIP Financing Motion ..... 93

5. Customer Programs ..... 93

6. Taxes ..... 93

7. Utility Service ..... 94

8. Scheduling Order ..... 94

C. Second Day Orders ..... 94

1. Retention of Professionals ..... 94

XIII. CONFIRMATION ..... 94

A. Confirmation Hearing ..... 94

B. Requirements for Confirmation ..... 94

C. Class Acceptance of the Plan ..... 95

D. Cram Down ..... 95
E. Plan Meets Requirements for Confirmation ..... 96
1. Best Interests of Creditors—Liquidation Analysis ..... 96
2. Feasibility of the Plan ..... 96
F. Alternatives to Confirmation and Consummation of the Plan ..... 97
1. Alternative Plans of Reorganization ..... 97
2. Dismissal of the Debtors' Chapter 11 Cases ..... 97
3. Liquidation Under Chapter 7 or Chapter 11 ..... 97

RECOMMENDATION AND CONCLUSION ..... 98

ANNEXES

I. List of Prospective Debtors
II. Definitions

EXHIBITS

A. Plan of Reorganization
B. Plan Support Agreement
C. Form of DIP Credit Agreement
D. DIP Commitment Letter
E. Exit Commitment Letter
F. Projections
G. Liquidation Analysis
H. Term Sheet for New Intercreditor Agreement

## GENERAL BACKGROUND

We negotiated the terms of the Plan with a steering committee of Holders of the Senior Credit Agreement Claims (the "Steering Committee"), who collectively hold approximately 60% of such Claims, and the Holders of 100% of the Subordinated Note Claims. If the Plan is confirmed and becomes effective, (1) each Holder of Allowed Senior Credit Agreement Claims shall receive, in full satisfaction of its claims, its pro-rata distribution of: (a) the Second Lien Notes and (b) 80% of the Reorganized Parent Common Stock (subject to dilution, as discussed below), and (2) each Holder of Allowed Subordinated Note Claims shall receive, in full satisfaction of its claims, its pro-rata distribution of Warrants. On the Effective Date, any and all Former Executive Compensation Claims, Subordinated Securities Claims and all Parent Equity Interests will be cancelled or extinguished. All other classified Claims and Equity Interests that are Allowed will be Unimpaired.

We do not believe that the Reorganized Debtors will be immediately subject to reporting requirements under the Exchange Act following the Effective Date.

As of the date hereof, none of the Prospective Debtors are under the jurisdiction of the Bankruptcy Court. If we receive the requisite acceptances of the Plan from Holders of Allowed Senior Credit Agreement Claims in number and dollar amount sufficient to satisfy the requirements for acceptance of the Plan in accordance with the Bankruptcy Code, we intend to commence the Chapter 11 Cases and promptly seek confirmation of the Plan by the Bankruptcy Court. The confirmation of the Plan is subject to, among other things, judicial approval of this Solicitation and Disclosure Statement and the Plan. If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of prepetition Claims and Equity Interests (including, in each case, those who do not submit Ballots, those who submit Ballots to reject the Plan and those whose Ballots are rejected because they are illegible, incomplete or unsigned) will be bound by the Plan and the transactions contemplated thereby.

**DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL OF OUR TRADE CREDITORS, CUSTOMERS AND EMPLOYEES, OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

We believe that confirmation of the Plan is in the best interests of creditors and other parties in interest, and, therefore, that the Plan should be confirmed**. The Prospective Debtors recommend that all eligible parties vote to accept the Plan.**

This Solicitation and Disclosure Statement and the Plan (and all exhibits, schedules and appendices hereto and thereto), the accompanying forms of Ballot and the related materials delivered together herewith are being furnished to Holders of Allowed Senior Credit Agreement Claims and Allowed Subordinated Note Claims pursuant to section 1126(b) of the Bankruptcy Code in connection with the solicitation of votes to accept or reject the Plan (and the transactions contemplated thereby, as described herein). Exemptions to the Securities Act apply to this solicitation, including, without limitation, sections 3(a)(9) and 4(2) of the Securities Act. Directors, officers, and employees of the Prospective Debtors may solicit exchanges from the Holders of Allowed Senior Credit Agreement Claims and the Holders of Subordinated Note Claims, but will not receive any additional compensation for such solicitations. The Voting Agent will distribute, collect, and tabulate the Ballots for the Prospective Debtors and will be compensated for such services, but the Voting Agent will not solicit, and will not be compensated for soliciting, the Holders of Allowed Senior Credit Agreement Claims or the Holders of Subordinated Note Claims to vote in favor of or against the Plan in their Ballots.

**The Voting Agent for the Plan is Garden City Group. It can be reached at:**

CHL, Ltd., *et al.*
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43107

E-Mail: CHLSolicitation@gcginc.com
Fax: (855) 687-2629

The Company's legal advisors are Pepper Hamilton LLP and Ropes & Gray LLP. They can be contacted at:

Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Attn: David B. Stratton
Fax: (302) 656-8865

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Attn: James A. Wright III
Fax: (617) 235-9542

The solicitation of votes on the Plan is being made in reliance on exemptions from the registration requirements of the Securities Act, including, without limitation, exemptions provided in sections 3(a)(9) and 4(2) thereof. Each of the New Securities issued in accordance with the Plan (*e.g.*, the shares of Reorganized Parent Common Stock, the Warrants, and the Second Lien Notes) will be issued pursuant to the exemption from the registration requirements of the Securities Act provided by section 1145 of the Bankruptcy Code. To the extent that section 1145 is not available to exempt the securities issued under, or in connection with, the Plan from registration under section 5 of the Securities Act, the Prospective Debtors believe that other provisions of the Securities Act, including, without limitation, sections 3(a)(9) and 4(2) of the Securities Act, and state securities laws will apply to exempt such issuance from the registration requirements of the Securities Act.

**THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN, THERE LIKELY WILL NOT BE ANY LIQUID MARKET FOR THE NEW SECURITIES AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP. OTHER THAN WITH RESPECT TO CERTAIN REGISTRATION RIGHTS DESCRIBED HEREIN, THE REORGANIZED DEBTORS WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.**

**EACH HOLDER OF A SENIOR CREDIT AGREEMENT CLAIM OR A SUBORDINATED NOTE CLAIM SHOULD REVIEW THIS SOLICITATION AND DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. WE BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING US AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.**

**ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. SUCH PROJECTIONS AND STATEMENTS ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY US, OUR ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. THERE CAN BE NO ASSURANCE THAT OUR ACTUAL ABILITY TO COVER OUR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED IN THIS SOLICITATION AND DISCLOSURE STATEMENT.**

**NEITHER OUR INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, NOR DO THEY ASSUME ANY RESPONSIBILITY FOR, OR CLAIM ANY ASSOCIATION WITH, THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR THE LIQUIDATION ANALYSIS.**

**FORWARD-LOOKING STATEMENTS PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.**

**SEE THE SECTION ENTITLED "RISK FACTORS" OF THIS SOLICITATION AND DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.**

---

All exhibits to this Solicitation and Disclosure Statement are incorporated into and are a part of this Solicitation and Disclosure Statement as if fully set forth herein.

No person has been authorized to give any information or make any representation on our behalf not contained, or incorporated by reference, in this Solicitation and Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Solicitation and Disclosure Statement will not, under any circumstances, create any implication that the information it contains (or incorporates by reference from other documents or reports) is correct as of any time subsequent to the date hereof (or the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein (or in a document or report incorporated by reference) or in our affairs since the date hereof (or thereof). All statements contained in this Solicitation and Disclosure Statement are made as of the date hereof unless otherwise specified.

**COMPANY INFORMATION**

Our corporate headquarters are located at 1023 State Street, Schenectady, New York 12307. Our website is www.gocontec.com. Information on our website is not a part of this Solicitation and Disclosure Statement, except to the extent that any such information is expressly incorporated herein.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Solicitation and Disclosure Statement contains statements relating to future results of the Company that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995 or by the U.S. Securities and Exchange Commission in its rules, regulations and releases. Any statements set forth in this Solicitation and Disclosure Statement with regard to our expectations as to financial results and other aspects of our business may constitute forward-looking statements. These statements relate to our future plans, objectives, expectations and intentions, and may be identified by words like "believe," "expect," "may," "will," "should," "seek," or "anticipate," and similar expressions. We caution readers that any such forward-looking statements are based on assumptions that we believe are reasonable, but are subject to a wide range of risks including, but not limited to, risks associated with, (i) current or future defaults under our existing indebtedness as it pertains to our ability to complete the Solicitation, (ii) our failure to make required interest payments under our existing indebtedness, (iii) future financial results and liquidity, including our continued ability to finance our operations in the normal course, (iv) various factors that may affect the value of the Second Lien Notes, Reorganized Parent Common Stock, and Warrants to be issued under the Plan, (v) our relationship with and payment terms provided by our trade creditors, (vi) additional financing requirements post-restructuring, (vii) the results of renegotiating certain key commercial agreements, (viii) future dispositions and acquisitions, (ix) our ability to continue to develop new products and services, (x) the effect of competitive products and services or pricing by our competitors, (xi) the costs of component parts, (xii) our proposed restructuring and the costs associated therewith, (xiii) the amount of customs duty claims, litigation uncertainties and warranty claims, (xiv) the effects of conditions in the industry on us and our operations, (xv) costs related to re-sourcing and outsourcing products, (xvi) the continued effectiveness of material restructuring agreements, including the Plan Support Agreement, (xvii) our ability to obtain relief from the Bankruptcy Court to facilitate our ability to operate smoothly under chapter 11, (xviii) the confirmation and consummation of the Plan, and (xix) each of the other risks identified in Article II "RISK FACTORS." Due to these uncertainties, we cannot assure you that any forward-looking statements will prove to be correct. We are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events or otherwise; *provided*, *however*, that we may be required to update or otherwise modify the information contained herein to comply with certain provisions of the Bankruptcy Code governing the solicitation of votes for acceptance of the Plan.

There may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors listed in this Solicitation and Disclosure Statement under "Risk Factors," as well as any cautionary language contained in this Solicitation and Disclosure Statement, provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations we describe in our forward-looking statements. Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims should be aware that the occurrence of the events described in these risk factors and elsewhere in this Solicitation and Disclosure Statement could have a material adverse effect on our business, operating results and financial condition.

## SUMMARY OF THE SOLICITATION AND PLAN

This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Solicitation and Disclosure Statement and in the accompanying Plan.

| | |
|---|---|
| **Background Information:** | We expect to commence the Chapter 11 Cases as soon as practicable if we obtain the requisite number of votes for the Plan from Holders of Allowed Senior Credit Agreement Claims; provided that we reserve the right to commence the Chapter 11 Cases at any time, including, without limitation, prior to the Voting Deadline. The Bankruptcy Code requires acceptance by creditors in Class 3 and Class 6 that hold at least two-thirds in dollar amount and a majority in number of allowed claims in that Class, counting only those claims actually voting to accept or reject the Plan; provided that the Plan may be confirmed over a rejection by a Class pursuant to Bankruptcy Code section 1129(b). See Article XIII. "CONFIRMATION." |
| **The Solicitation:** | We are soliciting votes to accept or reject the Plan directly from Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Record Date:** | Only Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims that are Record Holders as of the Voting Record Date, which has been set as the close of business on August 23, 2012, will be entitled to vote on the Plan. We reserve the right to establish a later Voting Record Date if we decide to extend the Voting Deadline. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Deadline; Extension; Termination; Amendments:** | The Voting Deadline is 4:00 p.m., Eastern Time, on September 24, 2012. If we extend the Voting Deadline, the term Voting Deadline will mean the latest time and date as to which the Solicitation is extended. Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension, which may be by press release or other public announcement. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS— Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Procedures:** | If you are a Holder of Allowed Senior Credit Agreement Claims or a Holder of Allowed Subordinated Note Claims as of the Voting Record Date, you should deliver a properly completed Ballot to the Voting Agent on or before the Voting Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **Revocation or Withdrawal of Ballots:** | Upon the expiration or termination of this Solicitation, Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims may not revoke or withdraw their Ballots; *provided*, *however*, that prior to the expiration or termination of this Solicitation, Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims may withdraw any votes cast even if such votes have been delivered to the Voting Agent. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting Votes and Deadlines for Voting on the Plan." |
| **Voting Agent:** | We have retained The Garden City Group, Inc. as our Voting Agent in connection with this Solicitation. Deliveries of Ballots should be directed to the Voting Agent at the address set forth on the back cover page of this Solicitation and Disclosure Statement, pursuant to the instructions contained in the Ballots. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |

**The Plan:** As a general matter, for the Plan to become effective and for any distributions to be made thereunder, the Plan must, among other things, be confirmed by the Bankruptcy Court. For the Plan to be confirmed by consent of each Impaired Class, votes to approve the Plan must be received prior to the Voting Deadline from Holders of Impaired Claims that constitute (i) at least two-thirds in amount of the Claims of the Holders in each Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) more than one-half in number of the Holders of each Impaired Class of Claims who actually cast votes with respect to the Plan. <u>See</u> Article XIII.C. “CONFIRMATION—Class Acceptance of the Plan.” The Plan may be confirmed by the Bankruptcy Court, however, so long as one Impaired Class of Claims votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code (as further described under Article XIII.D. “CONFIRMATION—Cram Down”). The only Classes of Claims Impaired under the Plan that are entitled to vote are Class 3 – Senior Credit Agreement Claims and Class 6 – Subordinated Note Claims. Holders of Claims and Equity Interests in Class 1 – Other Secured Claims, Class 2 – Other Priority Claims, Class 4 – General Unsecured Claims, Class 7 – Intercompany Claims, Class 9 – Parent Subsidiaries’ Equity Interests, Parent Class 1 – Parent Other Priority Claims, and Parent Class 2 – Parent Unsecured Claims are Unimpaired and therefore are deemed to have accepted the Plan and not entitled to vote on the Plan. Holders of Claims in Class 5 – Former Executive Compensation Claims and Class 8 – Subordinated Securities Claims and Equity Interests in Parent Class 3 – Parent Equity Interests are not entitled to receive any distributions under the Plan, and, as a result, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. <u>See</u> Article I.C. “VOTING PROCEDURES AND REQUIREMENTS—Parties Entitled to Vote on the Plan.”

If the Plan is confirmed by the Bankruptcy Court:

(a) Holders of Allowed Senior Credit Agreement Claims will receive their Pro-Rata Share of (x) the Second Lien Notes and (y) 80% of the Reorganized Parent Common Stock (subject to dilution pursuant to the New Management Equity Incentive Plan and the Warrants), distributed pursuant to Article VI of the Plan. Second Lien Notes and Reorganized Parent Common Stock will be distributed on the Effective Date. <u>See</u> Article V.D.2. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment and Voting Rights of Claims and Equity Interests—Treatment and Voting Rights of Claims and Equity Interests Against Parent Subsidiaries.”

(b) As a carve out from a portion of the Senior Lenders’ collateral, Holders of Allowed Subordinated Note Claims will receive their Pro-Rata Share of Warrants, distributed pursuant to Article VI of the Plan. Warrants will be distributed on the Effective Date. <u>See</u> Article V.D.2. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment and Voting Rights of Claims and Equity Interests—Treatment and Voting Rights of Claims and Equity Interests Against Parent Subsidiaries.”

(c) As a carve out from a portion of the Senior Lenders’ collateral, Holders of General Unsecured Claims will receive, at the election of the Debtors or the Reorganized Debtors, (i) reinstatement pursuant to section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired, (ii) payment in full in Cash on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such General Unsecured Claim becomes Allowed, (y) the date on which such General Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors, or (iii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. <u>See</u> Article V.D.2. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment and Voting Rights of Claims and Equity Interests—Treatment and Voting Rights of Claims and Equity Interests Against Parent Subsidiaries.”

**Risks to the Confirmation and Effectiveness of the Plan:** The Effective Date will not occur and distributions will not be made under the Plan unless the requisite votes to accept the Plan under the Bankruptcy Code have been received, the Plan has been confirmed by the Bankruptcy Court as satisfying the requirements set forth in section 1129 of the Bankruptcy Code, and the other conditions to effectiveness set forth in Article VIII of the Plan have been satisfied.

We cannot assure you that the requisite votes to accept the Plan under the Bankruptcy Code will be received or that the Plan will be confirmed by the Bankruptcy Court. <u>See</u> Article II.A. “RISK FACTORS—Risks Relating to the Chapter 11 Cases.” Further, while we believe it is reasonably likely that we can either satisfy the conditions to the Effective Date or have them waived by the Senior Agent, we cannot guarantee that these conditions will be satisfied or that any necessary waivers will be provided. <u>See</u> Article II.A.9. “RISK FACTORS—Risks Relating to the Chapter 11 Cases—Risk of Nonoccurrence of the Effective Date.”

If the Plan is confirmed by the Bankruptcy Court and becomes effective, every Holder of a Claim against or Equity Interest in the Debtors will be bound by the terms of the Plan, whether or not such Holder voted to accept the Plan. <u>See</u> Article X.E. “THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation.”

**Treatment of Claims and Equity Interests:** The table below summarizes each Class of Claims and Equity Interests in the Plan against Parent, the projected aggregate amount of Claims or Equity Interests comprising each Class, the treatment of each Class and the projected recoveries of each Class. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article VII.B. hereof. <u>See</u> Article V.D. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Equity Interests.”

| Class/Type of Claims or Equity Interests | Projected Claims/ Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Parent Class 1 – Parent Other Priority Claims | The Prospective Debtors estimate that the amount of Claims in this Class is $0. | Reinstated pursuant to section 1124(2) of the Bankruptcy Code or such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired / Deemed to Accept. | 100% |
| Parent Class 2 – Parent Unsecured Claims | The Prospective Debtors estimate that the amount of Claims in this Class is $0. | Either (i) reinstated pursuant to section 1124(2) of the Bankruptcy Code, (ii) paid in full in Cash, or (iii) receive such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired / Deemed to Accept. | 100% |
| Parent Class 3 - Parent Equity Interests | All shares of Parent common stock. | No recovery. | Impaired Deemed to Reject/Not Entitled to | 0% |

| Class/Type of Claims or Equity Interests | Projected Claims/ Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| | | | Vote. | |

The table below summarizes the unclassified Claims and each Class of Claims and Equity Interests in the Plan against Parent Subsidiaries, the projected aggregate amount of Claims or Equity Interests comprising each Class, the treatment of each Class and the projected recoveries of each Class. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article VII.B. hereof. See Article V.D. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Equity Interests."

| Class/Type of Claims or Equity Interests | Projected Claims/ Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Unclassified - Administrative Claims | The Prospective Debtors estimate that the amount of Claims pursuant to section 503(b)(9) of the Bankruptcy Code in this Class will be $600,000 to $800,000. The Prospective Debtors are unable to estimate the amount of other Administrative Claims at this time. | Paid in full in Cash. | N/A | 100% |
| Unclassified - Priority Tax Claims | The Prospective Debtors estimate that the amount of Claims in this Class is $0. | Paid in full in Cash, or treated in accordance with Bankruptcy Code section 1129(a)(9)(C). | N/A | 100% |
| Unclassified – Professional Fee Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be $1.5 million.[1] | Paid in full in Cash, subject to allowance by the Bankruptcy Court | N/A | 100% |
| Unclassified - DIP Credit Agreement Claims | Approximately $20 million (plus accrued and unpaid interest). | Paid in full in Cash on the Effective Date, or as otherwise provided in the DIP Credit Agreement, the Confirmation Order or the Exit Facility Documents. | N/A | 100% |

[1] This estimate does not include an estimate for fees for any official committees appointed in the Chapter 11 Cases.

| **Class/Type of Claims or Equity Interests** | **Projected Claims/ Equity Interests** | **Plan Treatment of Allowed Claims in Class** | **Status/ Voting Right** | **Projected Recovery Under Plan** |
|---|---|---|---|---|
| Class 1 – Other Secured Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be $0. | (i) reinstated pursuant to section 1124(2) of the Bankruptcy Code, (ii) paid in full on the Effective Date, (iii) receive proceeds from the sale of the collateral securing such Claims, (iv) receive the actual collateral securing such Claims, or (v) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. | Unimpaired/ Deemed to accept. | 100% |
| Class 2 - Other Priority Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be approximately $35,000. | Reinstated pursuant to section 1124(2) of the Bankruptcy Code or such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired/ Deemed to Accept. | 100% |
| Class 3 – Senior Credit Agreement Claims | $201,100,279 (plus all outstanding prepetition interest, fees, and expenses). | Will receive on the Effective Date a Pro-Rata Share of the Second Lien Notes and 80% of the Reorganized Parent Common Stock, subject to dilution for the New Management Equity Incentive Plan and the Warrants. | Impaired/ Entitled to Vote. | 14.7%- 24.6% |
| Class 4 - General Unsecured Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be approximately $10-11 million.[2] | Either (i) reinstated pursuant to section 1124(2) of the Bankruptcy Code, (ii) paid in full in Cash, or (iii) receive such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired/ Deemed to Accept. | 100% |

[2] This estimate is a projection of the amount of General Unsecured Claims on the expected Petition Date. The Prospective Debtors expect that certain General Unsecured Claims will be paid during their Chapter 11 Cases pursuant to various “first day orders”, reducing the amount outstanding as of the Effective Date. <u>See</u> Article XII.B. “THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS—First Day Orders.”

| **Class/Type of Claims or Equity Interests** | **Projected Claims/ Equity Interests** | **Plan Treatment of Allowed Claims in Class** | **Status/ Voting Right** | **Projected Recovery Under Plan** |
|---|---|---|---|---|
| Class 5 – Former Executive Compensation Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be approximately $980,000. | No recovery. | Impaired/ Deemed to Reject/Not Entitled to Vote. | 0% |
| Class 6 – Subordinated Note Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be approximately $159 million. | Will receive on the Effective Date a Pro-Rata Share of the Warrants and $25,000. | Impaired/ Entitled to Vote. | N/A[3] |
| Class 7 – Intercompany Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be $0. | Either (i) reinstated, in full or in part, and treated in the ordinary course of business or (ii) cancelled and discharged, as mutually agreed upon by each Holder of such Intercompany Claim and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired/ Deemed to Accept. | 100% |
| Class 8 – Subordinated Securities Claims | The Prospective Debtors estimate that the amount of Claims in this Class will be $0. | No recovery. | Impaired/ Deemed to Reject/Not Entitled to Vote. | 0% |
| Class 9 – Parent Subsidiaries Equity Interests | All shares and membership interests in Parent Subsidiaries. | Either (i) reinstated, in full or in part, and treated in the ordinary course of business or (ii) cancelled and discharged, as mutually agreed upon by each Holder of such Parent Subsidiaries Equity Interests and the Debtors or the Reorganized Debtors, as applicable. | Unimpaired/ Deemed to Accept. | 100% |

[3] No estimated recovery value has been provided for the Subordinated Note Claims because their recovery consists primarily of the Warrants, and warrants for privately held companies with small capitalization are inherently difficult to value.

| | |
|---|---|
| **Distribution Date:** | Distributions to be made under the Plan generally will be made as of the Effective Date, or as soon as practicable thereafter. <u>See</u> Article X.B.1. “THE PLAN—OTHER PROVISIONS—Provisions Governing Distributions—Date of Distributions.” |
| **Plan Supplement:** | We will file the Plan Supplement not later than ten (10) days prior to the first date on which the Confirmation Hearing is scheduled to be held. It is anticipated that the Plan Supplement will include, among other things, forms of: (i) the Exit Facility Documents, (ii) the New Constituent Documents, and (iii) the Second Lien Note Agreement. <u>See</u> Article V.E.9. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan— Directors of the Reorganized Debtors.” |
| **Board of Directors:** | Section 4.9 of the Plan provides that the initial Reorganized Parent Board of Directors will be composed of five (5) directors. <u>See</u> Article V.E.9. “THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan—Directors of the Reorganized Debtors.” The identity of the directors for the Reorganized Debtors, including the members of the initial Reorganized Parent Board of Directors, will be disclosed in the Plan Supplement or at the Confirmation Hearing. |
| **Non-Reporting Status:** | The Plan contemplates that Reorganized Parent will NOT be a reporting issuer under the Exchange Act nor will shares of Reorganized Parent Common Stock be registered under the Securities Act or Exchange Act immediately following the Effective Date. |
| **Stockholders’ Agreement & Registration Rights Agreement:** | The Plan provides for the establishment of the Stockholders’ Agreement and the Registration Rights Agreement, forms of which will be included in the Plan Supplement. The Plan requires all creditors who are to receive Reorganized Parent Common Stock under the Plan to execute the Stockholders’ Agreement and Registration Rights Agreement. The Stockholders’ Agreement will include provisions governing, among other things, (i) certain transfer limitations on the holders of Reorganized Parent Common Stock; (ii) the composition of the Reorganized Debtors’ Boards of Directors; (iii) matters that, in certain circumstances, will require super-majority shareholder approval; and (iv) shareholder preemptive rights. The Registration Rights Agreement will provide to the holders party thereto certain demand and incidental (or “piggyback”) and shelf registration rights. The terms of the Stockholders’ Agreement and the Registration Rights Agreement are described in Article VI.D.3. hereof. <u>See</u> Article VI.D.3. “DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Reorganized Parent Common Stock, Certificate of Incorporation, Stockholders’ Agreement, and Registration Rights Agreement—Description of Stockholders’ Agreement & Registration Rights Agreement.” |

| | |
|---|---|
| **Warrants:** | The Warrants will be exercisable for a 7.5 year term for 6% of the Reorganized Parent Common Stock on a fully diluted basis (subject to dilution for the New Management Equity Incentive Plan), with the following strike prices: (i) 1.5% of the Reorganized Parent Common Stock at a strike price of $25 million in Equity Value, (ii) with an incremental 3.5% of the Reorganized Parent Common Stock at a strike price of $62.5 million in Equity Value, and (iii) with an incremental 1% of the Reorganized Parent Common Stock at a strike price of $112.5 million in Equity Value. The material terms of the Warrants are described in Article VI.E. hereof. See "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Warrants." |
| **Intercreditor and Subordination Agreement:** | The respective rights and priority, with respect to both payment and security interests, of the lenders under the Exit Credit Agreement vis-à-vis the Second Lien Noteholders will be governed by the New Intercreditor Agreement. A term sheet describing certain material terms of the New Intercreditor Agreement is attached as Exhibit H, and a form of the New Intercreditor Agreement will be included in the Plan Supplement. See Article VI.C. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Intercreditor Agreement." The final terms of the New Intercreditor Agreement are subject to further negotiations with the Exit Facility Agent and the Second Lien Note Agent. |
| **Debtor-in-Possession and Exit Financing:** | On the Petition Date, the Prospective Debtors intend to enter into the DIP Credit Agreement, a form of which is attached hereto as Exhibit C. The proceeds from the DIP Facility may be used for working capital and other general corporate purposes of the Debtors during the Chapter 11 Cases. The terms of the DIP Facility are described in Article XII.A. hereof. See Article XII.A. "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS—Proposed Debtor in Possession Financing."<br><br>On the Effective Date, the proceeds from the Exit Facility will be used to repay the amounts borrowed under the DIP Credit Agreement, fund certain of the cash distributions under the Plan, and for general corporate purposes. The terms of the Exit Facility are described in Article VI.A. hereof. See Article VI.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing." |
| **Releases:** | In consideration for the contributions of certain parties to the Chapter 11 Cases, the Plan provides for certain waivers, exculpations, releases and injunctions. See Article X.E.3. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation—Releases." |
| **Certain Material U.S. Federal Income Tax Considerations:** | For a summary of certain material U.S. federal income tax consequences of this Solicitation to the Senior Lenders and the Subordinated Noteholders, see Article XI. "CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS." |

| | |
|---|---|
| **Risk Factors:** | Prior to deciding whether and how to vote on the Plan, each Holder of a Senior Credit Agreement Claim or a Subordinated Note Claim should consider carefully all of the information in this Solicitation and Disclosure Statement, especially the "Risk Factors" described in Article II hereof. See Article II. "RISK FACTORS." |

**The foregoing is only a brief summary of certain provisions of the Plan. You should read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.**

## SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following selected consolidated historical financial data sets forth, for the periods and dates indicated, certain summary consolidated financial information of the Company. We derived the summary consolidated statements of operations information and consolidated balance sheet data as of and for the years ended December 31, 2010 and 2009 from our audited consolidated financial statements and for the year ended December 31, 2011 and the three months ended March 31, 2012 from our unaudited consolidated financial statements. Any other data was derived from unaudited financial statements. Any statement contained in the financial statements attached hereto will be modified or superseded for all purposes to the extent that a statement contained in this Solicitation and Disclosure Statement (or in any other document that is subsequently made publicly available) modifies or is contrary to that previous statement. Any statement so modified or superseded will not be deemed a part of this Solicitation and Disclosure Statement except as so modified or superseded.

**CHL, LTD.**
Consolidated Income Statement

| ($ in millions) | FY 2009 | FY 2010 | FY 2011 | Q1 2012 |
|---|---|---|---|---|
| ***Income Statement*** | | | | |
| Revenue | $ 150.0 | $ 169.6 | $ 153.6 | $ 37.8 |
| Cost of Goods | 81.9 | 94.3 | 96.4 | 23.7 |
| Selling, General and Administrative | 26.0 | 34.8 | 33.1 | 7.6 |
| Depreciation and Amortization | 29.1 | 28.2 | 27.7 | 6.6 |
| Other Expenses | .3 | 24.2 | .3 | .1 |
| **Earnings Before Interest and Taxes** | **12.8** | **(11.9)** | **(3.9)** | **(.1)** |
| Interest Expense, Net | 37.0 | 36.5 | 38.5 | 11.9 |
| Income Tax Provision | (4.7) | (9.8) | (11.8) | .1 |
| **Net Income** | **$ (19.4)** | **$ (38.6)** | **$ (30.6)** | **$ (12.2)** |

**CHL, LTD.**
Consolidated Balance Sheet

| ($ in millions) | 2009 | 2010 | 2011 | Q1 2012 |
|---|---|---|---|---|
| ***Balance Sheet*** | | | | |
| Cash & Equivalents | $ 12.1 | $ 13.6 | $ 11.7 | $ 14.5 |
| Accounts Receivable, Net | 17.5 | 29.9 | 24.0 | 22.0 |
| Inventories, Net | 9.2 | 8.7 | 9.7 | 13.4 |
| Prepaid Expenses & Other Current Assets | 5.1 | 6.2 | 3.9 | 4.8 |
| **Total Current Assets** | **44.0** | **58.5** | **49.3** | **54.6** |
| Property and Equipment, Net | 16.2 | 12.7 | 9.7 | 9.6 |
| Goodwill | 258.6 | 252.0 | 252.0 | 252.0 |
| Intangible Assets, Net | 242.8 | 202.9 | 179.5 | 173.6 |
| Other Long Term Assets | 10.8 | 7.9 | 5.3 | 4.7 |
| **Total Long Term Assets** | **528.3** | **475.5** | **446.5** | **439.9** |
| **Total Assets** | **$ 572.3** | **$ 534.0** | **$ 495.9** | **$ 494.6** |
| Accounts Payable | $ 3.6 | $ 10.9 | $ 5.4 | $ 7.0 |
| Current Installments of Long-Term Debt Obligations | 2.3 | 1.9 | 18.3 | 27.9 |
| Borrowings Outstanding on Revolver | 5.0 | 7.0 | 7.0 | 7.0 |
| Accrued Expenses and Other Current Liabilities | 16.4 | 21.7 | 18.4 | 17.7 |
| **Total Current Liabilities** | **27.3** | **41.4** | **49.1** | **59.7** |
| Long Term Portion of Notes Payable | 315.8 | 312.0 | 311.0 | 311.0 |
| Other Long Term Liabilities | 27.1 | 16.7 | 1.8 | 1.9 |
| **Total Long Term Liabilities** | **342.9** | **328.7** | **312.8** | **312.9** |
| **Total Liabilities** | **370.2** | **370.1** | **362.0** | **372.6** |
| Total Equity | 202.1 | 163.9 | 133.9 | 121.9 |
| **Total Liabilities and Equity** | **$ 572.3** | **$ 534.0** | **$ 495.9** | **$ 494.6** |

## I. VOTING PROCEDURES AND REQUIREMENTS

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot, constitute the Voting Instructions. To vote on the Plan, you must be a Holder of a Class 3 Senior Credit Agreement Claim or a Class 6 Subordinated Note Claim as of the Voting Record Date. To vote, you must fill out and sign a Ballot enclosed herewith.

### A. *Ballots*

After carefully reviewing this Solicitation and Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. Ballots should be returned to the Voting Agent as directed below.

If you do not receive a Ballot for a Claim that you believe you hold and that is in a Class that is entitled to vote on the Plan, or if a Ballot is damaged or lost, or if you have any questions regarding the procedures for voting on the Plan, you should contact the Voting Agent at:

CHL LTD, *et al.*
c/o GCG
P.O. Box 9862
Dublin, OH 43017-5762
Email: ContecInfo@gcginc.com
Telephone: (888) 369-8912
Fax: (855) 687-2629

### B. *Procedures for Casting Votes and Deadlines for Voting on the Plan*

Please complete the information requested on the Ballot, sign, date and indicate your vote on the Ballot, and return the Ballot in the enclosed return envelope, by first class mail, courier or hand delivery, to the Voting Agent at the following address so that it is actually received by the Voting Agent prior to the Voting Deadline:

**By Regular Mail:**

CHL LTD, *et al.*
c/o GCG
P.O. Box 9862
Dublin, OH 43017-5762

**By Hand Delivery or Overnight Courier:**

CHL LTD, *et al.*
c/o GCG
51515 Blazer Parkway
Suite A
Dublin, OH 43017

**By Email:**

CHLSolicitation@gcginc.com

**By Facsimile:**

(855) 687-2629

If a Ballot is returned indicating acceptance or rejection of the Plan, but is unsigned, illegible or incomplete, the unsigned, illegible or incomplete Ballot will not be included in any calculation to determine whether the requisite parties entitled to vote on the Plan have voted to accept the Plan.

**BALLOTS WILL NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE OR ARE ILLEGIBLE, INCOMPLETE, OR UNSIGNED.**

We reserve the right to terminate the Solicitation at any time prior to the Voting Deadline. Additionally, upon notice to the Holders of Allowed Senior Credit Agreement Claims and the Holders of Allowed Subordinated Note Claims, we reserve the right to amend this Solicitation at any time prior to the Voting Deadline; *provided, however*, that any such amendment is made after acquiring any and all consents required under the terms of the Plan.

We also reserve the right to extend the Voting Deadline. Any such extension will be followed as promptly as practicable by notice thereof by press release or other public announcement. If we extend the Voting Deadline, we reserve the right to establish a later Voting Record Date.

Upon the expiration or termination of the Solicitation, Ballots may not be revoked or withdrawn; *provided, however*, that prior to the expiration or termination of the Solicitation, Ballots may be revoked or withdrawn even if such votes have been delivered to the Voting Agent.

C. *Parties Entitled to Vote on the Plan*

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims that is not deemed to accept or reject the Plan is entitled to vote to accept or reject the Plan. A class is "impaired" unless the legal, equitable and contractual rights of the holders of claims or equity interests in that class are left unaltered by a plan of reorganization or if the plan reinstates the claims or equity interests held by members of such class by (i) curing any defaults which exist, (ii) reinstating the maturity of such claims or equity interests, (iii) compensating the holders of such claims or equity interests for damages that result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims or equity interests, (iv) compensating the holders (other than the debtor or an insider) of any claims arising from failure to perform a non-monetary obligation for any actual pecuniary loss incurred by such holder as a result of such failure, and (v) otherwise leaving unaltered any legal, equitable or contractual rights to which the claims or equity interests entitle the holders of such claims or interests.

Classes that are not impaired under a plan are conclusively presumed to accept such plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, votes are not being solicited from the holders of claims or equity interests in classes that are not impaired.

Section 1126(g) of the Bankruptcy Code provides that a class of claims or equity interests is presumed to have rejected a plan of reorganization if such plan does not entitle the holders of claims or equity interests in such class to receive or retain any property on account of such claims or interests. Accordingly, votes are not being solicited from the holders of claims or equity interests in such classes.

Votes to accept the Plan are being solicited only from Impaired Classes that are not deemed to accept or reject the Plan. Holders of Claims in Class 3 and Class 6 are Impaired under the Plan, and Holders of Claims in such Classes are the only Holders of Claims that are entitled to vote to accept or reject the Plan. No other Class of Claims or Equity Interests is entitled to vote on the Plan.

D. *Counting of Ballots for Determining Acceptance of the Plan*

Only those Ballots (other than any Ballot that is illegible, incomplete or unsigned) that are received prior to the Voting Deadline will be counted for purposes of determining whether each Impaired Class that is entitled to vote has voted to accept or reject the Plan.

Under Section 1126(c) of the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by holders holding at least two-thirds in amount and more than one-half in number of the allowed claims in such class that vote on the plan.

Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or equity interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is presumed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) if there is no such law, rule or regulation, such acceptance or rejection was solicited after disclosure to such holder of “adequate information,” as defined in section 1125(a) of the Bankruptcy Code. Section 1125 of the Bankruptcy Code defines “adequate information” as information of a kind and in sufficient detail as is reasonably practicable, in light of the nature and history of a company and the condition of such company’s books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest that has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be presumed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

We believe that this Solicitation is proper under applicable non-bankruptcy law, rules and regulations. The Prospective Debtors cannot be certain, however, that this Solicitation will be approved by the Bankruptcy Court. If such approval is not obtained, then we may have to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. There also is a risk that confirmation of the Plan would be denied by the Bankruptcy Court.

We believe that, with respect to the Plan, all the requirements of Bankruptcy Rule 3018(b) will be satisfied. This Solicitation and Disclosure Statement and the Plan, together with the accompanying materials, are being transmitted to the Holders of Allowed Senior Credit Agreement Claims and the Holders of Allowed Subordinated Note Claims to solicit their votes to accept or reject the Plan. We believe that this Solicitation and Disclosure Statement contains sufficient information for all of the Holders of Allowed Senior Credit Agreement Claims and the Holders of Allowed Subordinated Note Claims to cast informed votes to accept or reject the Plan.

## II. RISK FACTORS

### A. *Risks Relating to the Chapter 11 Cases*

#### 1. *General*

The filing of bankruptcy petitions by the Prospective Debtors and the publicity attendant thereto may affect our businesses adversely. Any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not timely confirmed and consummated as expected.

#### 2. *Failure to Satisfy Vote Requirement*

We intend to solicit votes from the Holders of Allowed Senior Credit Agreement Claims and the Holders of Subordinated Note Claims. If we obtain the requisite votes from the Holders of Allowed Senior Credit Agreement Claims to accept the Plan in accordance with the requirements of the Bankruptcy Code, we intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan.

3. *Method of Solicitation*

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or equity interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or equity interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), we are attempting to deliver this Solicitation and Disclosure Statement to all Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims as of the Voting Record Date. In that regard, we believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. We cannot be certain, however, that our solicitation of acceptances or rejections will be approved by the Bankruptcy Court, and if such approval is not obtained, the confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that we did not satisfy the solicitation requirements then we may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. We cannot provide any assurances that such a resolicitation would be successful.

4. *Risks Associated with Resolicitation*

If we resolicit acceptances of the Plan from parties entitled to vote thereon, confirmation of the Plan could be delayed and possibly jeopardized. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that the Plan Support Agreement, the DIP Credit Agreement or the Exit Commitment Letter may expire or be terminated in accordance with their terms. See Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Expiration or Termination Rights Under Material Restructuring Agreements."

5. *Classification and Treatment of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. We believe that all Claims and Equity Interests have been appropriately classified in the Plan. We have elected to separately classify General Unsecured Claims because such Claims are held by trade creditors, many of whom are key suppliers of products and services essential to our operations. Further, we believe that a substantial amount of the General Unsecured Claims would be entitled to administrative expense priority pursuant to sections 503(b)(9) and/or 546(c) of the Bankruptcy Code and would therefore receive payment in full upon confirmation of a plan of reorganization in any event. Any impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair the ability of the Prospective Debtors to do business with trade creditors whose goods and services are essential. In addition, based on both the enterprise value and liquidation value of the Debtors as set forth herein, the Debtors have insufficient value to pay their secured creditors in full. Accordingly, any distribution to a class of unsecured creditors under the Plan is an election by the Holders of Senior Credit Agreement Claims to allocate value to which they would otherwise be entitled to such class. The Debtors believe that governing law permits separate classification of General Unsecured Claims, Subordinated Note Claims,

and Former Executive Compensation Claims. To the extent that the Bankruptcy Court determines that such classification is inappropriate, however, the Bankruptcy Court could deny confirmation of the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. We believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

6. *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"*

It is possible that a Class entitled to vote on the Plan may vote against confirmation of the Plan, and certain classes of Claims and Equity Interests are deemed to vote against the Plan. If a Class of Claims or Equity Interests does not vote to accept the Plan or is deemed to reject the Plan, the Bankruptcy Court nevertheless may confirm the Plan at our request pursuant to the "cram down" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class. Under section 1129(b)(2)(B) of the Bankruptcy Code, the condition that a plan be "fair and equitable" with respect to a class of claims or equity interests includes the requirement that the holder of any claims or equity interests that are junior to the claims or equity interests of such class will not receive or retain under the plan on account of such junior claims or equity interests any property.

Although we believe that the Plan will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, we may pursue one of the following alternatives: (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases, or (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. See Article XIII.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

7. *Certain Risks of Nonconfirmation or Delay of Confirmation*

It is possible that the Chapter 11 Cases could evolve into lengthy and contested cases, the results of which cannot be predicted.

Regardless of whether all Classes of Claims and Equity Interests accept or are presumed to have accepted the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion. A nonaccepting creditor might challenge the adequacy of the disclosure provided in connection with this Solicitation, the solicitation procedures and results, or the confirmability of the Plan. In such event, we may seek to resolicit acceptances or modify the Plan to bring into compliance with the Bankruptcy Code. Nonetheless, confirmation of the Plan could be delayed and possibly jeopardized. Additionally, we cannot assure you that the Plan will not require significant modifications for confirmation, or that such modifications would not require a resolicitation of acceptances.

Even if the Bankruptcy Court were to determine that the disclosure and the balloting procedures were appropriate and the results were accurate and appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan was proposed in good faith, that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to nonaccepting Holders of Impaired Claims and

Impaired Equity Interests will not be less than the value of distributions such Holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code. See Article XIII.E.1. "CONFIRMATION—Plan Meets Requirements for Confirmation—Best Interests of Creditors—Liquidation Analysis." Although we believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion. See Article XIII.E. "CONFIRMATION—Plan Meets Requirements for Confirmation."

The confirmation and consummation of the Plan also are subject to certain other conditions. See Article X.D. "THE PLAN—OTHER PROVISIONS—Conditions Precedent to Confirmation and Effective Date of the Plan." These conditions include a requirement that no event that would result in a material adverse effect on our business has occurred prior to the Effective Date. No assurance can be given that this condition or the various other conditions to the Effective Date will be satisfied or, if not satisfied, that we could or would waive such conditions, or that any required consent to such waiver, including from the Holders of Senior Credit Agreement Claims and/or the Senior Agent, would be obtained.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive on account of their Claims and Equity Interests. If an alternative plan of reorganization could not be agreed to, it is possible that we would have to liquidate our assets, in which case it is likely that Holders of Claims and Equity Interests would receive less than they would have received pursuant to the Plan. See Article XIII.F.3. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan—Liquidation Under Chapter 7 or Chapter 11." Moreover, nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements may expire or be terminated in accordance with their terms. See Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Expiration or Termination Rights Under Material Restructuring Agreements."

8. *Alternatives to Confirmation and Consummation of the Plan*

There can be no assurance that the Plan will be confirmed or consummated. If we commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases, and (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. We believe the Plan is significantly more attractive than these alternatives because we believe, among other things, that confirmation and consummation of the Plan will minimize disputes concerning our reorganization, significantly shorten the time required to accomplish the reorganization, reduce the expenses of cases under chapter 11 of the Bankruptcy Code, minimize the disruption to our business that would result from protracted and contested bankruptcy cases and ultimately result in a larger distribution to creditors than would alternative plans of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 or chapter 11 of the Bankruptcy Code.

9. *Risk of Nonoccurrence of the Effective Date*

The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in Section 8.1 of the Plan. Although we believe is it reasonably likely that we will satisfy (or receive a waiver from the Senior Agent for) each condition and that the Effective Date will occur, there can be no assurance that each condition will occur (or be waived in accordance with the terms of the Plan). Under the Plan, the Effective Date must occur by the Outside Date, November 30, 2012; accordingly, each condition to the Effective Date must be satisfied by November 30, 2012 for the Plan to become effective (or the November 30, 2012 deadline must be extended or waived by the Senior Agent).

If the conditions to the Effective Date cannot be satisfied by the Outside Date or if, for any other reason, the Effective Date is significantly delayed, there is a risk that the Effective Date may not occur and that certain material restructuring agreements may expire or be terminated in accordance with their terms. See Article II.A.10.

"RISK FACTORS—Risks Relating to the Chapter 11 Cases—Expiration or Termination Rights Under Material Restructuring Agreements."

- Plan Support Agreement Condition

The Plan requires that all conditions to the Plan Support Agreement shall have been satisfied or waived prior to the Effective Date. The Plan Support Agreement, described in further detail below and attached as Exhibit B, sets forth a number of deadlines and other conditions for the Plan. These conditions include a requirement that the DIP Credit Agreement has not been terminated. See Article II.A.11. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Failure to Close DIP Facility; Event of Default". We believe we will succeed in satisfying all of the conditions in the Plan Support Agreement. We cannot, however, be certain that we will succeed in complying with all of the conditions by the Outside Date and meeting all of the deadlines or that, if a deadline is not met or a condition not timely satisfied, that the necessary Senior Lenders party to the Plan Support Agreement will provide us a waiver of such deadline or condition.

- Material Adverse Effect Condition

The Plan includes a material adverse effect clause as a condition to the Effective Date. Subject to limited exceptions, this provision requires that no material adverse effect has occurred during the Chapter 11 Cases with respect to, among other things, the Company's business, operations, properties, assets, condition (financial or otherwise) or the Senior Lenders' rights under the Senior Credit Agreement and related documents (a "Material Adverse Effect"). While we do not believe a Material Adverse Effect will occur during the Chapter 11 Cases, the Company's business is subject to a number of risks and uncertainties, as set forth in detail in Article II.C. "RISK FACTORS—Risks Relating to the Company," and there can be no assurance that a Material Adverse Effect will not occur. If a Material Adverse Effect occurs prior to the Effective Date, we will be unable to proceed with the Plan absent a waiver of this condition by the Senior Agent in its sole discretion, which we may not be able to obtain.

10. *Expiration or Termination Rights Under Material Restructuring Agreements*

Our ability to consummate the transactions contemplated by the Plan is conditioned upon, among other things, satisfaction of the terms contained in the Exit Commitment Letter and the Plan Support Agreement. Each of these agreements contains certain closing conditions and termination rights. As discussed in Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases," there are several risks that, if realized, could have the effect of extending the chapter 11 proceeding beyond the anticipated timeline. If this happens, the termination rights may be triggered.

- Exit Commitment Letter

Barclays Bank PLC, Garrison Investment Group LP or its designated affiliate(s), and Babson Capital Management LLC, on behalf of certain of its managed funds and advisory accounts, have agreed to backstop the Exit Facility in the Exit Commitment Letter. This commitment, however, expires pursuant to the Exit Commitment Letter on November 30, 2012, unless the Effective Date has occurred and we have entered into the Exit Credit Agreement by that date. While we intend to promptly seek to confirm and consummate the Plan, as discussed in detail herein we cannot guarantee that the Bankruptcy Court will confirm the Plan or that we will be able to satisfy (or have waived) the various other conditions to consummation of the Plan. In addition, even if we are successful in confirming the Plan and meeting the other conditions to the Effective Date, we cannot guarantee that there will not be delays preventing the Effective Date or the effectiveness of the Exit Credit Agreement from occurring by November 30, 2012, the date on which the Exit Commitment Letter expires.

The Exit Commitment Letter also provides for a number of conditions precedent to the Exit Facility, including covenants relating to the occurrence of an event resulting in a material adverse effect on our business. If our financial condition deteriorates during our Chapter 11 Cases sufficient to constitute a material adverse effect, or if a material adverse effect otherwise occurs, we may not satisfy this or other conditions and the Exit Facility may not be made available to us. See Article VI.A. "DESCRIPTION OF MATERIAL AGREEMENTS,

INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing."

- Plan Support Agreement

Pursuant to the Plan Support Agreement, which is attached as Exhibit B, certain Holders of approximately 60% of the Senior Credit Agreement Claims and the Holders of 100% of the Subordinated Note Claims are obligated to vote in support of and otherwise support confirmation of the Plan. The Plan Support Agreement also obligates the Prospective Debtors, subject to their fiduciary duties, to seek approval and confirmation of the Plan. Among other things, the Plan Support Agreement contains certain timing mechanisms which cause it to terminate if the Prospective Debtors do not commence chapter 11 cases by August 29, 2012, a confirmation order is not entered by October 2, 2012, or the Effective Date does not occur by November 30, 2012. Additionally, the Senior Lenders party to the Plan Support Agreement may terminate the Plan Support Agreement if the Debtors breach their obligations thereunder, an event of default occurs under the DIP Credit Agreement, the Debtors make a material modification to the Plan without the requisite consent, the Debtors' exclusive right to file a plan under section 1121 of the Bankruptcy Code expires or is otherwise terminated, or if the Debtors' Chief Restructuring Officer resigns or is terminated and a new Chief Restructuring Officer is not appointed within a short timeframe.

If the Plan Support Agreement terminates, the Senior Lenders party thereto and the Subordinated Noteholders will no longer be obligated to support the Plan. Further, as discussed above in Article II.A.9. "RISK FACTORS—Risks Relating to Chapter 11 Cases—Risk of Nonoccurrence of the Effective Date," it is a condition to the Effective Date under the Plan that the Debtors satisfy the conditions in the Plan Support Agreement. Accordingly, if the Plan Support Agreement terminates, the Debtors will be unable to consummate the Plan as currently constituted absent a waiver of this condition by the Senior Agent.

11. *Failure to Close DIP Facility; Event of Default*

As noted above, Barclays Bank PLC's commitment to backstop the DIP Facility expires pursuant to the DIP Commitment Letter on September 1, 2012, unless we have entered into the DIP Credit Agreement by that date. While we intend to seek approval from the Bankruptcy Court to enter into the DIP Facility upon the commencement of the Chapter 11 Cases, we cannot guarantee that the Bankruptcy Court will approve the DIP Facility or that, if the Bankruptcy Court requires certain changes to the DIP Facility, that the DIP Lenders will agree to provide the DIP Facility on those changed terms.

The DIP Commitment Letter provides for a number of conditions precedent to the DIP Facility, including covenants relating to the occurrence of an event resulting in a material adverse effect on our business. If our financial condition deteriorates prior to the funding of the DIP Facility sufficient to constitute a material adverse effect, or if a material adverse effect otherwise occurs, we may not satisfy this or other conditions and the DIP Facility may not be made available to us. See Article XII.A. "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS—Proposed Debtor in Possession Financing."

In addition, the DIP Facility also provides for certain financial covenants and events of default, certain of which are keyed off of events beyond our ability to control. The financial covenants in the DIP Facility include a requirement that the Company maintain a minimum liquidity of at least $5 million at all times and comply, within certain variances, with a weekly budget. The Company intends to carefully manage its operations and, in particular, its cash during the Chapter 11 Cases in an effort to comply with the requirements of the DIP Facility and avoid events of default. Based on the Company's cash forecast, the Company believes it will be able to comply with the financial covenants in the DIP Facility during the anticipated term of the Chapter 11 Cases.

If an event of default under the DIP Facility were to occur, the DIP Agent could cut off our access to financing and accelerate the DIP Facility, requiring us to pay up to $35 million immediately. Such an event could derail our restructuring efforts and potentially force us into a liquidation. The Senior Agent and the other Senior Lenders on the Steering Committee have repeatedly indicated their strong support for our business and reorganization. If despite our best efforts we are unable to comply with the financial covenants of the DIP Facility or an event of default otherwise occurs, we intend to seek a waiver of such event of default and believe there is a

material probability that the DIP Agent will grant such a waiver to permit our reorganization pursuant to the Plan to continue.

12. *Failure to Close the Exit Facility*

One of the conditions to the effectiveness of the Plan is the execution and delivery of all material documents and agreements necessary to implement the terms of the Plan, including with respect to the availability to the Debtors of the Exit Facility in the amount of $25 million. The Exit Commitment Letter provides for a number of conditions precedent to the Exit Facility, including covenants relating to the occurrence of an event resulting in a material adverse effect on our business. If our financial condition deteriorates during our Chapter 11 Cases sufficient to constitute a material adverse effect, or if a material adverse effect otherwise occurs, we may not satisfy this or other conditions and the Exit Facility may not be made available to us. <u>See</u> Article VI.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing."

If, for these or any other reasons, we are unable to obtain the Exit Facility we would be unable to consummate the Plan. <u>See</u> Article XIII.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

13. *Inability to Assume Certain Contracts*

The Plan provides for the assumption of a list of executory contracts to be included in the Plan Supplement and, with limited exceptions, the rejection of all our other executory contracts and unexpired leases. Our intention is to preserve as much of the benefit of our existing contracts as possible. Certain limited classes of executory contracts, however, may not be assumed without the consent of the counterparty. In these cases, we would need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent would be forthcoming or that material conditions would not be attached to any such consent that would make assuming such contracts unreasonable. We would then be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them. We may attempt to pass through to the Reorganized Debtors any and all licenses in respect of patents, trademarks, copyright or other intellectual property that cannot otherwise be assumed pursuant to section 365(c) of the Bankruptcy Code. The counterparty to any contract that we seek to pass through may object to our attempt to pass through the contract and seek to require us to reject the contract or seek approval of the Bankruptcy Court to terminate the contract. If the counterparty prevails with respect to such action, we could lose the benefit of the contract, which could harm our business.

B. *Factors Affecting the Value of the Plan Distributions to Be Issued Under the Plan of Reorganization*

1. *Capital Requirements*

The Reorganized Debtors' business is expected to have significant capital expenditure needs. Although the Plan reduces our debt obligations, we will remain leveraged, and our ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

2. *Variances From Projections*

A fundamental premise of the Plan is that it restructures our indebtedness to reasonable levels consistent with our business plan, as reflected in the Projections. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and their subsidiaries, some of which may not occur. Such assumptions include, among others, assumptions concerning the general economy, our ability to make necessary capital expenditures, our ability to manage costs and achieve cost reductions, our ability to establish market strength, the performance of, and demand for our services from, major customers, consumer purchasing trends and preferences, the ability to stabilize and grow our customer base and control future operating expenses, and other risk factors described below. We believe that the assumptions underlying the Projections are reasonable.

Unanticipated events and circumstances occurring subsequent to the preparation of the Projections, however, may affect our actual financial results. Additionally, upon the Effective Date, Reorganized Parent will have new directors who may elect not to pursue the same business plan that underlies the Projections. The actual results achieved, therefore, necessarily will vary from the projected results, and such variations may be material and adverse. Accordingly, Holders of Claims and Equity Interests and other interested parties are cautioned not to place undue reliance on the Projections.

3. *Recovery Percentages May Differ From Estimates*

The estimated percentage recoveries by Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims are based upon estimated values of the Reorganized Parent Common Stock, the Warrants, and the Second Lien Notes. Given that the market and economic conditions upon which such values are based are beyond our control, the actual results achieved necessarily will vary from the estimate. Such variations may be material and adverse. See “SUMMARY OF THE SOLICITATION AND PLAN.”

4. *Lack of Trading Market for Reorganized Parent Common Stock and Restrictions on Transfer of Reorganized Parent Common Stock*

The Reorganized Parent Common Stock will be a new issue with no established trading market or prior trading history. There can be no assurance regarding the future development of a market for the Reorganized Parent Common Stock, the ability of holders thereof to sell their Reorganized Parent Common Stock or the price for which such holders may be able to sell such Reorganized Parent Common Stock. If a market were to develop, the Reorganized Parent Common Stock could trade at prices lower than their initial values under the Plan. The trading price of the Reorganized Parent Common Stock will depend on many factors, including factors beyond our control. Furthermore, the liquidity of, and trading market for, the Reorganized Parent Common Stock may be adversely affected by price declines and volatility in the market for similar instruments, as well as by any changes in our financial condition or results of operations.

The Reorganized Parent Common Stock also will be subject to certain restrictions on transfer contained in the Stockholders' Agreement. See Article VI.D.3. “DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Reorganized Parent Common Stock, Certificate of Incorporation and Stockholders' Agreement—Description of Stockholders' Agreement & Registration Rights Agreement.” Consequently, any Holder of the Reorganized Parent Common Stock may have to bear the economic risk associated with such stock for an indefinite period of time.

We do not intend to register the Reorganized Parent Common Stock under the Securities Act or to list it on any securities exchange. Holders of the Reorganized Parent Common Stock should not expect to receive reports or financial statements from us except to the extent required by the Reorganized Parent Constituent Documents, the Stockholders' Agreement, or to the extent voluntarily provided.

5. *Dividends on Reorganized Parent Common Stock*

We do not anticipate that we will generate sufficient net profits to pay cash dividends on account of the Reorganized Parent Common Stock for the foreseeable future. In addition, provisions in the Exit Facility Documents and the Second Lien Note Agreement may limit our ability to pay dividends.

6. *Ownership of Voting Stock*

After the Effective Date, we anticipate that the voting shares of Reorganized Parent Common Stock may become concentrated in a small number of holders. As a result, and pursuant to the terms of the Reorganized Parent Certificate of Incorporation, these stockholders will have significant voting power, and such holders may exercise any resulting voting power in their own interests and not necessarily in the interests of other stakeholders of Reorganized Parent. The extent of ownership by these stockholders also may discourage a potential acquiror from

making an offer to acquire the Company. Reduced likelihood of an acquisition could reduce the value of the Reorganized Parent Common Stock.

Pursuant to the Plan, the Holders of Allowed Subordinated Note Claims will receive the Warrants described in Article VI.E. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Warrants." If the Warrants are exercised, the additional Reorganized Parent Common Stock issued in satisfaction thereof will dilute the then outstanding shares of Reorganized Parent Common Stock.

7. *Issuance of Equity Interests Pursuant to the New Management Equity Incentive Plan May Dilute the Reorganized Parent Common Stock*

After the Effective Date, the Reorganized Parent Board of Directors will establish the New Management Equity Incentive Plan, which will, among other things, provide for a pool of up to 10% of non-voting Reorganized Parent Common Stock to be issued to management of the Reorganized Debtors. The terms and conditions for any such distributions will be determined by the Reorganized Parent Board of Directors. If the Reorganized Parent Board of Directors distributes such equity interests, or options to acquire such equity interests, to management pursuant to the New Management Equity Incentive Plan, it is contemplated that such distributions will dilute the Reorganized Parent Common Stock issued on account of Claims under the Plan and the ownership percentage represented by the Reorganized Parent Common Stock distributed under the Plan.

8. *Ranking of Reorganized Parent Common Stock*

Reorganized Parent Common Stock will rank junior to all of our existing and future liabilities. In addition, in the event of a subsequent bankruptcy, liquidation or winding-up, our assets will be available to make payments with respect to our obligations on Reorganized Parent Common Stock only after all of our indebtedness and other liabilities have been paid.

9. *Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Adversely Affect the Reorganized Debtors*

Holders of Allowed Claims should carefully review Article XI herein, "CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS," for a summary of certain material U.S. federal income tax consequences to the Reorganized Debtors relating to the consummation of the Plan and these Chapter 11 Cases. Such U.S. federal income tax consequences are complex and subject to significant uncertainties. Holders of Allowed Claims should consult their respective tax advisors regarding the specific tax consequences to such Holders of the transactions described herein and in the Plan.

10. *Impact of Interest Rates and Foreign Exchange Rates*

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

C. *Risks Relating to the Company*

1. *Leverage and Debt Service*

We are highly leveraged and will remain leveraged even if the Plan is confirmed and the transactions contemplated thereunder are consummated. Our levels of indebtedness could have important consequences, including:

(a) requiring us to dedicate a substantial portion of our cash flow from operations to payments on indebtedness, thereby reducing the availability of cash flow to fund

working capital, capital expenditures, research and development efforts and other general corporate purposes;

(b) increasing our vulnerability to adverse general economic or industry conditions;

(c) limiting our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate;

(d) impairing our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, general corporate purposes or other purposes;

(e) placing us at a competitive disadvantage to our competitors who may not be as highly leveraged; or

(f) triggering an event of default under the Exit Credit Agreement or Second Lien Note Agreement if we fail to comply with the financial and other restrictive covenants contained therein.

To adequately service our indebtedness, we will require a significant amount of cash. Our future cash flow may not be sufficient to meet our obligations and commitments. If we are unable to generate sufficient cash flow from operations in the future to service our indebtedness and to meet our other commitments, we will be required to adopt one or more alternatives, such as a further refinancing or restructuring of our indebtedness, selling material assets or operations or seeking to raise additional debt or equity capital. These actions may not be implemented on a timely basis or on satisfactory terms or at all, and they may not enable us to continue to satisfy our capital requirements. Restrictive covenants in our indebtedness may prohibit us from adopting any of these alternatives (with the failure to comply with these covenants resulting in an event of default which, if not cured or waived, could result in the acceleration of all of our indebtedness). We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt instruments, if accelerated upon an event of default, or that we would be able to repay, refinance or restructure the payments of those debt instruments.

2. *Floating Rate Indebtedness*

The DIP Facility, the Exit Facility, and the Second Lien Notes will bear interest at floating rates, which may adversely affect our cash flow and liquidity. If there is a rise in interest rates, our debt service obligations on the borrowings under such facilities would increase even though the principal amount of our indebtedness remained the same. We cannot assure you that we will be able to limit our exposure to such rate fluctuations by entering into an interest rate hedging agreement on favorable terms, or at all, in the future.

3. *Liquidity*

Our liquidity generally depends on cash provided by operating activities. Our ability to continue as a going concern during the Solicitation period depends, among other things, on (i) our ability to maintain adequate cash on hand; (ii) our ability to generate cash from operations; and (iii) the duration and outcome of the Solicitation. In conjunction with our advisors, we are working to design and implement strategies to provide adequate liquidity. There can be no assurance, however, as to the success of such efforts.

4. *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business*

We believe that our ability to continue to receive significant levels of trade support following the Petition Date will require that we obtain “first day orders” from the Bankruptcy Court authorizing us to continue to pay trade vendors and other unsecured creditors in the ordinary course of business, including certain obligations that arise

prior to the filing of the Chapter 11 Cases. Although we believe that ample precedent exists for obtaining such orders in prepackaged chapter 11 cases such as ours, there can be no assurance that the Bankruptcy Court will grant the requested orders or that we will succeed in maintaining trade support from our vendors.

Irrespective of whether we are able to obtain such orders, the Plan provides that Holders of Allowed General Unsecured Claims will be Unimpaired. If the Plan is confirmed, Allowed General Unsecured Claims will, at the election of the Debtors or the Reorganized Debtors, (i) be reinstated pursuant to section 1124(2) of the Bankruptcy Code (including receiving any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired, (ii) be paid in full in Cash, or (ii) receive such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. As a result, except as otherwise agreed with the Holders of such claims, no Allowed General Unsecured Claims will be restructured or otherwise reduced in connection with the Plan (although it is possible that certain Claims will be "statutorily impaired" pursuant to section 502 of the Bankruptcy Code).

The Prospective Debtors anticipate that there will not be a general Claims bar date established in connection with the Plan. In the absence of a bar date, there will be uncertainty with respect to the overall liabilities of the Reorganized Debtors because there will be no requirement for Holders of General Unsecured Claims to identify the nature and amount of their Claims by timely Filing a proof of claim. If we had elected to pursue an alternative plan of reorganization in which General Unsecured Claims were Impaired, the amount of indebtedness with respect to such Claims could have been reduced, and the total liabilities of the Reorganized Debtors would be more clear. We believe, however, that the Plan is a superior alternative to any alternative plan of reorganization that would Impair the Holders of General Unsecured Claims because: (i) a large number of the Holders of General Unsecured Claims are customers and/or key suppliers of products and services used by the Company and any Impairment of these Claims could be detrimental to our ability to generate new business or obtain essential trade credit and could substantially impair our ability to do business with trade creditors whose goods and services are essential and (ii) we believe the Plan can be consummated on a more expeditious and significantly less contentious and costly basis if General Unsecured Claims are Unimpaired than if such Claims were to be Impaired.

5. *Competition*

There is significant competition in the digital set top box repair, remanufacture and sale markets. We compete with numerous companies in this market space to serve major cable providers in the U.S., Mexico, Canada and South America. There can be no assurance that we will be able to compete effectively with these competitors even if the Plan is confirmed and the transactions contemplated thereunder are consummated.

6. *Customer Issues*

Revenues from the Company's largest customers represent a significant portion of the Company's total revenue. For the year ended December 31, 2011, revenues from customers who individually exceeded 10% of total revenues were approximately $83.7 million, or 54% of total revenues. Accordingly, the failure of a major customer to pay its account payables to the Company, or the loss of a major customer's business, could have a material adverse effect on the Company. The Company intends to work closely with its customers during its Chapter 11 Cases to maintain these critical business relationships.

7. *Disruption of Operations and Retention of Key Customers and Employees*

The commencement and pendency of the Chapter 11 Cases could adversely affect our relationships with our customers and suppliers, as well as our ability to retain or attract high-quality employees. In such event, weakened operating results may occur that could give rise to variances from the stated Projections.

Our ability to operate our businesses and implement our strategies effectively depends, in part, on the efforts of our executive officers and other key employees. In this way, our future success will depend on, among other factors, our ability to attract and retain other qualified personnel in key areas, including sales and marketing, operations, information technology and finance. Because of the traditional stigma associated with any bankruptcy,

regardless of whether it may improve our financial condition, the commencement of the Chapter 11 Cases may adversely affect our ability to attract and retain the requisite highly skilled personnel and key employees. Although we intend to seek authority from the Bankruptcy Court to pay, among other things, prepetition wages, salaries, commissions and employee benefits, we cannot assure you that the Bankruptcy Court will grant such an order, or that, even with such an order, our highly skilled personnel and key employees will commence or continue their employment with us, and their failure to do so could have a material adverse effect on our business.

8. *New Technologies in the Cable Television Space*

The introduction of new technologies into the cable television space may cause existing digital set top boxes to become obsolete, which could have an adverse effect on the Company's financial position, results of operations and cash flows.

9. *Product Development and Technology*

We attempt to protect our intellectual property rights through a combination of patent, trademark, copyright and trade secret protection, as well as licensing agreements and third-party nondisclosure and assignment agreements. There can be no assurance that any of our applications for protection of intellectual property rights will be approved or that others will not infringe or challenge our intellectual property rights. We also rely on unpatented proprietary technology. It is possible that our competitors will independently develop the same or similar technology or otherwise obtain access to our unpatented technology. To protect our trade secrets and other proprietary information, we require employees, consultants and advisors to enter into confidentiality agreements. There can be no assurance that these agreements will provide meaningful protection for our trade secrets, know-how or other proprietary information if any unauthorized use, misappropriation or disclosure occurs.

Our protection of intellectual property may not adequately safeguard such property and we may incur significant costs to defend our intellectual property rights, which may harm our operating results. From time to time, we may pursue potential litigation relating to the protection of certain intellectual property rights, including with respect to some of our more profitable products. If we are unable to maintain the proprietary nature of our technologies, our ability to sustain margins on some or all of our products may be affected, which could reduce our sales and profitability. In addition, third parties may accuse us of infringing their proprietary rights. Any infringement claims, whether with or without merit, could be time-consuming, result in costly litigation or damages, undermine the exclusivity or value of our brands, decrease sales or require us to enter into royalty or licensing agreements that may not be on terms acceptable to us, any of which could have a material adverse effect on our business or financial condition or the results of our operations.

10. *Litigation*

From time to time, we are subject to claims or litigation incidental to our business. As of the date of this Solicitation and Disclosure Statement, we are not currently involved in any legal proceedings that, individually or in the aggregate, are expected to have a material effect on our business, financial condition, results of operations or cash flows. Our major pending litigation consists of the matters described in Article IV.H. "THE BUSINESS—Environmental, Health and Safety Matters."

11. *Asset Sales and Other Major Transactions*

We may consider, on a case by case basis, certain asset sales or other divestitures of non-core assets in the future, although no such sale or divestiture is contemplated by the Plan. There can be no assurances that material liabilities will not arise in connection with such future sales and divestitures or of the consideration that we would receive in connection with any such sale or other disposition.

12. *Environmental and Health and Safety Liabilities and Requirements*

Our operations and properties are subject to federal, state and local environmental and occupational health and safety laws and regulations in the United States and in Mexico. In the United States, such laws and regulations, among other things, (a) impose limitations on the discharge of pollutants, and (b) establish standards for management and disposal of hazardous substances and waste used or generated during our engineering, research and development and manufacturing activities. In addition, environmental laws also impose obligations and liability for the cleanup of properties affected by hazardous substance spills or releases. These liabilities can be imposed on the parties generating or disposing of such substances or on the owner or operator of the affected property, often without regard to whether the owner or operator knew of, or was responsible for, the presence of hazardous substances. Accordingly, we may become liable, either contractually or by operation of law, for remediation costs even if the contaminated property is not presently owned or operated by us, or if the contamination was caused by third parties. We have incurred and expect to continue to incur significant costs to maintain or achieve compliance with applicable environmental laws and regulations. Future events, such as changes in existing laws and regulations or their interpretation, or discovery of unknown contamination at sites now or formerly owned or operated by us, may give rise to additional compliance costs or liabilities that could have a material adverse effect on our business or financial condition or results of operations. Our failure to comply with applicable environmental laws and regulations and permit requirements could result in civil or criminal fines, penalties or enforcement actions, third-party claims for property damage and personal injury, suspension or cessation of our operations, requirements to clean up property or pay for the costs of cleanup or regulatory or judicial orders enjoining or curtailing operations or requiring corrective measures, including the installation of pollution control equipment or remedial actions, any of which could have a material adverse effect on our business, financial condition or results of operations. Compliance with more stringent laws or regulations, as well as more vigorous enforcement policies of regulatory agencies or stricter or different interpretations of existing laws, may affect the sales volume of certain product offerings or require additional expenditures that may materially and adversely affect our business or financial condition or the results of our operations.

13. *Warranty Issues*

The Debtors provide warranty programs to their customers that cover various aspects of the repairs made by the Debtors. In the ordinary course of business, the Debtors' customers send defective consumer equipment to the Debtors and the Debtors repair and return the fixed consumer equipment to such customers, pursuant to the Debtors' warranty programs. The time period and scope of the warranties are specific to each customer. The Debtors typically incur warranty obligations when an end-user returns a defectively repaired product to a customer. The customer then returns the defectively repaired product to the Debtors, at which point the Debtors satisfy their incurred warranty obligations by repairing the defective product and shipping it to the customer at no charge. From an accounting perspective, the Debtors recognize anticipated warranty costs for repaired consumer equipment at the time the equipment is returned to the Debtors. The warranty accrual is based on management's estimate of the dollar amount that eventually will be required to settle the warranty obligations. A significant increase in the Debtors' warranty obligations could have an adverse effect on the results of their operations.

14. *The Debtors' Tax Attributes May be Significantly Reduced Following Their Emergence from Bankruptcy*

The Prospective Debtors expect that their net operating loss carryforwards that are not absorbed in the calculation of the Reorganized Debtors' tax for the year of their emergence from chapter 11 will be eliminated and, therefore, not available to offset income of the Reorganized Debtors for taxable years following the year of emergence. Further, it is expected that a significant portion of the Reorganized Debtors' depreciable and amortizable tax basis in their assets will be reduced after the calculation of tax for the year of emergence from chapter 11, thereby potentially causing the Reorganized Debtors to pay U.S. federal income taxes sooner and in a greater amount than if such asset tax basis reduction were not required. Holders of Allowed Claims should carefully review Article XI herein, "CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS," for a summary of certain material U.S. federal income tax consequences to the Reorganized Debtors relating to the consummation of the Plan and these Chapter 11 Cases. Such U.S. federal income tax consequences are complex and are subject to

significant uncertainties. Holders of Allowed Claims should consult their respective tax advisors regarding the specific tax consequences to such Holders of the transactions described herein and in the Plan.

15. *Decline in the Demand for Repairs from the Debtors' Major Customers Could Harm the Debtors' Profitability*

Demand for the Debtors' products is directly related to the consumer equipment repair needs of the Debtors' major customers. The demand for consumer equipment repairs can be affected by general economic or industry conditions, labor relations issues, regulatory requirements, government initiatives, and other factors. The consumer equipment repair industry has been and continues to be extremely challenging. Due to the nature of the cable and satellite industry, there are only a few major cable and satellite companies. The Company's top 10 customers account for over 90% of the Company's revenue.

In mid-2011, a large customer decided to stop repairing a number of models of set-top boxes, in favor of replacing broken boxes with new set-top boxes capable of providing more extensive services. Halting orders for repair of the affected models for this customer resulted in an immediate decline in the Company's repair volume and a significant revenue drop. It is possible that the Company's revenue may continue to decline, especially if another large customer decides to stop sending a significant category of set-top boxes to the Company for repair.

16. *The Debtors' International Operations Make Them Vulnerable to Risks Associated with Doing Business in Foreign Countries*

As a result of the Debtors' global presence, a significant portion of the Debtors' revenues and expenses are denominated in currencies other than the U.S. dollar. In addition, the Debtors have facilities in Mexico. International operations are subject to certain risks inherent in doing business abroad, including:

- exposure to local economic conditions;
- expropriation and nationalization;
- foreign exchange rate fluctuations and currency controls;
- withholding and other taxes on remittances and other payments by subsidiaries;
- investment restrictions or requirements;
- export and import restrictions; and
- increases in working capital requirements related to long supply chains.

Maintaining the Debtors' business in Mexico is an important element of the Debtors' strategy. The Debtors' strategy includes increasing their Mexican market share and expanding the Debtors' operations in lower-cost regions. As a result, the Debtors' exposure to the risks described above is substantial. The likelihood of such occurrences and their potential effect on the Debtors vary from country to country and are unpredictable. However, any such occurrences could be harmful to the Debtors' business and the Debtors' profitability, thereby making it more difficult for the Debtors to make payments under the Debtors' indebtedness or resulting in a decline in the value of the Reorganized Parent Common Stock.

17. *Potential for the Loss of Key Members of the Executive Management Team*

The Debtors are highly dependent on the efforts and performance of their executive management team. If the Debtors were to lose key members of this team, the Debtors' business, financial condition, liquidity and results of operations could be adversely affected.

## III. BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION

A. *Background*

The Company is a leading provider of repair and other services for customer premise equipment to the broadband industry. Since 1978, the Company has grown and expanded its service offerings to cable operators

throughout North America. The Company repairs millions of digital cable set-tops, VoIP modems, data modems, and satellite receivers annually. The Debtors are headquartered in Schenectady, New York.

For a more detailed description of the Company's businesses, see Article IV. "THE BUSINESS."

B. *Events Leading to Financial Distress and the Proposed Financial Restructuring*

As a result of the slowdown in the domestic economy and changes in customer business models, the Company has experienced an erosion of its revenue and profit margin over the last few years. Coupled with the Company's significant long-term capital debt service, the Company began to experience financial difficulties, ultimately resulting in the breach of a financial covenant in the Senior Credit Agreement in the second quarter of 2011.

The Company promptly informed the Senior Agent and American Capital of this breach and initiated discussions regarding a forbearance agreement. After extensive negotiations, the Debtors entered into initial standstill agreements with both the Steering Committee and American Capital on August 19, 2011. The initial standstill agreements provided, among other things, for an eight-week standstill, until October 12, 2011, while the Company stabilized its business and engaged in discussions with the Steering Committee and American Capital.

During this initial standstill period, the Company provided substantial information and access to the Steering Committee and American Capital regarding the Company's financial situation and strategy. The Senior Agent retained FTI as its financial advisor, and the Company provided FTI with full access to its business and finances. During this period the Company also engaged in negotiations with the Steering Committee and American Capital regarding a further extension of the standstill period and various restructuring options, both out of court and through chapter 11.

As the negotiations between the various parties progressed, the Steering Committee, American Capital and the Company entered into a series of amendments to the standstill agreements that repeatedly extended the standstill period, ultimately extending it through July 27, 2012. During this time, the Company provided diligence information to the Steering Committee and American Capital, and the parties exchanged various term sheet proposals and held numerous in-person and telephonic negotiating sessions.

Ultimately, the Debtors, the Steering Committee, American Capital, and the Sponsor reached agreement on the proposed restructuring embodied in the Plan Support Agreement and the Plan. The Solicitation and proposed restructuring are being made pursuant to the restructuring terms agreed upon in the Plan Support Agreement.

C. *Equity Ownership and Debt Structure*

1. *Equity Ownership Structure*

The vast majority of the equity interest in CHL, Ltd., the holding company parent in the Company's corporate structure, is held by the Sponsor. Certain current and former employees also have holdings in CHL's equity. Each Prospective Debtor (other than CHL) is either a direct or indirect wholly-owned subsidiary of CHL.

2. *Debt Structure*

(a) Senior Credit Agreement

The Prospective Debtors, other than CHL, are parties to the Senior Credit Agreement, which provides for a term loan, a revolving commitment and a swing line loan commitment.

The term loan under the Senior Credit Agreement has a maturity date of July 28, 2014, and bears interest at the rate of LIBOR plus 4.75% or Federal Funds Rate plus 3.75% per annum. Revolving commitments under the Senior Credit Agreement have a maturity date of July 28, 2013, and bear an interest rate of LIBOR or Federal Funds

Rate plus 4.5% per annum. If a specified default under the Senior Credit Agreement occurs, these interest rates may increase by an additional 2% per annum.

Each Prospective Debtor other than CHL and Contec, LLC is a guarantor under the Senior Credit Agreement. The Prospective Debtors' obligations under the Senior Credit Agreement are secured by a first priority lien, held by the Senior Agent, as collateral agent, for the benefit of the Senior Lenders, on substantially all of the Prospective Debtors' assets (other than CHL's), including a pledge of all the equity interests of each of their respective domestic and foreign subsidiaries. As of the Petition Date, approximately $177,890,500 in principal is outstanding under the term loan, and $3 million is outstanding under the revolving loan (which provides for borrowings up to $20 million).

(b) Subordinated Notes

The Prospective Debtors, other than CHL, issued (i) $67.5 million aggregate principal amount of unsecured Senior Subordinated Notes due September 30, 2015, and (ii) $67.5 million aggregate principal amount of unsecured Junior Subordinated Notes due September 30, 2016, pursuant to the Note Purchase Agreement, with American Capital and certain of its affiliates as note purchasers thereunder. Each Prospective Debtor, other than Contec, LLC and CHL, is a guarantor under the Note Purchase Agreement. The Prospective Debtors' obligations under the Note Purchase Agreement are unsecured and, pursuant to the Intercreditor Agreement, subordinated in priority to the Debtors' obligations under the Senior Credit Agreement. As of the Petition Date, approximately $135 million in principal was outstanding under the Note Purchase Agreement.

## IV. THE BUSINESS

### A. *General*

The Company is a leading provider of repair and other services for customer premise equipment to the broadband industry. The Company maintains operations at its Schenectady headquarters and at facilities in Edison, New Jersey, Seattle, Washington, Matamoros, Mexico, and Mexico City, Mexico.

### B. *Employees*

As of July 28, 2012, the Debtors directly employed 177 employees in the United States and 2,134 employees in Mexico. 72% of the Debtors' employees are union employees and 28% are non-union employees. 61% of the U.S. Debtors' employees are hourly employees and 39% are salaried employees. All of Contec de Mexico's and Ensambladora's employees are compensated on a *per diem* basis. Approximately 1,668 of the Mexican employees are unionized, and their compensation and benefits are governed pursuant to collective bargaining agreements and applicable law. In addition, the Debtors also retain the services of 80 contractors that are arranged through various agencies and other third-party providers.

### C. *Corporate History*

Since 1978, the Company has continually grown and expanded its service offerings to cable operators throughout North America. In 2002, the Company acquired WorldWide Digital, formerly Motorola Broadband Communications Sector in Matamoros, Mexico. In August 2008, the Sponsor acquired a controlling share of the equity in the Company from certain funds affiliated with American Capital in an equity transaction. In connection with such transaction, the Company amended and restated its secured bank facility and issued the Subordinated Notes.

### D. *Repair Services*

The Debtors' customer base is primarily comprised of multiple system operators and original equipment manufacturers ("OEMs"). The Debtors provide their customers with repair services for, among others, (i) digital cable set-tops, (ii) VoIP modems, (iii) data modems, and (iv) satellite receivers. The Debtors also provide "screen

and clean" services to their customers, which involve screening customer premise equipment for problems and cleaning and refurbishing the equipment to "new" condition. The Debtors generate approximately 72% of their revenues, or $110.5 million in 2011, from providing repair and related services to multiple system operators for goods covered under warranty programs, and approximately 14% of their revenues, or $21.5 million in 2011, from providing licensed repair and related services to original equipment manufacturers.

The Debtors also sell parts for customer premise equipment to their multiple system operator customers, along with QuickTest™ benches. A QuickTest™ bench is a machine, developed by the Company, that performs a series of diagnostic tests on set-top boxes to detect and identify faults with the boxes. A single QuickTest™ bench can test up to 24 set-top boxes at once, or up to 900 boxes in a single day. QuickTest™ benches assist multiple system operators by helping them identify, prior to sending a box out for repair, what faults are present, and assist the Debtors by providing earlier information on what services will be required for the set-top boxes provided by customers.

E. *Sales*

*Geographic Segments*

The Debtors serve their customer base in North America out of their Seattle, Washington, and Matamoros, Mexico repair facilities. The Debtors' Contec de Mexico facility in Mexico City, Mexico, predominantly serves the Debtors' customers in South America.

*Marketing*

Our sales force consists of eighteen employees. This sales force is responsible for all facets of account management, including new product introduction, marketing programs, technical training and customer service functions.

F. *Facilities*

The Company employs a number of engineers at its Schenectady headquarters who research and develop new repair and servicing technologies and work with the Company's OEM customers to develop methodologies to assess and repair new models of set-top boxes and other customer premise equipment. The Company's engineers also developed and help service QuickTest™ machines. The Company also maintains its sales and customer service functions at its Schenectady headquarters.

The Company maintains a screen and clean facility in Edison, New Jersey and major repair facilities in Seattle, Washington, Matamoros, Mexico, and Mexico City, Mexico. The Company operates its largest repair facility, in Matamoros, Mexico, through debtor Ensambladora, a Mexican subsidiary. The Matamoros facility performs screen and clean services and also specializes in repairing certain set-top models, data and VoIP modems, and satellite receivers. The Company also operates smaller repair facilities in Seattle, Washington, and through its other Mexican Subsidiary, Contec de Mexico, in Mexico City, Mexico. The Seattle facility specializes in various types of electronic rework projects. Through the Mexico City facility, the Company remanufactures and repairs set-tops for customers located in Mexico and South America.

A summary of the three main repair facilities is included below. Each is well maintained and suitable for its purposes.

| **Location** | **Approx. size** | **Owned/Leased** |
|---|---|---|
| Matamoros, Mexico | 243,890 | Leased |
| Mexico City, Mexico | 5,669 | Leased |

| | | |
|---|---|---|
| Seattle, Washington | 66,760 | Leased |

G. *Recent and Future Strategy*

Upon emergence from chapter 11, the Company intends to pursue new business opportunities to grow its current market share and expand into new technology repair areas. See Article VII.A. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS—Financial Projections."

H. *Environmental, Health and Safety Matters*

Our facilities are subject to federal, state, local and foreign environmental requirements in the United States and Mexico, including those governing discharges to the air and water, the handling and disposal of industrial and hazardous wastes and the remediation of contamination associated with releases of hazardous substances. We operate under various environmental permits and approvals, the violation of which may subject us to fines and penalties or, in certain situations, lead to revocation of these permits or orders to curtail operations. We believe that we are currently in compliance, in all material respects, with all applicable environmental requirements (including environmental permits and approvals) and that any non-compliance with such laws or requirements will not have a material adverse effect on our business, financial position or results of operations. We cannot assure you, however, (a) that changes in federal, state or local laws, regulations or regulatory policy or the discovery of unknown problems or conditions will not in the future require substantial expenditures or (b) as to the extent of our liabilities, if any, for past failures, if any, to comply with applicable environmental laws, regulations and permits, any of which could also have a material adverse effect on our business or financial condition or results of operations.

For a discussion of our current and future liabilities under CERCLA or similar state laws for the investigation and cleanup of hazardous waste or contamination at third party waste disposal sites or at current or former facilities, see Article II.C.12 "RISK FACTORS—Risks Relating to the Company—Environmental and Health and Safety Liabilities and Requirements".

I. *Executive Officers*

The Company's executive officers are as follows:

| **Name** | **Position(s) held** |
|---|---|
| Wesley Hoffman | Co-Chief Executive Officer, Senior Vice President, Tech. & Eng. |
| Lawrence Young | Co-Chief Executive Officer, Chief Restructuring Officer |

Dax H. Funderburk resigned from his position as Chief Executive Officer on June 18, 2012, and David A. Tanner resigned from his position as Chief Financial Officer on August 17, 2012.

## V. THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION

A. *Overview of Chapter 11*

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its financial affairs for the benefit of itself and its creditors and equity holders. The principal goals of chapter 11 are to permit the rehabilitation of the debtor and provide for equality of treatment of similarly situated creditors.

The Plan provides, among other things, for a restructuring of our financial indebtedness. The goal of the Plan is to de-lever our balance sheet to provide us with a capital structure that will best enable us to compete effectively in our markets while maintaining strong relationships with our customers and vendors.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement. Capitalized terms used in this Article V but not otherwise defined in Annex II shall have the meanings assigned such terms in the Plan.

B. *Administrative Claims, Priority Tax Claims and Other Unclassified Claims*

1. *Administrative Claims*

Pursuant to Section 2.1 of the Plan, each Holder of an Allowed Administrative Claim will receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable, and (d) such other date as mutually may be agreed to by such Holder and the Debtors; *provided*, that any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

2. *Priority Tax Claims*

Pursuant to Section 2.2 of the Plan, each Holder of an Allowed Priority Tax Claim will receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable, and (d) such other date as mutually may be agreed to by and among such Holder, the Senior Agent and the Debtors or the Reorganized Debtors; *provided*, *however*, that the Debtors will be authorized, at their option, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

3. *Professional Fees*

Pursuant to Section 2.3 of the Plan, each Professional requesting compensation pursuant to sections 330, 331, 363, or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date will File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the forty-fifth (45th) day following the Effective Date. Without limiting the foregoing, any Debtor or Reorganized Debtor may pay, upon submission of appropriate documentation and in the ordinary course of business, the charges incurred by the Debtors on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services without application to or approval by the Bankruptcy Court.

Notwithstanding the preceding paragraph, all reasonable fees and expenses of the Senior Agent Professionals that are incurred in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date, but no later than the Effective Date) will be deemed to be Allowed Administrative Claims for purposes of the Plan and shall be paid in Cash in full on or before the Effective Date without application to or approval by the Bankruptcy Court.

4. *DIP Credit Agreement Claims*

Pursuant to Section 2.4 of the Plan, unless the DIP Agent consents in writing to a different treatment, the DIP Credit Agreement Claims will be paid in full in Cash on the Effective Date.

C. *Classification of Claims and Equity Interests*

Section 1123(a)(1) of the Bankruptcy Code requires a plan of reorganization to designate classes of claims and classes of equity interests. The Plan segregates the various Claims against, and Equity Interests in, the Debtors into various classes. Based on both the enterprise value and liquidation value of the Debtors as set forth herein, the Debtors have insufficient value to pay their secured creditors in full. Accordingly, any distribution to a class of unsecured creditors under the Plan is an election by the Holders of Senior Credit Agreement Claims to allocate value to which they would otherwise be entitled to such classes.

The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. We believe that all Claims and Equity Interests have been appropriately classified in the Plan. Further, the Debtors believe that governing law permits separate classification of General Unsecured Claims from Subordinated Note Claims and Former Executive Compensation Claims. To the extent that the Bankruptcy Court determines that such classification is inappropriate, however, the Bankruptcy Court could deny confirmation of the Plan.

If the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, we might seek (with the consent of any required parties) to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the Holder of such Claim was initially a member (or any other Class under the Plan) by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of Claims in a manner that requires resolicitation, we likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class to which such Holder is ultimately deemed to be a member. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. We believe we have complied with the requirement of equal treatment for each Claim or Equity Interest of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan. As a general matter, a class of claims or equity interests is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable and contractual rights of the holders of such claims or equity interests. Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed plan of reorganization. Holders of Claims or Equity Interests that do not receive or retain any property under a proposed plan of reorganization are deemed to have rejected such plan.

The categories of Claims and Equity Interests outlined in the Plan and listed below classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Pursuant to Section 3.1 of the Plan, a Claim or Equity Interest will be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date.

**The Plan classifies General Unsecured Claims as a separate Class and provides that Allowed General Unsecured Claims will, at the election of the Debtors or Reorganized Debtors, (i) be reinstated pursuant to section 1124 of the Bankruptcy Code so as to be rendered Unimpaired, (ii) be paid in full in Cash, or (iii) receive such other treatment as mutually may be agreed to by and among the Holder and the Debtors or the Reorganized Debtors. We believe this classification and treatment is appropriate because this Class is largely composed of trade creditors, many of whom are critical to our ongoing business operations and reorganization. Further, we believe that significant amounts of the General Unsecured Claims would be entitled to administrative priority treatment under sections 503(b)(9) or 546 of the Bankruptcy Code, and therefore would be entitled to payment in full upon the consummation of any chapter 11 plan of reorganization.**

**We intend to seek authority from the Bankruptcy Court on the first day of the Chapter 11 Cases to make payments on account of obligations to many of our unsecured creditors in the ordinary course of business, including any such obligations arising prior to the Petition Date. Such motions are typical in prepackaged chapter 11 cases similar to ours and permit the Debtors' business to continue operating with minimal disruptions from the bankruptcy proceedings. Any impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair the ability of the Prospective Debtors to do business with trade creditors whose goods and services are essential.**

The classification of Claims and Equity Interests Against Parent pursuant to the Plan is as follows:

Class 1—Parent Other Priority Claims

Class 2—Parent Unsecured Claims

Class 3—Parent Equity Interests

The classification of Claims and Equity Interests Against Parent Subsidiaries pursuant to the Plan is as follows:

Class 1— Other Secured Claims

Class 2— Other Priority Claims

Class 3— Senior Credit Agreement Claims

Class 4—General Unsecured Claims

Class 5—Former Executive Compensation Claims

Class 6—Subordinated Note Claims

Class 7—Intercompany Claims

Class 8—Subordinated Securities Claims

Class 9—Parent Subsidiaries' Equity Interests

D. *Treatment and Voting Rights of Claims and Equity Interests*

The treatment of Claims and Equity Interests pursuant to Article III of the Plan is as follows:

1. *Treatment of Claims and Equity Interests Against Parent*

(a) Parent Class 1—Parent Other Priority Claims.

(i) *Treatment*: Each Holder of an Allowed Parent Other Priority Claim shall receive, in full and complete settlement, release and discharge of such Claim (i) reinstatement of its Allowed Parent Other Priority Claim in accordance with section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired; or (ii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Parent Other Priority Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Parent Other Priority Claim becomes Allowed, (y) the date on which such Parent Other Priority Claim otherwise is due and payable and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors.

(ii) *Reservation of Rights*: The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Parent Other Priority Claim that is reinstated by the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(iii) *Voting*: Parent Class 1 is Unimpaired. Holders of Allowed Parent Other Priority Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(b) Parent Class 2—Parent Unsecured Claims.

(i) *Treatment*: Each Holder of an Allowed Parent Unsecured Claim shall receive, at the election of the Debtors or the Reorganized Debtors, in full and complete settlement, release and discharge of such Claim (i) reinstatement pursuant to section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired, (ii) payment in full in Cash on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Parent Unsecured Claim becomes Allowed, (y) the date on which such Parent Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors, or (iii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Parent Unsecured Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Parent Unsecured Claim becomes Allowed, (y) the date on which such Parent Unsecured Claim otherwise is due and payable, and (z) such other date

as mutually may be agreed to by and among such Holder and the Debtors.

(ii) *Reservation of Rights*: The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Parent Unsecured Claim that is reinstated by the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(iii) *Voting*: Parent Class 2 is Unimpaired. Holders of Allowed Parent Unsecured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(c) Parent Class 3—Parent Equity Interests.

(i) *Treatment*: No Holder of Parent Equity Interests shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Parent Equity Interests. On the Effective Date, all Parent Equity Interests shall be cancelled, extinguished and discharged.

(ii) *Voting*: Parent Class 3 is Impaired. Holders of Parent Equity Interests are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

2. *Treatment and Voting Rights of Claims and Equity Interests Against Parent Subsidiaries.*

(a) Class 1—Other Secured Claims

(i) *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, in full and complete settlement, release and discharge of such Claim, in the sole discretion of the Debtors or the Reorganized Debtors, as applicable: (i) reinstatement of its Allowed Other Secured Claim in accordance with section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired; (ii) either (a) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim, to the extent of the value of such Holder's secured interest in such collateral, (c) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code; or (iii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as

practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any distributions due pursuant to clause (ii) of Section 3.4(a)(i) of the Plan shall be made either on, or as soon as practicable after, the latest of (I) the Effective Date, (II) the date on which such Other Secured Claim becomes Allowed, (III) the date on which such Other Secured Claim becomes due and payable, and (IV) such other date as mutually may be agreed to by such Holder and the Debtors.

(ii) *Reservation of Rights*: The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim that is reinstated by the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(iii) *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(b) Class 2—Other Priority Claims

(i) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and complete settlement, release and discharge of such Claim (i) reinstatement of its Allowed Other Priority Claim in accordance with section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired; or (ii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Priority Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Other Priority Claim becomes Allowed, (y) the date on which such Other Priority Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors.

(ii) *Reservation of Rights*: The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Priority Claim that is reinstated by the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(iii) *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims are presumed to have accepted the Plan pursuant to section

1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(c) Class 3—Senior Credit Agreement Claims

(i) *Allowance*: The Senior Credit Agreement Claims are deemed Allowed in the aggregate amount of $200,780,789.33 plus all outstanding prepetition interest, fees, and expenses.

(ii) *Treatment*: Each Holder of an Allowed Senior Credit Agreement Claim shall receive, on the Effective Date, in exchange for the full and complete settlement, release and discharge of such Claim, its Pro-Rata Share of (a) the Second Lien Notes and (b) 80% of the Reorganized Parent Common Stock, subject to dilution for the New Management Equity Incentive Plan and the Warrants.

(iii) *Voting*: Class 3 is Impaired. Holders of Allowed Senior Credit Agreement Claims are entitled to vote to accept or reject the Plan.

(d) Class 4—General Unsecured Claims

(i) *Treatment*: As a carve out from a portion of the Senior Lenders' collateral, each Holder of an Allowed General Unsecured Claim shall receive, at the election of the Debtors or the Reorganized Debtors, in full and complete settlement, release and discharge of such Claim (i) reinstatement pursuant to section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired, (ii) payment in full in Cash on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such General Unsecured Claim becomes Allowed, (y) the date on which such General Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors, or (iii) such other treatment as mutually may be agreed to by and among such Holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated General Unsecured Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such General Unsecured Claim becomes Allowed, (y) the date on which such General Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Debtors.

The Senior Lenders have agreed to carve out a portion of their collateral to ensure that holders of Allowed General Unsecured Claims receive a full recovery on their claims.

(ii) *Reservation of Rights*: The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated by the Plan shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in

accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(iii) *Voting*: Class 4 is Unimpaired. Holders of Allowed General Unsecured Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(e) Class 5—Former Executive Compensation Claims

(i) *Treatment*: No Holder of a Former Executive Compensation Claim shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Former Executive Compensation Claim. On the Effective Date, all Former Executive Compensation Claims shall be cancelled, extinguished and discharged.

(ii) *Voting*: Class 5 is Impaired. Holders of Former Executive Compensation Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(f) Class 6—Subordinated Note Claims

(i) *Allowance of Subordinated Note Claims*: The Subordinated Note Claims are deemed Allowed in the aggregate amount of $135,000,000, plus all outstanding prepetition interest, fees, and expenses of the Petition Date.

(ii) *Treatment*: As a carve out from a portion of the Senior Lenders' collateral, each Holder of a Subordinated Note Claim shall receive, on the Effective Date, in fully and complete settlement, release and discharge of such Claim, its Pro-Rata share of Warrants.

The Senior Lenders have agreed to carve out a portion of their collateral to provide a recovery to Holders of Allowed Subordinated Note Claims.

In addition, the Debtors shall pay the Holders of Allowed Subordinated Note Claims $25,000 in cash on the Effective Date as reimbursement for expenses.

(iii) *Voting*: Class 6 is Impaired. Holders of Allowed Subordinated Note Claims are entitled to vote to accept or reject the Plan.

(g) Class 7—Intercompany Claims

(i) *Treatment*: Each Intercompany Claim shall, on the Effective Date, (i) be reinstated, in full or in part, and treated in the ordinary course of business, or (ii) be cancelled and discharged, as mutually agreed upon by each Holder of such Intercompany Claim and the Debtors or Reorganized Debtors, as applicable. Holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claim to the extent that such Intercompany Claim is cancelled and discharged.

(ii) *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Claims are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(h) Class 8—Subordinated Securities Claims

(i) *Treatment*: No Holder of a Subordinated Securities Claim shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Subordinated Securities Claim. On the Effective Date, all Subordinated Securities Claims shall be cancelled, extinguished and discharged.

(ii) *Voting*: Class 8 is Impaired. Holders of Subordinated Securities Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

(i) Class 9—Parent Subsidiaries Equity Interests

(i) *Treatment*: Parent Subsidiaries Equity Interests shall, on the Effective Date, (i) be reinstated, in full or in part, and treated in the ordinary course of business, or (ii) be cancelled and discharged, as mutually agreed upon by each Holder of such Parent Subsidiaries Equity Interests and the Debtors or Reorganized Debtors, as applicable.

The Parent Subsidiaries Equity Interests are Unimpaired solely to preserve the Debtors' corporate structure. Holders of Parent Subsidiaries' Equity Interests shall not receive or retain any property on account of such Parent Subsidiaries' Equity Interests.

(ii) *Voting*: Class 9 is Unimpaired. Holders of Allowed Parent Subsidiaries Equity Interests are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan.

3. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

Section 3.5 of the Plan provides that, with respect to the Classes of Claims and Equity Interests that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

E. *Means of Implementation of Plan*

1. *Compromise of Controversies.*

Pursuant to Section 4.1 of the Plan, in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

2. *Substantive Consolidation for Plan Purposes Only*

Section 4.2 of the Plan provides for a substantive consolidation for purposes of the Plan to avoid the expense, delay, and complexity involved with a separate classification of claims against each Debtor. Absent the proposed substantive consolidation, the Debtors would be required to separately classify claims against each Debtor, instead of classifying claims against the Parent Subsidiaries together.

Under the Plan, almost all classes of claims are Unimpaired. The three main Impaired classes of claims are the Senior Credit Agreement Claims, the Subordinated Note Claims, and the Former Executive Compensation Claims. The Senior Credit Agreement Claims are direct obligations of each of the Debtors, the Debtors' assets are subject to liens in favor of the Senior Credit Agreement Claims, and the value of the Debtors' assets as a going concern or in a liquidation is substantially less than the amount due on the Senior Credit Agreement Claims. See Article VII. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS." The Former Executive Compensation Claims and the Subordinated Note Claims are unsecured Claims, and the Subordinated Note Claims are contractually subordinate to the Senior Credit Agreement Claims and cannot recover until the Senior Credit Agreement Claims are repaid in full. Accordingly, the proposed substantive consolidation will have no economic impact on any claimants.

Pursuant to Section 4.2 of the Plan, on the Effective Date, the Estates of the various Parent Subsidiaries shall be deemed to be substantively consolidated for voting, confirmation and distribution purposes only, such that (i) all assets and all liabilities of the Parent Subsidiaries shall be deemed merged into Contec Acquisition Corp., (ii) all guarantees by any Parent Subsidiary of the payment, performance or collection of another Parent Subsidiary shall be eliminated, cancelled and of no further force and effect, such that any obligation of any Parent Subsidiary and all guarantees thereof executed by one or more of the other Parent Subsidiaries shall be treated as a single Claim against the consolidated Parent Subsidiaries, (iii) all joint obligations of two or more Parent Subsidiaries and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Parent Subsidiaries, and (iv) all Claims against any of the Parent Subsidiaries shall be considered claims against the consolidated Parent Subsidiaries. Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for purposes of voting on, confirmation of, and distributions under the Plan.

The deemed substantive consolidation will not (1) alter the legal and organizational structure of the Debtors or the Reorganized Debtors, (2) alter or impair the legal and equitable rights of the Debtors to enforce any of the Causes of Action, (3) alter or impair the tax treatment of the Debtors, (4) alter or impair the rights of any Claims reinstated by the Plan upon such reinstatement, or (5) alter or impair the legal or equitable rights of the Senior Lenders.

3. *Vesting of Assets*

Pursuant to Section 4.3 of the Plan, except as otherwise provided in the Plan or in any Plan Document, on the Effective Date, title to all Assets of any Debtor will vest in such Reorganized Debtor, free and clear of all Claims, liens, encumbrances and other interests.

4. *Continued Corporate Existence*

Pursuant to Section 4.4 of the Plan, and except as otherwise provided in Section 4.12 of the Plan, each of the Debtors, as Reorganized Debtors, will continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law and pursuant to the applicable New Constituent Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the occurrence of the Effective Date, the Reorganized Debtors will be authorized to operate their respective businesses, and to use, acquire or dispose of Assets without supervision or approval by the Bankruptcy Court, free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

5. *Cancellation of Notes, Instruments, Debentures and Equity Interests*

Pursuant to Section 4.5 of the Plan, so long as the treatments provided for in, and the distributions contemplated by, Article III are effectuated or made, upon the Effective Date, but subject to Section 4.5 of the Plan, each of (a) the Senior Credit Agreement, (b) the Note Purchase Agreement, (c) the Subordinated Notes, (d) the Parent Equity Interests, and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired by the Plan, shall be cancelled and deemed terminated and satisfied and discharged with respect to the Debtors, and the Holders thereof shall have no further rights or entitlements in respect thereof against the Debtors, except the rights to receive the distributions, if any, to which the Holders thereof are entitled under the Plan.

6. *Cancellation of Liens*

Pursuant to Section 4.6 of the Plan, upon the Effective Date, any Lien securing any Secured Claim (other than a Lien with respect to a Claim that is reinstated pursuant to Section 3.4) shall be deemed released, and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors or the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors or the Reorganized Debtors.

7. *New Constituent Documents*

Pursuant to Section 4.7 of the Plan, on, or as soon as practicable after, the Effective Date, the Reorganized Debtors shall (a) make any and all filings that may be required in connection with the New Constituent Documents with the appropriate governmental offices and/or agencies and (b) take any and all other actions that may be required to render the New Constituent Documents effective.

8. *New Officers*

Pursuant to Section 4.8 of the Plan and section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each of the New Officers (and, to the extent such Person is an insider, the nature of any compensation for such Person) will be provided in the Plan Supplement or disclosed at the Confirmation Hearing. On or as soon as practicable after the Effective Date, the Reorganized Debtors may enter into employment agreements with the New Officers.

9. *Directors of the Reorganized Debtors*

Pursuant to Section 4.9 of the Plan:

(a) *Initial Reorganized Parent Board of Directors*. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each proposed member of the initial Reorganized Parent Board of Directors (and, to the extent such Person is an insider, the nature of any compensation for such Person) will be disclosed in the Plan Supplement or at the Confirmation Hearing. The initial Reorganized Parent Board of Directors shall consist of five directors, (i) one of whom shall be designated by the Senior Lenders, (ii) one of whom shall be the chief executive officer of Reorganized Parent, and (iii) three of whom will be designated by the Exit Backstop Lenders. Each member of the initial Reorganized Parent Board of Directors shall assume such position on the Effective Date. Any subsequent Reorganized Parent Board of Directors shall be elected, classified and composed in a manner consistent with the Reorganized Parent New Constituent Documents, the Stockholders' Agreement and applicable non-bankruptcy law.

(b) *Initial Reorganized Parent Subsidiaries' Boards of Directors*. The proposed members of each of the initial Reorganized Parent Subsidiaries' Boards of Directors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Plan Supplement or at the Confirmation Hearing. The classification and composition of each Reorganized Parent Subsidiary's Board of Directors shall be consistent with the applicable New Constituent Documents and applicable non-bankruptcy law.

10. *Corporate Action*

Pursuant to Section 4.10 of the Plan, upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, to the extent applicable, (a) the adoption of the New Constituent Documents, (b) the selection of the directors, members, and officers for the Reorganized Debtors, (c) the execution of and entry into the Exit Facility Documents, the Second Lien Note Documents, and the employment agreements with the New Officers, (d) the issuance of the Reorganized Parent Common Stock, (e) the issuance of the Warrants, (f) the execution of and entry into the Stockholders' Agreement and the Registration Rights Agreement, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, members or officers of the Debtors or the Reorganized Debtors. Upon the Effective Date, the appropriate officers, members and boards of directors of the Reorganized Debtors shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, to the extent applicable, (i) the Exit Facility Documents, (ii) the Second Lien Note Documents, (iii) the Stockholders' Agreement, (iv) the Registration Rights Agreement, (v) the Warrants, and (vi) any and all other agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated in Section 4.10 of the Plan shall be effective notwithstanding any requirements under any applicable non-bankruptcy law.

11. *Sources of Cash for Plan Distribution*

Pursuant to Section 4.11 of the Plan, except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained pursuant to the Exit Credit Agreement and the Debtors' and the Reorganized Debtors' operations and Cash balances.

12. *Restructuring Transactions*

Pursuant to Section 4.12 of the Plan, from the Confirmation Date through the Effective Date, the Debtors, subject to the consent of the Senior Agent (in its sole discretion), shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of their businesses, to otherwise simplify the overall corporate structure of the Debtors, or to reincorporate certain of the Debtors under the laws of jurisdictions other than the laws of which such Debtors currently are incorporated, which restructuring may include one or more mergers, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Debtors (subject to the consent of the Senior Agent, in its sole discretion) to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors vesting in one or more surviving, resulting or acquiring corporations (collectively, the "Restructuring Transactions"). In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring corporation will perform the obligations of such Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Debtor will perform such obligations.

In effecting the Restructuring Transactions, the Debtors shall be permitted to (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree, (b) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree, (c) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law, and (d) take all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.

13. *Direction Letters; Stockholders' Agreement; Registration Rights Agreement*

Pursuant to Section 4.13 of the Plan, following the Confirmation Date, the Debtors may transmit direction letters to the Senior Agent and the Subordinated Note Agent as of the Distribution Record Date instructing the Senior Agent and the Subordinated Note Agent, respectively, to complete, certify and return to the Debtors a certification containing information necessary to issue and distribute shares of Reorganized Parent Common Stock to the Holders of Allowed Senior Credit Agreement Claims and Warrants to Holders of Subordinated Note Claims.

Notwithstanding anything to the contrary in the Plan, all Holders of Claims entitled to receive a distribution of shares of Reorganized Parent Common Stock shall properly execute and return to the Debtors copies of the Stockholders' Agreement and the Registration Rights Agreement. The Debtors, in their sole discretion, may (a) withhold distribution of shares of Reorganized Parent Common Stock to any Holder of Claims who fails to properly execute and return the Stockholders' Agreement and the Registration Rights Agreement or (b) distribute such shares to such Holders or to the Senior Agent. Distributions of Reorganized Parent Common Stock that are not made pursuant to Section 4.13 of the Plan due to the failure of a Holder to properly execute and return the Stockholders' Agreement and the Registration Rights Agreement shall be considered undeliverable distributions subject to the provisions of Section 6.4 of the Plan. As of the Effective Date, whether or not the Stockholders' Agreement and the Registration Rights Agreement have been properly executed and returned, Holders of Claims or the Senior Agent receiving Reorganized Parent Common Stock shall be deemed bound by the Stockholders' Agreement and the Registration Rights Agreement.

14. *Issuance of Second Lien Notes and Distribution of Reorganized Parent Common Stock and Warrants*

Pursuant to Section 4.14 of the Plan, upon the Effective Date, (I) in exchange for the Allowed Senior Credit Agreement Claims, (A) the Second Lien Notes shall be issued by Reorganized Borrower, with guarantees from the other Reorganized Debtors, and (B) an amount of shares of Reorganized Parent Common Stock representing 80% of the Reorganized Parent Common Stock to be issued on the Effective Date shall be contributed by Reorganized Parent to Reorganized CAC, which shall contribute the Reorganized Parent Common Stock to Reorganized Contec Holdings, which shall contribute the Reorganized Parent Common Stock to Reorganized Borrower, which shall distribute the Reorganized Parent Common Stock, (II) an amount of shares of Reorganized Parent Common Stock representing 10% of the Reorganized Parent Common Stock to be issued on the Effective Date shall be contributed by Reorganized Parent to Reorganized CAC, which shall contribute the Reorganized Parent Common Stock to Reorganized Contec Holdings, which shall contribute the Reorganized Parent Common Stock to Reorganized Borrower, which shall distribute the Reorganized Parent Common Stock to the Exit Facility Lenders in accordance with the terms of the Exit Credit Agreement, (III) an amount of shares of Reorganized Parent Common Stock representing 10% of the Reorganized Parent Common Stock to be issued on the Effective Date shall be contributed by Reorganized Parent to Reorganized CAC, which shall contribute the Reorganized Parent Common Stock to Reorganized Contec Holdings, which shall contribute the Reorganized Parent Common Stock to Reorganized Borrower, which shall distribute the Reorganized Parent Common Stock to the Exit Backstop Lenders in accordance with the terms of the Exit Credit Agreement, and (IV) in exchange for the Allowed Subordinated Note Claims, the Warrants shall be contributed by Reorganized Parent to Reorganized CAC, which shall contribute the Warrants to Reorganized Contec Holdings, which shall contribute the Warrants to Reorganized Borrower, which shall distribute the Warrants.

15. *Settlement of Sponsor's Claims Against the Debtors*

Pursuant to Section 4.15 of the Plan, upon the Effective Date, in exchange for the good and valuable consideration provided in the Plan and as a good faith settlement pursuant to Bankruptcy Rule 9019, the Sponsor will have an Allowed General Unsecured Claim against the Debtors in the amount of $200,000 related to unpaid out-of-pocket expenses that will be paid in full in Cash on the Effective Date and will waive all other Claims against the Debtors, their affiliates, successors and assigns. Nothing in the foregoing will limit or modify the scope of the release, exculpation, and injunction provisions of the Plan.

## VI. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN

A. *Description of Exit Financing*

We anticipate entering into the Exit Commitment Letter immediately prior to the Petition Date. A copy of the Exit Commitment Letter is attached as Exhibit E, and a form of the Exit Credit Agreement will be included in the Plan Supplement. Upon execution of the Exit Commitment Letter, the Exit Backstop Lenders will agree to backstop a $25 million senior secured revolving credit facility following consummation of the Plan. All Holders of Senior Credit Agreement Claims may participate in the Exit Facility on a *pro rata* basis. The proceeds from the Exit Facility will be used to repay the DIP Facility and for general corporate purposes following the Effective Date. If confirmation of the Plan and entry into the Exit Facility does not occur by November 30, 2012, the Exit Commitment Letter will terminate, unless extended by the Exit Backstop Lenders.

Certain of the principal terms of the Exit Facility are summarized below, and the material terms of the Exit Facility are set forth in the form of Exit Credit Agreement included in the Plan Supplement. Capitalized terms used in this Article VI.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Exit Financing" but not otherwise defined in Annex II shall have the meanings assigned such terms in the Exit Commitment Letter.

| | |
|---|---|
| **Borrower:** | Contec, LLC |
| **Guarantors:** | CHL, Ltd. and all of the entities that guarantee the Senior Credit Agreement other than Contec, LLC. |
| **Exit Backstop Lenders:** | Barclays Bank PLC, Garrison Investment Group LP or its designated affiliate(s), and Babson Capital Management LLC, on behalf of certain of its managed funds and advisory accounts. |
| **Exit Facility Agent:** | Barclays Bank PLC |
| **Exit Facility:** | A senior secured revolving credit facility with a maximum credit amount of $25 million. |
| **Term:** | 42 months from the Closing Date. |
| **Interest Rate:** | Base rate (with a 2% floor) plus 6%, or LIBOR (with a 2% floor) plus 7%. |
| **Commitment Fee:** | All lenders participating in the Exit Facility shall share, on a *pro rata* basis based on their commitments, a fee of 10% of the equity in Reorganized Parent. |
| **Backstop Fee:** | The Exit Backstop Lenders shall collectively receive a fee of 10% of the equity in Reorganized Parent to be shared by the Exit Backstop Lenders *pro rata* in accordance with their respective backstop commitments. |

| | |
|---|---|
| **Collateral:** | First priority liens on all of the Issuer's and the Guarantors' assets (subject to exceptions for certain permitted liens). |

B. *Description of Second Lien Notes*

Pursuant to the Plan, we will issue $27.5 million in Second Lien Notes to the Holders of the Allowed Senior Credit Agreement Claims on the Effective Date. A form of the Second Lien Note Agreement will be included in the Plan Supplement.

Certain of the principal terms of the Second Lien Note Agreement are summarized below, and the material terms of the Second Lien Notes are set forth in a term sheet attached to the Plan Support Agreement. A form of Second Lien Note Agreement will be included in the Plan Supplement. Capitalized terms used in this Article VI.B. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Second Lien Notes" but not otherwise defined in Annex II shall have the meanings assigned such terms in the Second Lien Note Agreement.

| | |
|---|---|
| **Issuer:** | Contec, LLC |
| **Guarantors:** | CHL, Ltd. and all of the entities that guarantee the Senior Credit Agreement other than Contec, LLC. |
| **Second Lien Noteholders:** | The Holders of the Allowed Senior Credit Agreement Claims, to whom the Second Lien Notes will be issued on a *pro rata* basis. |
| **Second Lien Note Agent:** | To be determined by the Noteholders. |
| **Term:** | 4 years from the Closing Date. |
| **Interest Rate:** | Base rate (with a 2% floor) plus 7%, or LIBOR (with a 2% floor) plus 8%. |
| **Collateral:** | Second priority liens on all of the Issuer's and the Guarantors' assets (subject to exceptions for certain permitted liens). |

C. *Description of New Intercreditor Agreement*

The relative rights and priorities, with respect to both payment and security interests, of the Exit Facility Lenders vis-à-vis the Second Lien Noteholders will be governed by the terms of the New Intercreditor Agreement. Certain of the principal terms of the New Intercreditor Agreement are set forth in a term sheet attached as Exhibit H. The material terms of the New Intercreditor Agreement will be set forth in the form of New Intercreditor Agreement included in the Plan Supplement.

D. *Description of Reorganized Parent Common Stock, Certificate of Incorporation, Stockholders' Agreement, and Registration Rights Agreement*

1. *Description of Reorganized Parent Common Stock*

Pursuant to the Reorganized Parent Certificate of Incorporation, 10,000,000 shares of common stock, par value $0.01 per share, will be authorized. All shares of the Reorganized Parent Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable.

2. *Description of Reorganized Parent Certificate of Incorporation*

Section 8.1(l) of the Plan provides, among other things, that it is a condition precedent to the effectiveness of the Plan that the Reorganized Parent Certificate of Incorporation be duly filed with the Delaware Secretary of State, unless such condition is waived pursuant to the terms of the Plan. The Reorganized Parent Certificate of Incorporation is subject to negotiation with the Senior Agent and will be included in the Plan Supplement.

3. *Description of Stockholders' Agreement & Registration Rights Agreement*

The Plan provides for the establishment of a Stockholders' Agreement that will govern the Reorganized Parent Common Stock and a Registration Rights Agreement that will provide certain registration rights to the holders of the Reorganized Parent Common Stock. Forms of the Stockholders' Agreement and the Registration Rights Agreement will be included in the Plan Supplement. The Plan requires all creditors receiving a distribution of Reorganized Parent Common Stock under the Plan to execute the Stockholders' Agreement and the Registration Rights Agreement prior to receiving such distribution. The Stockholders' Agreement will provide for an initial Reorganized Parent Board of Directors consisting of five (5) members, with one seat for the Chief Executive Officer, one seat to be appointed initially by the Senior Lenders, and three seats to be appointed by the Exit Backstop Lenders.

The Stockholders' Agreement and the Registration Rights Agreement include the following minority protections:

- Registration Rights: At any time after the second anniversary of the Effective Date, (a) any initial Holder or group of initial Holders that beneficially owns, in the aggregate, fifteen percent 15% or more of Reorganized Parent Common Stock shall have three (3) demand registration rights and unlimited demand shelf registration rights and (b) all initial holders of Reorganized Parent Common Stock and holders of the Warrants upon becoming holders of Reorganized Parent Common Stock shall have unlimited piggy-back registration rights.

- Preemptive Rights: All beneficial Holders of Reorganized Parent Common Stock shall have the right to participate in any future offering of equity interests in Reorganized Parent on a pro rata basis, subject to limited exceptions for corporate acquisitions approved by Reorganized Parent Board of Directors and employee or management equity programs approved by Reorganized Parent Board of Directors.

- Right of First Offer: Each time a Holder receives a bona fide offer from a person or a group of persons, other than an affiliate of the Holder, to purchase all or any portion of the Reorganized Parent Common Stock owned by the Holder, the Holder shall first offer those shares to the other Holders on the same terms and conditions as the third-party offer.

- Drag-Along Rights: In the event that any Holder or group of Holders propose to sell, or otherwise dispose of, in one transaction or a series of related transactions, to a person or a group of persons, other than an affiliate of one or more of the transferring Holders, shares of Reorganized Parent Common Stock representing more than fifty percent (50%) of the then outstanding shares of Reorganized Parent Common Stock, the proposing Holder(s) shall have the right to require each of the other Holders to transfer to the buyer its pro rata portion of shares of Reorganized Parent Common Stock upon the same terms and subject to the same conditions as are applicable to the proposing Holder(s).

- Tag-Along Rights: Subject to customary exceptions, if a Holder proposes to transfer, in one transaction or a series of related transactions, to a third party that is not an affiliate of such Holder, shares of Reorganized Parent Common Stock representing more than ten percent (10%) of the outstanding shares of Reorganized Parent Common Stock, each Holder shall have the right to participate in the transfer (regardless of whether such Holder exercises its right of first refusal) by transferring up to its pro rata portion to the proposed

transferee on the same terms and conditions as those proposed or accepted by the proposing Holder. In the event of a drag sale, each Holder will only have tag rights if the drag-along rights are not exercised.

- Information Rights: Reorganized Parent shall deliver to each stockholder audited annual consolidated financial statements for the Reorganized Debtors, including all notes thereto, within one hundred and twenty (120) days of the end of each fiscal year, and unaudited consolidated financial statements for the Reorganized Debtors, consisting of a balance sheet, income statement, and statement of cash flows, within forty-five (45) days (except that, in the case of the first fiscal quarter in which the Effective Date occurs, sixty (60) days) of the end of each fiscal quarter for the first three quarters of a fiscal year, which shall include audited annual consolidated financial statements for the Reorganized Debtors, including all notes thereto and an annual budget provided with MD&A around assumptions on revenue, Gross Profit and SG&A, within ninety (90) days of the end of each fiscal year, an unaudited consolidated financial statements (presented against prior year performance and budget) for the Reorganized Debtors, consisting of a balance sheet, income statement, statement of cash flows, MD&A and an LTM adjusted EBITDA reconciliation within forty-five (45) days (except that, in the case of the first fiscal quarter in which the Effective Date occurs, sixty (60) days) of the end of each fiscal quarter for the first three quarters of a fiscal year (the "Financial Information").

- Super-Majority Voting: The following actions will require the approval of the Holders of sixty-six and two-thirds percent (66 $^2/_3$ %) of the outstanding shares of Reorganized Parent Common Stock:

  - any sale, lease, or other disposition of, assets of Reorganized Parent, involving aggregate consideration paid to Reorganized Parent or its subsidiaries (including by way of assumption of liabilities) in excess of $20,000,000; provided, however, that no (x) sale of obsolete equipment or inventory, (y) sales of products or services to customers in the ordinary course of business, or (z) transactions between Reorganized Parent and its subsidiaries shall require super-majority approval;

  - purchase, lease, exchange, or otherwise acquire securities or assets of any other person (other than a wholly owned subsidiary), involving aggregate consideration paid by Reorganized Parent or its subsidiaries (including by way of assumption of liabilities) in excess of $20,000,000;

  - merge, consolidate with or into, engage in a share exchange with, or otherwise consummate any business combination transaction with, any other person (other than (A) transactions solely involving the merger or consolidation of a wholly owned subsidiary with or into, or a share exchange by a wholly owned subsidiary with, Reorganized Parent or another wholly owned subsidiary of Reorganized Parent or (B) pursuant to which Reorganized Parent remains as the surviving corporation and (i) the consolidated gross assets of Reorganized Parent (computed on a book basis) or annualized gross revenues of Reorganized Parent do not increase by more than $20,000,000 and (ii) the transaction is EBITDA accretive);

  - amend, modify, or repeal any provision of Reorganized Parent Certificate of Incorporation or Reorganized Parent By-Laws that would have an adverse effect on any Holder of the outstanding shares of Reorganized Parent Common Stock;

  - incur any indebtedness (other than (i) any indebtedness under the Exit Credit Agreement and the Second Lien Notes, (ii) indebtedness between Reorganized Parent and a wholly owned subsidiary of Reorganized Parent or between two wholly owned subsidiaries of Reorganized Parent, or (iii) trade payables incurred in the ordinary course of business and that are not overdue) or voluntarily purchase, cancel, prepay, or otherwise provide for a complete or partial discharge in advance of a scheduled payment date with respect to, or waive any material right under or modify any material term of, any indebtedness, in any case in excess of $20,000,000;

  - commence any proceeding or file any petition seeking relief under any insolvency law, consent to the institution of or fail to contest in a timely and appropriate manner any such proceeding or filing under any insolvency law, apply for or consent to the appointment of a receiver, trustee, custodian,

sequestrator, conservator, or similar official for Reorganized Parent or any of its subsidiaries or assets; initiate or take any action for the liquidation, dissolution or winding up of Reorganized Parent or any of its subsidiaries; make a general assignment for the benefit of creditors; or take or authorize the taking of any action for the purpose of effecting any of the foregoing;

- increase the authorized number of directors of Reorganized Parent Board of Directors;
- make any material change in the nature of Reorganized Parent's business; and
- enter into or engage in, or amend or modify the terms of, a transaction with an affiliate of Reorganized Parent unless (A) a written opinion from a nationally recognized investment banking firm shall have been delivered to Reorganized Parent stating that the terms of such transaction (including any amendment to or modification of the terms thereof) are fair and reasonable and no less favorable to Reorganized Parent or the relevant subsidiary, as the case may be, than those that would have been obtained in a comparable transaction on an arm's length basis from an unrelated person and (B) such transaction (including any amendment to or modification of the terms thereof) shall have been approved by the affirmative vote of a majority of disinterested directors.

E. *Description of Warrants*

The Warrants will be exercisable for a 7.5 year term for 6% of the Reorganized Parent Common Stock on a fully diluted basis (subject to dilution for the New Management Equity Incentive Plan) as follows:

- 1.5% of the Reorganized Parent Common Stock at a strike price of $25 million in Equity Value;
- With an incremental 3.5% of the Reorganized Parent Common Stock at a strike price of $62.5 million in Equity Value;
- With an incremental 1% of the Reorganized Parent Common Stock at a strike price of $112.5 million in Equity Value.

Equity Value shall be defined in the Warrants to mean (a) the total enterprise value of the Reorganized Debtors immediately prior to the date of determination, as reasonably determined by the Reorganized Parent Board of Directors in good faith, reduced by (b) the amount of the Company's Net Debt and (c) any dividends or other distributions of cash or cash equivalents to equity holders, without duplication and without counting distributions made to warrant holders. If the holders of the Warrants do not agree with or consent to the total enterprise value as determined by the Reorganized Parent Board of Directors, the parties shall resolve valuation by means of binding arbitration before a neutral third party.

Net Debt shall be defined in the Warrants to mean, as of the date of determination (a) total long-term debt (as determined in accordance with GAAP), plus the current portion of long-term debt (as determined in accordance with GAAP) (including any amounts outstanding under the Exit Credit Agreement), less (b) unrestricted cash and cash equivalents (as determined in accordance with GAAP). For the avoidance of doubt, the Warrants shall contain customary anti-dilution provisions; *provided, however,* that the Warrants shall be subject to dilution for the New Management Equity Incentive Plan.

GAAP shall be defined in the Warrants to mean United States generally accepted accounting principles in effect as of the date of determination thereof.

Upon a change of control of the Reorganized Debtors, the holders of the Warrants will be entitled to customary tag-along and drag-along rights. The Warrants shall also provide for the holders of the Warrants to receive the Financial Information. Forms of the Warrants will be included in the Plan Supplement.

F. *Description of New Management Incentive Plans*

As soon as practicable after the Effective Date, the Reorganized Debtors will implement the New Management Cash Incentive Plan and the New Management Equity Incentive Plan. The New Management Cash Incentive Plan will provide an opportunity for certain of the Company's current managers to earn cash awards upon achieving financial targets and satisfying conditions established by the Reorganized Parent Board of Directors. The total available cash pool for awards under the New Management Cash Incentive Plan will be as follows:

| Target | Available Cash Pool |
|---|---|
| Below Target EBITDA | At the discretion of the new Reorganized Parent Board of Directors in an amount less than $800,000 |
| 100% Target EBITDA | $800,000 |
| 150% Target EBITDA | $1,500,000 |
| 160% Target EBITDA | $1,800,000 |

Similarly, the New Management Equity Incentive Plan will provide for non-voting Reorganized Parent Common Stock for up to 10% of the equity of Reorganized Parent to be issued or reserved for issuance to the Company's managers on terms determined by the Reorganized Parent Board of Directors.

## VII. FINANCIAL PROJECTIONS AND VALUATION ANALYSIS

A. *Financial Projections*[1]

The Bankruptcy Code requires as one of the conditions to confirmation of a plan of reorganization that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. 11 U.S.C. § 1129(a)(11). This standard is commonly referred to as "feasibility." For the purposes of determining whether the Plan meets the feasibility standard, and to assist the Holders of Allowed Senior Credit Agreement Claims and Holders of Allowed Subordinated Note Claims to evaluate whether to vote to accept or reject the Plan and exchange their Claims against the Prospective Debtors for the distributions described herein, our management, working with our restructuring advisor, AlixPartners, has analyzed our ability to meet our obligations under the Plan and retain sufficient liquidity and capital resources to conduct our business following emergence from the Chapter 11 Cases. Our management has also prepared certain estimates and projections of operating profit, EBITDA and certain other items for the period covered by the Projections.

The Projections, which are attached as Exhibit F, should be read in conjunction with Article II "RISK FACTORS," the historical financial information provided herein and with the assumptions, qualifications and notes to the Projections. Our management prepared the Projections in good faith based upon assumptions believed to be reasonable and applied in a manner consistent with past practice.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. OUR INDEPENDENT ACCOUNTANTS HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

WE DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF OUR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, WE DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT

[1] The Projections are attached as Exhibit F and discussed in detail in ARTICLE VII.A. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS—Financial Projections."

WE MAY FILE WITH THE SEC OR INCLUDE ON OUR WEBSITE, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE COMPANY'S MANAGEMENT. THESE PROJECTIONS, ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY OUR MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND OUR CONTROL. WE CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO OUR ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE FAIR VALUE OF OUR ASSETS AND OUR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. SEE ARTICLE II "RISK FACTORS."

B. *Going Concern Valuation*

1. *In General*

At the Debtors' request, Moelis & Company performed a valuation analysis of the Reorganized Debtors. Based upon, and subject to the review and analysis described herein, including the assumptions, limitations and qualifications described herein, Moelis estimates, as of July 24, 2012, that the going concern enterprise value of the Reorganized Debtors, as of an assumed Effective Date of September 30, 2012, would be in a range between $50 million and $75 million with a midpoint of $62.5 million. Moelis' views are necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to Moelis as of the date of its analysis (July 24, 2012). Subsequent developments may affect Moelis' views, but Moelis does not have any obligation to (and is not expected to) update, revise or reaffirm its estimate.

Moelis based its analysis, at the Debtors' direction, on a number of assumptions, including, among other assumptions, that (i) the Debtors will be reorganized in accordance with the Plan, which will be effective on or prior to September 30, 2012; (ii) the Reorganized Debtors will achieve the results set forth in the Projections for fiscal years 2012 to 2017; (iii) the Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this Solicitation and Disclosure Statement, including that the *pro forma* indebtedness of the Reorganized Debtors as of the Effective Date will be a maximum of $52.5 million; and (iv) the Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections. Moelis makes no representation as to the achievability or reasonableness of such assumptions. In addition, Moelis assumed that there will be no material change in economic, market, financial and other conditions prior to the assumed Effective Date.

Moelis assumed, at the Debtors' direction, that the Projections prepared by the Debtors' management and by AlixPartners were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future financial and operating performance of the Reorganized Debtors. The actual future results achieved by the Reorganized Debtors depends on various factors, many of which are beyond the control or knowledge of the Debtors and, consequently, are inherently difficult to project. <u>*See*</u> Article II "RISK FACTORS." The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Projections and, as a result, the actual enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range provided herein. Among other things, failure to consummate the Plan in a timely manner may have a material negative impact on the enterprise value of the Reorganized Debtors.

The estimated enterprise value in this section sets forth a hypothetical enterprise value of the Reorganized Debtors as the continuing operators of their business and assets, after giving effect to the Plan, based on certain

valuation methodologies described below. The estimated enterprise value in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, its securities or its assets, which may be significantly higher or lower than the estimated enterprise value range herein. The actual value of any operating business, including the Reorganized Debtors' business, is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant; (ii) reviewed certain internal information relating to the business, earnings, cash flow, assets, liabilities and prospects of the Reorganized Debtors, including the Projections, furnished to Moelis by the Debtors; (iii) conducted discussions with members of senior management, AlixPartners and other representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business and prospects before and after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data, including valuation multiples, for certain other companies in lines of business that Moelis deemed relevant; (v) reviewed a draft of the Plan; and (vi) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet or otherwise) of the Reorganized Debtors, nor was Moelis furnished with any such evaluation or appraisal. Moelis also assumed, with the Debtors' consent, that the final form of the Plan on the Effective Date will not differ in any respect material to its analysis from the draft that Moelis reviewed.

The estimated enterprise value in this section does not constitute a recommendation to any Holder of a Claim as to how such Person should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what prices the Reorganized Debtors' securities will trade at when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated enterprise value set forth herein does not constitute an opinion as to fairness from a financial point of view to any Person of the consideration to be received by such Person under the Plan or of the terms and provisions of the Plan.

2. *Valuation Methodologies*

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (i) a selected publicly traded companies analysis, (ii) a selected transactions analysis and (iii) a discounted cash flow analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the applications of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description.

**Selected Publicly Traded Companies Analysis**

The selected publicly traded companies valuation analysis is based on the enterprise values of selected publicly traded companies that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors, for example, comparable lines of business, business risks, growth prospects, market presence and size and scale of operations. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and are then applied to the Reorganized Debtors' Projections to imply an enterprise value for the Reorganized Debtors. Moelis used, among other measures, enterprise value (defined as market value of equity plus book value of debt, book value of preferred stock and minority interests less cash) for each selected company as a multiple of such company's publicly available LTM EBITDA. Although the selected companies were used for comparison purposes, no selected company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of the selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was

not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Reorganized Debtors. The selection of appropriate companies for analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful market-based information. The lack of publicly traded technological equipment repair businesses comparable to the Reorganized Debtors made the selection of companies for comparison to the Reorganized Debtors challenging.

**Selected Transactions Analysis**

The selected transactions analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. Under this methodology, the enterprise value of each such company is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. The enterprise value is then divided by the target's last twelve month EBITDA prior to the transaction announcement date to calculate an EBITDA multiple. These multiples (to the extent available) would then be applied to the Reorganized Debtors' 2012 EBITDA to imply an enterprise value for the Reorganized Debtors. Moelis analyzed various merger and acquisition transactions that have occurred in the Reorganized Debtors' industry since 2006. There have not been many recent public transactions that were comparable, which limits the usefulness of this methodology.

Unlike the selected publicly traded companies analysis, the enterprise valuation derived using this methodology reflects a "control" premium (*i.e.*, a premium paid to purchase a majority or controlling position in a company's assets). Thus, this methodology generally produces higher valuations than the selected publicly traded companies analysis. In addition, other factors not directly related to a company's business operations can affect a valuation in a transaction, including, among others factors: (i) a buyer may pay an additional premium for reasons that are not solely related to competitive bidding; (ii) the market environment is not identical for transactions occurring at different periods of time; (iii) the sale of a discrete asset or segment may warrant a discount or premium to the sale of an entire company depending on the specific operational circumstances of the seller and acquirer; and (iv) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (*i.e.*, a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

**Discounted Cash Flow Analysis**

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Moelis' DCF analysis used the Reorganized Debtors' Projections of its debt-free, after-tax cash flows for the period covered by the Projections and estimated a terminal value for the period after the Projection period. These cash flows and estimated terminal value were then discounted at a range of appropriate weighted average costs of capital, which are determined by reference to, among other things, the average cost of debt and equity of selected publicly traded companies. The discounted cash flow analysis involves complex considerations and judgments concerning appropriate terminal values and discount rates.

3. *Valuation Considerations*

As a result of the foregoing, the estimated enterprise value in this section is not necessarily indicative of the actual value of the Reorganized Debtors, which may be significantly higher or lower than the estimate herein. Accordingly, none of the Debtors, Moelis or any other person assumes responsibility for the accuracy of such estimated enterprise value. Depending on the actual financial results of the Debtors or changes in the financial markets, the enterprise value of the Reorganized Debtors as of the Effective Date may differ from the estimated enterprise value set forth herein as of an assumed Effective Date of September 30, 2012. In addition, the market prices, to the extent there is a market, of Reorganized Debtor's securities will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.

## VIII. LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Impaired Equity Interest that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code (sometimes called the "Best Interests Test," which is described in greater detail in Article XIII.E. hereof). If all members of an impaired class of claims or equity interests have accepted the Plan, the "best interests test" does not apply with respect to that class. To show that the Plan satisfies the "best interest test," a Liquidation Analysis for the Debtors has been prepared, a copy of which is attached as Exhibit G.

A determination of the value that Holders will receive or retain if the Prospective Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code begins with an estimate of the gross proceeds that would be generated from the hypothetical liquidation of our assets and properties in the context of a chapter 7 liquidation case, including the cash and cash equivalents we would hold at the time of the commencement of the hypothetical chapter 7 case. The gross liquidation proceeds then are reduced by the costs and expenses of the liquidation – including such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of a hypothetical liquidation – to determine the net liquidation proceeds available for distribution to creditors. Such net liquidation proceeds (*i.e.*, cash available for distribution) are then applied on a hypothetical basis to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code.

Two of the Debtors are Mexican subsidiaries, and therefore subject to the laws of Mexico in a chapter 7 liquidation. We have assumed that Ensambladora, our Mexican subsidiary in Matamoros, would be shut down and liquidated as described above. Under Mexican law, in a shutdown scenario certain wage and severance claims of employees have first priority against the assets of the Mexican subsidiary, coming before the liens of secured creditors. Accordingly, in the Liquidation Analysis we have assumed the proceeds from the sale of the assets owned by or located at Ensambladora will be applied first to reduce these wage and severance claims, with any excess then being applied to reduce the Senior Credit Agreement Claims.

We have assumed that our other Mexican subsidiary, Contec de Mexico, would be sold as a going concern, which avoids the incurrence of the employee wage and severance claims noted above that result in a shutdown of operations in Mexico. Unlike Ensambladora, Contec de Mexico is a somewhat independent business and is therefore more amenable to a quick sale on an operating basis.

The Liquidation Analysis also considers the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including:

- the increased cost and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;
- the erosion in value of assets in a chapter 7 case in the context of the liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and
- substantial increase in claims treated as priority and general unsecured claims than we anticipate in a chapter 11 case.

In addition to these factors, we believe that the value of any distributions from the liquidation proceeds to each class of allowed claims and equity interests in a chapter 7 case would be less than the value of distributions under the Plan because the distributions in chapter 7 may not occur for a substantial period of time. In our Liquidation Analysis, for example, we estimated that a liquidation of the Debtors' assets would take six months. Further, it is possible that distribution of the proceeds of the liquidation could be delayed for a substantial time after the completion of such liquidation to resolve all objections to claims and prepare for distributions.

AlixPartners prepared the Liquidation Analysis at our request and with the assistance of our management. The Liquidation Analysis estimates the values that may be obtained by Claim and Equity Interest Holders upon a disposition of assets pursuant to a liquidation in a bankruptcy case under chapter 7 of the Bankruptcy Code, as an alternative to continued operations of our businesses under the Plan. The Liquidation Analysis assumes we file for bankruptcy protection with a prepackaged plan but that we fail to confirm such plan. The Liquidation Analysis is also based on the other assumptions discussed below. **Because of the numerous risks, uncertainties and contingencies beyond our control, there can be no assurances whatsoever that the recoveries set forth in the Liquidation Analysis could be realized in actual liquidation.** Moreover, because the Liquidation Analysis was prepared for purposes of evaluating the Plan in respect of section 1129(a)(7) of the Bankruptcy Code, the amounts disclosed are not likely to be meaningful for us as a going concern or indicative of actual returns that may eventually be realized in a non-liquidation context.

Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of ourselves or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. The actual amount of claims could vary significantly from our estimate, depending on the claims asserted during the chapter 7 case. Accordingly, the actual liquidation value of the Prospective Debtors could vary materially from the estimates provided in the Liquidation Analysis.

The Liquidation Analysis concludes that, after a six month liquidation of all of the Prospective Debtors' assets commencing on September 30, 2012, the range of proceeds available for distribution would be between approximately $16.3 million and $20.8 million. Even on the high end of this range, the proceeds from a liquidation would be insufficient to satisfy in full the more than $200 million in secured Senior Credit Agreement Claims. We therefore estimate that, in a hypothetical chapter 7 liquidation, no distribution would be available to any unsecured claims (other than certain wage and severance claims held by employees of Ensambladora, as discussed above).

Under the Plan, Holders of Allowed Senior Credit Agreement Claims will receive a significant distribution, Holders of Allowed Subordinated Note Claims will receive the Warrants, all priority claims will be paid in full, and all Allowed General Unsecured Claims will be Unimpaired and will, at the election of the Debtors or the Reorganized Debtors, (i) be reinstated, (ii) be paid in full, or (iii) receive such other treatment as mutually may be agreed to by and among the Holder of such Claim and the Debtors or the Reorganized Debtors. Thus, based on the Liquidation Analysis, we believe that all individual Holders of Claims and Equity Interests will receive under the Plan not less than what they would receive under a chapter 7 liquidation.

## IX. CERTAIN OTHER LEGAL CONSIDERATIONS

### A. *Solicitation of Votes Prior to Commencement of Chapter 11 Cases*

We are relying on exemptions from the registration requirements of the Securities Act, including, without limitation, sections 3(a)(9) and 4(2) thereof, to exempt the offer of Reorganized Parent Common Stock, Warrants, and Second Lien Notes to the Holders of Allowed Senior Credit Agreement Claims and Holders of Subordinated Note Claims that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 3(a)(9) of the Securities Act provides an exemption from the registration requirements of the Securities Act for any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. Section 4(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("Reg. D") provides a safe harbor under section 4(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501).

None of the Prospective Debtors has any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to, any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchanges of Senior Credit Agreement Claims or Subordinated Note Claims. In addition, none of our financial advisors, and no broker, dealer, salesperson, agent, or any other person, has been engaged or authorized to express any statement, opinion,

recommendation, or judgment with respect to the relative merits and risks of the solicitation or the Plan (and the transactions contemplated thereby). Further, we believe the Holders of the Allowed Senior Credit Agreement Claims and the Holders of Allowed Subordinated Note Claims are "accredited investors," and the Ballots include a certification that the voting Holder of Allowed Senior Credit Agreement Claims or Allowed Subordinated Note Claims is an "accredited investor."

B. *Section 1145 of the Bankruptcy Code*

1. *Initial Offer and Sale of Securities*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against, or an interest in, the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claims against, or interests in, the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property. We believe that the distributions of the Reorganized Parent Common Stock, Warrants, and Second Lien Notes under the Plan satisfy the requirements of sections 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

To the extent that section 1145 is not available to exempt the securities issued under, or in connection with, the Plan from registration under section 5 of the Securities Act, the Prospective Debtors believe that other provisions of the Securities Act, including, without limitation, sections 3(a)(9) and 4(2) of the Securities Act, and state securities laws will apply to exempt such issuance from the registration requirements of the Securities Act.

2. *Subsequent Transfers of Securities*

To the extent not otherwise prohibited, and subject to the terms of the New Constituent Documents, Reorganized Parent Common Stock, Warrants, and Second Lien Notes issued under the Plan and covered by sections 1145(a)(1) of the Bankruptcy Code may be resold by the holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against or interest in, or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) under an agreement made in connection with the plan, the consummation of the plan or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act. Under section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, defined as any person directly or indirectly controlling or controlled by the issuer or any person under direct or indirect common control of the issuer. "Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

To the extent that Persons who receive Reorganized Parent Common Stock, Warrants, or Second Lien Notes pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b)(1) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell Reorganized Parent Common Stock, Warrants, or Second Lien Notes except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including the provisions of rule 144 under the Securities Act. In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Reorganized Parent Common Stock, Warrants, or Second Lien Notes to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any particular Person receiving Reorganized Parent Common Stock, Warrants, or Second Lien Notes under the Plan would be an "underwriter" with respect to such Reorganized Parent Common Stock, Warrants, or Second Lien Notes.

**Given the complex and subjective nature of the question of whether a particular holder may be an "underwriter," we make no representation concerning the right of any Person to trade in the Reorganized Parent Common Stock, Warrants, or Second Lien Notes. We recommend that potential recipients of the Reorganized Parent Common Stock, Warrants, or Second Lien Notes consult their own counsel concerning whether they may freely trade the Reorganized Parent Common Stock, Warrants, or Second Lien Notes without taking additional action to ensure compliance with the Securities Act, the Exchange Act or similar state and federal laws.**

As discussed above, we believe section 1145 of the Bankruptcy Code will apply to exempt the issuance of Reorganized Parent Common Stock, Warrants, and Second Lien Notes pursuant to the Plan from the registration requirements of the Securities Act. To the extent that section 1145 of the Bankruptcy Code is not available and the Debtors rely on (i) section 4(2) of the Securities Act and the safe harbor provided in section 506 of Reg. D, certain additional sale and transfer restrictions, including a one year holding period, will apply to the Holders of the Reorganized Parent Common Stock, Warrants, and Second Lien Notes or (ii) section 3(a)(9) of the Securities Act, all or certain of these restrictions will apply.

3. *Subsequent Transfers Under State Law*

State securities laws generally provide registration exemptions for subsequent transfers by a *bona fide* owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the Reorganized Parent Common Stock, Warrants, or Second Lien Notes. However, recipients of Reorganized Parent Common Stock, Warrants, or Second Lien Notes are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**We are not making any representation to any offeree of the securities issued under the Plan regarding the legality of any investment therein by such offeree under appropriate legal investment or similar laws or regulations.**

## X. THE PLAN – OTHER PROVISIONS

Capitalized terms used in this Article X but not otherwise defined in Annex II shall have the meanings assigned such terms in the Plan.

A. *Treatment of Executory Contracts and Unexpired Leases*

1. *Rejection of Executory Contracts and Unexpired Leases*

Section 365 of the Bankruptcy Code permits debtors to assume or reject executory contracts and unexpired leases with the authorization of the Bankruptcy Court. Section 365 of the Bankruptcy Code further provides that an executory contract or unexpired lease can be assumed only if (i) certain defaults with respect to such contract or lease are cured (or adequate assurance of a prompt cure is provided), (ii) compensation for any pecuniary losses arising from such default are provided, and (iii) "adequate assurance" of future performance is provided. Section 1123(b)(2) of the Bankruptcy Code allows for the assumption of unrejected contracts and leases pursuant to the terms of a plan of reorganization. Pursuant to Section 5.1 of the Plan:

(a) All executory contracts and unexpired leases of the Debtors that are not (i) assumed by the Debtors prior to the Effective Date, (ii) subject to a motion seeking such assumption as of the Effective Date, or (iii) identified in the Plan or the Plan Supplement as executory contracts or unexpired leases to be assumed pursuant to the Plan or for which the Debtors expressly reserve the right to seek to assume such executor contract(s) or unexpired lease(s), shall be deemed to have been rejected by the Debtors on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court. The Debtors reserve the right after the Confirmation Date to withdraw any pending motion seeking the assumption of any executory contracts or unexpired leases that have not been approved by Final Order, in which case the subject executory contracts or unexpired leases shall be deemed rejected pursuant to the Plan as of the date of notice of such withdrawal. The assumption or rejection of an executory contract or unexpired lease shall be subject to the consent of the Senior Agent.

(b) Notwithstanding anything to the contrary herein, all Former Executive Compensation Agreements that have not been rejected prior to the Effective Date shall be deemed rejected on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court.

(c) Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of such amount in Cash on the Effective Date, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree. If a dispute arises regarding (i) the amount of any cure payments required under section 365(b)(1) of the Bankruptcy Code, (ii) the ability of any Reorganized Debtor or any assignee thereof to provide “adequate assurance of future performance” (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption under section 365 of the Bankruptcy Code, the cure payments required under section 365(b)(1) of the Bankruptcy Code, if any, shall be made following the entry of a Final Order resolving such dispute.

2. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Section 5.2 of the Plan provides that all proofs of claim with respect to Claims arising from the rejection of executory contracts (including the Former Executive Compensation Agreements) or unexpired leases must be Filed within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection or the date of withdrawal of a motion to assume. Any Claim arising from the rejection of an executory contract or unexpired lease for which proof of such Claim is not Filed within such time period shall forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. Notwithstanding anything herein to the contrary, if a Former Executive does not file a proof of Claim arising from the rejection of a Former Executive Compensation Agreement within the time period set forth in Section 5.2 of the Plan, such Claim shall forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. Any Allowed Claim arising from the rejection of executory contracts or unexpired leases for which proof of such Claim has been timely Filed, shall be, and shall be treated as, an Allowed General Unsecured Claim under the terms hereof, subject to any limitation under section 502(b) of the Bankruptcy Code or otherwise; *provided*, *however*, that any Allowed Claim arising from the rejection of the Former Executive Compensation Agreements for which proof of such Claim has been timely Filed shall be, and shall be treated as an Allowed Former Executive Compensation Claim under the terms hereof. See 11 U.S.C. § 502(b).

3. *Indemnification of Directors, Officers and Employees*

Pursuant to Section 5.3 of the Plan, any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse or limit the liability of any past or present directors, officers, or managers pursuant to any applicable certificates of incorporation, by-laws, policy of providing employee indemnification, state law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings (other than the Reserved Actions) against such past or present directors, officers, or managers based upon any act or omission related to such past or present directors, officers, or managers' service with, for or on behalf of the Debtors prior to the Effective Date, shall be treated as if they were executory contracts that are assumed under the Plan (and, if necessary, assigned to the Reorganized Debtors) pursuant to Bankruptcy Code section 365 and shall survive the Effective Date and remain unaffected hereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability is owed in connection with an occurrence before or after the Petition Date.

Upon the Effective Date, all insurance policies of the Debtors or their current or past officers, directors, and managers providing liability coverage for the Debtors and/or such officers, directors and/or managers shall be deemed to be, and treated as though they are, executory contracts and the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue such insurance policies in full force) all of such policies pursuant to Bankruptcy Code section 365.

In addition, the Reorganized Debtors shall include in their New Constituent Documents provisions that (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other key employees serving on or after the Effective Date for all claims (other than the Reserved Actions) and actions to the fullest extent permitted by applicable law in the state in which the subject Reorganized Debtor is organized.

4. *Indemnification of Senior Agent*

Pursuant to Section 5.4 of the Plan, the obligations of the Debtors to indemnify the Senior Agent pursuant to section 10.3 of the Senior Credit Agreement, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date, shall not be discharged or Impaired by confirmation of the Plan and shall continue as obligations of the Reorganized Debtors.

5. *Compensation and Benefit Programs*

Section 5.5 of the Plan provides that, unless otherwise rejected by the Debtors prior to the Effective Date or subject to a motion seeking such rejection as of the Effective Date, all duly-authorized and validly-existing employment and severance policies and compensation and benefit plans, policies and programs of the Debtors applicable to their employees, retirees and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans and life, accidental death and dismemberment insurance plans, shall be deemed to be, and treated, as executory contracts and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided*, *however*, that the Prepetition Long Term Incentive Plan shall be cancelled. As soon as practicable after the Effective Date, the Reorganized Debtors will implement the New Management Equity Incentive Plan and the New Management Cash Incentive Plan.

6. *Termination of Prepetition Equity Agreements*

Section 5.6 of the Plan provides that upon the Effective Date, each Prepetition Equity Agreement shall be deemed terminated and of no further force and effect, and any Claim in respect thereof shall be treated as a Subordinated Securities Claim under the Plan.

B. *Provisions Governing Distributions*

1. *Date of Distributions*

Pursuant to Section 6.1 of the Plan, and except as otherwise provided in the Plan, any distribution to be made hereunder shall be made on the Effective Date or as soon as practicable thereafter. Any payment or act required to be made or done hereunder on a day that is not a Business Day shall be made or done on the next succeeding Business Day.

2. *Disbursing Agent*

Section 6.2 of the Plan provides:

(a) *General*. Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other entity designated by the Reorganized Debtors as the Disbursing Agent.

(b) *Rights and Powers of the Disbursing Agent*. The Disbursing Agent shall be empowered (i) to effect all actions and execute all agreements, instruments and other documents necessary to perform such Disbursing Agent's duties under the Plan, (ii) make all distributions contemplated by the Plan, (iii) without further order of the Bankruptcy Court, employ or contract with any Entities to assist in or make the distributions required by the Plan, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(c) *Senior Agent*. The Senior Agent shall be deemed to be the Holder of all Senior Credit Agreement Claims for purposes of distributions to be made under the Plan, and all distributions on account of Allowed Senior Credit Agreement Claims shall be made to the Senior Agent or as otherwise agreed to by the Reorganized Debtors and the Senior Agent.

(d) *DIP Agent.* The DIP Agent shall be deemed to be the Holder of all DIP Credit Agreement Claims for purposes of distributions to be made under the Plan, and all distributions on account of DIP Credit Agreement Claims shall be made to the DIP Agent or as otherwise agreed to by the Reorganized Debtors and the DIP Agent.

(e) *Subordinated Note Agent*. The Subordinated Note Agent shall be deemed to be the Holder of all Subordinated Note Claims for purposes of distributions to be made hereunder, and all distributions on account of Allowed Subordinated Note Claims shall be made to the Subordinated Note Agent.

3. *Distribution Record Date*

Pursuant to Section 6.3 of the Plan, distributions under the Plan to the Holders of Allowed Senior Credit Agreement Claims and Holders of Subordinated Note Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Senior Credit Agreement Claims or Subordinated Note Claims after the Distribution Record Date shall not be recognized for purposes of the Plan. On the Distribution Record Date, the Senior Agent shall provide a true and correct copy of the registry for the Senior Credit Agreement Claims to the Debtors. On the Distribution Record Date, the Subordinated Note Agent shall provide a true and correct copy of the registry for the Subordinated Note Claims to the Debtors.

4. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a) *General*. Pursuant to Section 6.4 of the Plan, any distribution to be made under the Plan to a Holder of an Allowed Claim will be made to the address of such Holder as set forth in the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address,

including by the Filing of a proof of claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal.

(b) *Undeliverable Distributions*. Pursuant to Section 6.4 of the Plan, if any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent shall make no further distribution to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then current address. On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent shall make such distribution without interest thereon. Any Holder of an Allowed Claim that fails to assert a Claim hereunder for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates or the Reorganized Debtors or their property. After the first anniversary of the Effective Date, all property or interests in property not distributed pursuant to Section 6.4 of the Plan shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code. Such property or interests in property shall be returned by the Disbursing Agent to the Reorganized Debtors, and the Claim of any other Holder to such property or interests in property shall be discharged and forever barred. Nothing contained herein shall require, or be construed to require, the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5. *Setoff and Recoupment*

Pursuant to Section 6.5 of the Plan, the Reorganized Debtors shall be permitted, but not required, to set off or recoup against any Claim (other than the Senior Credit Agreement Claims, the DIP Credit Agreement Claims, and the Subordinated Note Claims, which Claims shall not be subject to setoff, recoupment or reduction of any kind), or the distributions to be made hereunder on account of such Claim, any claims of any nature whatsoever the Debtors have against the Holder of such Claim; *provided*, *however*, that neither the failure to exercise such setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim the Reorganized Debtors may have against such Holder.

6. *Surrender of Cancelled Instruments or Securities*

(a) Pursuant to Section 6.6 of the Plan, any Holder of any Claim or Interest evidenced by the instruments, securities or other documentation cancelled under Section 4.5 of the Plan (including the Senior Agent and the Subordinated Note Agent) shall surrender such applicable instruments, securities or other documentation to the Reorganized Debtors or certify in writing that such instrument, security or other documentation has been cancelled, in accordance with written instructions to be provided to such Holder by the Reorganized Debtors, unless waived in writing by the Debtors or the Reorganized Debtors. Any distribution required to be made hereunder on account of any such Claim shall be treated as an undeliverable distribution under Section 6.4(b) of the Plan pending the satisfaction of the terms of Section 6.6(a) of the Plan.

(b) Pursuant to Section 6.6 of the Plan, and subject to Section 6.7 of the Plan, other than for instruments, securities or other documentation certified as cancelled by the Subordinated Note Agent in accordance with Section 6.6(a) of the Plan, any Holder of any Claim evidenced by the instruments, securities or other documentation cancelled under Section 4.5 of the Plan that fails to surrender such applicable instruments, securities or other documentation in accordance with Section 6.6(a) of the Plan within two years after the Effective Date shall have such Claim, and the distribution on account of such Claim, discharged and shall forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.

7. *Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities*

Pursuant to Section 6.7 of the Plan, in addition to any requirements under any applicable agreement, any Holder of any Claim evidenced by the instruments, securities or other documentation cancelled under Section 4.5 of the Plan (including the Senior Agent and the Subordinated Note Agent), which instruments, securities or other documentation have been lost, stolen, mutilated or destroyed shall, in lieu of surrendering such instruments,

securities or other documentation, (a) deliver evidence of such loss, theft, mutilation or destruction that is reasonably satisfactory to the Reorganized Debtors, and (b) deliver to the Reorganized Debtors such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such Entity as the Holder of such Allowed Claim. Such Holder shall, upon compliance with Article VI of the Plan, be deemed to have surrendered such instruments, securities or other documentation for all purposes hereunder.

8. *Fractional Distributions*

Pursuant to Section 6.8 of the Plan, and notwithstanding anything contained herein to the contrary, no fractional shares of Reorganized Parent Common Stock (or Warrants for fractional shares of Reorganized Parent Common Stock) and no fractional dollars of Cash shall be distributed. For purposes of distribution hereunder on account of such Claims, fractional shares and fractional dollars (whether in the form of Cash or notes) shall be rounded to the nearest whole unit (with any amount less than one-half share or one-half dollar, as applicable, to be rounded down).

9. *Manner of Payment Under Plan of Reorganization*

Pursuant to Section 6.9 of the Plan, the Disbursing Agent shall be authorized, in its discretion, to make any Cash payment required to be made hereunder by check or wire transfer. Cash payments to Claims reinstated by the Plan shall be made using the legal tender in which such Claims were originally payable.

10. *Withholding and Reporting Requirements.*

Pursuant to Section 6.10 of the Plan, in connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. For a summary of certain material U.S. federal income tax consequences, including certain U.S. federal income tax withholding and reporting requirements, relating to the consummation of the transactions described herein and in the Plan, <u>see</u> Article XI. "CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS."

11. *No Proofs of Claim Required*

Pursuant to Section 6.11 of the Plan, except with respect to professional fee applications governed by Section 2.3(a) of the Plan and with respect to proofs of claim relating to the rejection of executory contracts and unexpired leases governed by Section 5.2 of the Plan, Holders of Claims against the Debtors will not be required to file proofs of claim.

C. *Procedures for Resolving Disputed Claims*

With respect to Holders of Claims in Classes that are not impaired, their legal, equitable and contractual rights will be unaltered by the Plan (except to the extent that any such claims are "statutorily impaired" by virtue of the application of section 502(b) of the Bankruptcy Code or otherwise). As such, all General Unsecured Claims, including claims asserted in litigation against the Debtors, will be unimpaired by the Chapter 11 Cases and will remain subject to all legal and equitable defenses of the Debtors. Nothing under the Plan will affect the Debtors' rights, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against such Claims, except as expressly provided in the Plan. Because holders of Claims in Classes 1, 2, 4, and 7 and Parent Classes 1 and 2 are not impaired, and because the Debtors believe they are aware of the amount of all outstanding claims in Class 3, the Prospective Debtors do not intend to set a bar date by which holders of Claims and Equity Interests must file proofs of claim and proofs of equity interest. The Prospective Debtors anticipate that their Chapter 11 Cases will have little or no impact on the business relationship with unimpaired creditors.

1. *Prosecution of Objections to Claims.*

Pursuant to Section 7.1 of the Plan, the Debtors and the Reorganized Debtors (a) shall have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims and (b) shall be permitted to settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided*, that prior to the Effective Date, the Debtors shall in each case obtain the consent of the Senior Lenders.

2. *Estimation of Claims.*

Pursuant to Section 7.2 of the Plan, the Debtors and the Reorganized Debtors shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

3. *Payments and Distributions on Disputed Claims*

Notwithstanding any other provision to the contrary herein, no payments or distributions shall be made hereunder with respect to all or any portion of any Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn or determined by Final Order, and such Disputed Claim has become an Allowed Claim. Moreover, notwithstanding any other provision of the Plan, no interest shall accrue or be Allowed on any Claim during the period after the Petition Date, except as provided for in the DIP Order or under section 506(b) of the Bankruptcy Code.

4. *Adjustment to Claims and Equity Interests Without Objection*

Pursuant to Section 7.4 of the Plan, any Claim or Equity Interest that has been paid or satisfied, or any Claim or Equity Interest that has been amended or superseded, may be adjusted or expunged on the claims register without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise agreed by the Debtors prior to the Effective Date or unless otherwise ordered by the Bankruptcy Court, any and all proofs of Claim filed after the applicable bar date shall be deemed Disallowed in full and expunged from the official Claims register maintained in these Chapter 11 Cases for purposes of distribution or any other treatment under the Plan as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distribution on account of such Claims, unless such late Claim has been deemed timely Filed by a Bankruptcy Court order.

D. *Conditions Precedent to Confirmation and Effective Date of the Plan*

1. *Conditions Precedent to the Effective Date*

Section 8.1 of the Plan provides that the Effective Date will not occur unless and until each of the following conditions has occurred or has been waived in accordance with the terms of the Plan:

(a) The Confirmation Order shall approve the Solicitation and Disclosure Statement pursuant to section 1125 of the Bankruptcy Code;

(b) the Confirmation Order shall provide that the Reorganized Debtors shall execute and deliver the New Management Equity Incentive Plan and the New Management Cash Incentive Plan as soon as practicable after the Effective Date;

(c) the Confirmation Order shall have been entered on the docket for the Chapter 11 Cases;

(d) the Confirmation Order shall have become a Final Order;

(e) the Plan Support Parties shall have complied materially with the covenants in the Plan Support Agreement (or the failure to comply shall have been waived in accordance with the Plan Support Agreement), and all conditions in the Plan Support Agreement shall have been satisfied or waived in accordance with the Plan Support Agreement;

(f) the Plan Documents shall have been executed and delivered;

(g) no material litigation restraining or materially altering the Restructuring Transactions shall have occurred;

(h) a Material Adverse Effect shall not have occurred;

(i) the execution and delivery of (i) the Exit Financing Documents, (ii) the Second Lien Note Documents, (iii) the Stockholders' Agreement, (iv) the Registration Rights Agreement, (v) the New Intercreditor Agreement, and (vi) the Warrants; *provided*, that the deemed execution and delivery of the Stockholders' Agreement and the Registration Rights Agreement pursuant to Section 4.13 of the Plan shall be sufficient to satisfy the requirement in Section 8.2(i)(iii) of the Plan;

(j) the proceeds of the Exit Credit Agreement shall be made available to the Reorganized Debtors to fund the distributions under the Plan;

(k) the Reorganized Parent Certificate of Incorporation shall have been duly filed with the Delaware Secretary of State;

(l) all authorizations, consents and approvals determined by the Debtors or the Senior Agent to be necessary to implement the terms of the Plan shall have been obtained;

(m) the Outside Date shall not have passed, unless waived or extended by the Plan Support Parties in accordance with the Plan Support Agreement;

(n) the fees and expenses payable under Section 2.3(b) of the Plan, requests for which have been submitted to the Debtors, shall have been paid in full;

(o) all statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full; and

(p) all other actions necessary to implement the terms of the Plan shall have been taken.

2. *Waiver of Conditions*

Pursuant to Section 8.2 of the Plan, any condition set forth in Article VIII of the Plan (other than the conditions set forth in Sections 8.1(a), (c), and (o)) may be waived, in whole or in part, at any time by the Debtors, subject to the consent of the Senior Agent, without notice or leave or order of the Bankruptcy Court.

3. *Modification of Plan*

Section 1127 of the Bankruptcy Code provides for the modification of a plan of reorganization, subject to certain statutory requirements. A modification of the Plan prior to confirmation of the Plan would require compliance with the Bankruptcy Code provisions governing the filing and content, solicitation and disclosure and confirmation of a plan of reorganization. Section 1127 of the Bankruptcy Code also provides for modification of a plan of reorganization after confirmation (but prior to substantial consummation) of such plan if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified under section 1129 of the Bankruptcy Code.

Section 8.3 of the Plan provides that the Debtors, with the consent of the Senior Agent, shall be permitted to amend, supplement or modify the Plan, in accordance with the Plan Support Agreement, at any time, subject to the restrictions and requirements under section 1127 of the Bankruptcy Code, and except to the extent such amendment, supplement or modification affects a party's right of consent hereunder and such consent has not been previously obtained.

4. *Effect of Withdrawal or Revocation*

Pursuant to Section 8.4 of the Plan, the Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is so revoked or withdrawn, or if the Effective Date fails to occur, then the Plan shall be deemed null and void in its entirety and of no force or effect. In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claim against or Equity Interest in any Debtor or any other Entity, or to prejudice in any manner any further proceedings involving (i) any Debtor, the rights of any Debtor or any other Entity, (ii) the Senior Agent or Senior Lenders, (iii) the DIP Facility Agent or DIP Facility Lenders, (iv) the Exit Facility Agent or Exit Facility Lenders, or (v) the Subordinated Note Agent or Subordinated Noteholders.

5. *Reservation of Rights*

Pursuant to Section 8.5 of the Plan, the Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

6. *Substantial Consummation of Plan*

Pursuant to Section 8.6 of the Plan, substantial consummation of the Plan under Bankruptcy Code sections 1101(2) and 1127(b) shall be deemed to occur on the Effective Date.

E. *Effect of Plan Confirmation*

1. *Binding Effect*

Pursuant to Section 9.1 of the Plan, the Plan shall be binding upon and inure to the benefit of the Debtors, all current and former Holders of Claims and Equity Interests and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

2. *Discharge of Claims*

Section 9.2 of the Plan provides that pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including with respect to Claims reinstated by the Plan), the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of all Claims and causes of action of any nature whatsoever arising on or before the Effective Date, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against the Debtors and liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties arising before the Effective Date, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, in each case, whether or not: (i) a proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim has accepted the Plan. Any default by the Debtors with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims arising before the Effective Date against the Debtors, subject to the Effective Date occurring.

3. *Releases*

Pursuant to Section 9.3 of the Plan:

(a) *Releases By the Debtors*. Upon the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors in possession, shall be deemed forever to release, waive and discharge the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action and liabilities (other than the Reserved Actions) whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities (other than the rights of the Debtors or Reorganized Debtors to enforce the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, at equity or otherwise , based in whole or in part on any act, omission, transaction, event or other occurrence or circumstances taking place on or before the Effective Date in any way relating to (a) any investment by any Releasee in any of the Debtors; (b) any action or omission of any Releasee with respect to any indebtedness under which any Debtor is or was a borrower or guarantor, or any common or preferred equity investment in the Debtors (including, without limitation, any action or omission of any Releasee with respect to the acquisition, holding, voting or disposition of any such investment); (c) any Releasee in any such Releasee's capacity as an officer, director, employee or agent of, or advisor to, any Debtor; (d) any disclosure made or not made by any person to any current or former Holder of any indebtedness; (e) any consideration paid to any Releasee by any of the Debtors arising from or related to any investment by any Releasee in any indebtedness of, or any common or preferred equity investment in, the Debtors or in respect of any services provided by any Releasee to any Debtor under any management agreement or otherwise; or (f) the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan, the Plan Support Agreement, or the Solicitation and Disclosure Statement, against any of the Releasees.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Fed. R. Bankr. P. 9019, of the releases described in Section 9.3(a) of the Plan by Releasors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Section 9.3(a) of the Plan is: (a) in exchange for the good and valuable consideration provided by the Releasees, a good faith settlement and compromise of such Claims; (b) in the best interests of the Debtors and all Holders of Equity Interests and Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Releasors asserting any Claim, cause of action or liability related thereto of any kind whatsoever against any of the Releasees or their property.

(b) *Releases By Holders of Claims*. Upon the Effective Date, each Releasor, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, shall be deemed forever

to release, waive and discharge the Releasees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action and liabilities (other than the rights of the Releasors to enforce the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, at equity or otherwise whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence or circumstances taking place on or before the Effective Date in any way relating to (a) any investment by any Releasee in any of the Debtors; (b) any action or omission of any Releasee with respect to any indebtedness under which any Debtor is or was a borrower or guarantor, or any common or preferred equity investment in the Debtors (including, without limitation, any action or omission of any Releasee with respect to the acquisition, holding, voting or disposition of any such investment); (c) any Releasee in any such Releasee's capacity as an officer, director, employee or agent of, or advisor to, any Debtor; (d) any disclosure made or not made by any person to any current or former Holder of any indebtedness; (e) any consideration paid to any Releasee by any of the Debtors arising from or related to any investment by any Releasee in any indebtedness of, or any common or preferred equity investment in, the Debtors or in respect of any services provided by any Releasee to any Debtor under any management agreement or otherwise; or (f) the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan, the Plan Support Agreement, or the Solicitation and Disclosure Statement against any of the Releasees.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Fed. R. Bankr. P. 9019, of the releases described in Section 9.3(b) of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Section 9.3(b) of the Plan is: (a) in exchange for the good and valuable consideration provided by the Releasees, a good faith settlement and compromise of such Claims; (b) in the best interests of the Debtors and all Holders of Equity Interests and Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Releasors asserting any Claim, cause of action or liability related thereto of any kind whatsoever against any of the Releasees or their property.

4. *Exculpation and Limitation of Liability*

Section 9.4 of the Plan provides that none of the Debtors, the Reorganized Debtors or the Releasees shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or Parent Equity Interest, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation, preparation, dissemination, confirmation, solicitation, implementation, or administration of the Plan, the Plan Supplement, the Solicitation and Disclosure Statement, any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other pre- or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company or confirming or consummating the Plan (other than the Reserved Actions); *provided*, *however*, that the foregoing provisions of this Article shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted actual fraud or willful misconduct. Without limiting the generality of the foregoing, the Debtors, the Reorganized Debtors and the Releasees shall, in all respects, be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

5. *Injunction*

Pursuant to Section 9.5 of the Plan:

(a) *General*. All Persons or Entities who have held, hold or may hold Claims or Parent Equity Interests (other than the Claims that are reinstated under Sections 3.2 or 3.4 of the Plan) and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, directors, principals and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, or in respect of any Claim or Cause of Action released or settled hereunder, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtors or Reorganized Debtors, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or interests in property of the Debtors or Reorganized Debtors, on account of such Claims or Parent Equity Interests; *provided*, *however*, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms hereof and the contracts, instruments, releases and other agreements and documents delivered under or in connection with the Plan.

(b) *Injunction Against Interference With Plan*. Upon entry of the Confirmation Order, all Holders of Claims and Parent Equity Interests and their respective current and former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim, by accepting distributions under or reinstatement of such Claim pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Section 9.5 of the Plan.

6. *Term of Bankruptcy Injunction or Stays*

Pursuant to Section 9.6 of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date.

7. *Termination of Subordination Rights and Settlement of Related Claims*

Section 9.7 of the Plan provides that classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

8. *Preservation of Rights of Action*

Pursuant to Section 9.8 of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and have the exclusive right to enforce, after the Effective Date, any Claims, rights and Causes of Action that the Debtors or the Estates may hold against any Entity (other than claims, rights and Causes of Action released pursuant to Section 9.3(a) of the Plan), including actions pursuant to Chapter 5 of the Bankruptcy Code and any other Causes of Action in favor of the Reorganized Debtors or their Estates, including those described in the Plan Supplement. The Reorganized Debtors shall be permitted to pursue such retained claims, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

F. *Retention of Jurisdiction*

Article X of the Plan provides that, pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction, to the extent applicable to:

(a) Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b) Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(c) Resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(d) Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e) Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f) Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order;

(g) Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

(h) Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, in each case in accordance with the Plan Support Agreement and subject to the consent of the Senior Agent;

(i) Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; *provided*, *however*, that from and after the Confirmation Date, the payment of fees and expenses of the Reorganized Debtors, including fees and expenses of counsel, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j) Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k) Hear and determine any rights, claims or Causes of Action held or reserved by, or accruing to, the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the Confirmation Order or, in the case of the Debtors, any other applicable law;

(l) Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(m) Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(n) Determine any other matters that may arise in connection with or that relate to the Plan, the Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Confirmation Order;

(o) Enter an order of final decree closing the Chapter 11 Cases;

(p) Hear and resolve all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(q) Hear and resolve all matters involving the nature, existence or scope of the Debtors' discharge;

(r) Hear and resolve all matters related to the property of the Estates from and after the Confirmation Date; and

(s) Hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by the Bankruptcy Code.

G. *Miscellaneous Provisions*

1. *Payment of Statutory Fees*

Pursuant to Section 11.1 of the Plan, all fees payable under section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date; *provided*, that in the event of a dispute regarding such fees, the fees in dispute shall be paid upon entry of a Final Order resolving such dispute.

2. *Section 1145 Exemption*

Section 11.2 of the Plan provides that, pursuant to section 1145(a) of the Bankruptcy Code, the shares of Reorganized Parent Common Stock, Warrants, and Second Lien Notes issued under or in connection with the Plan shall be exempt from registration under section 5 of the Securities Act and may be resold by holders thereof without registration, unless the holder is an "underwriter" (as defined in section 1145(b)(l) of the Bankruptcy Code) with respect to such securities, in each case, subject to the terms thereof, applicable securities laws and the Reorganized Parent Constituent Documents, as applicable. To the extent that section 1145 is not available to exempt the securities issued under, or in connection with, the Plan from registration under section 5 of the Securities Act, the Debtors believe that other provisions of the Securities Act, including, without limitation, sections 3(a)(9) and 4(2) of the Securities Act, and state securities laws will apply to exempt such issuance from the registration requirements of the Securities Act. See Article IX.B. "CERTAIN OTHER LEGAL CONSIDERATIONS—Section 1145 of the Bankruptcy Code" for a discussion of section 1145.

3. *Governing Law*

Section 11.3 of the Plan provides that, except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to the Plan

provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

4. *Severability*

Section 11.4 of the Plan provides that if, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Senior Agent) shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

5. *Inconsistency*

Pursuant to Section 11.5 of the Plan, in the event of any inconsistency among the Plan, the Solicitation and Disclosure Statement, the Plan Documents, any exhibit or schedule to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

6. *Filing of Additional Documents*

Pursuant to Section 11.6 of the Plan, the Debtors or the Reorganized Debtors shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

7. *Service of Documents*

Pursuant to Section 11.7 of the Plan, all notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as follows:

CHL, Ltd.
1023 State Street
Schenectady, New York 12307
Attn: Lawrence E. Young
Fax: (214) 647-7501

with copies to:

Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Attn: David B. Stratton
Fax: (302) 656-8865

- and -

Ropes & Gray LLP

Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Attn: James A. Wright III
Fax: (617) 235-9542

8. *Section 1125(e) of the Bankruptcy Code*

Section 11.8 of the Plan provides that, as of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the Plan Support Parties, the Sponsor and each of their respective affiliates, agents, directors, officers, principals, employees, advisors and attorneys shall be deemed to have participated to the extent, if any, of their participation in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

9. *Exemption from Certain Transfer Taxes*

Pursuant to Section 11.9 of the Plan and section 1146(a) of the Bankruptcy Code, no stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax shall result from, or be levied on account of, (a) the issuance, transfer or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest, (c) the making or assignment of any lease or sublease, or (d) the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale and transfers of tangible property. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

10. *Determination of Tax Liability*

Section 502(b)(2) of the Bankruptcy Code empowers debtors to obtain expedited determinations of tax liability with respect to postpetition tax periods and proscribes certain time limits within which governmental units must respond to tax returns for such periods. Pursuant to Section 11.10 of the Plan, the Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

11. *Schedules and Exhibits*

Pursuant to Section 11.11 of the Plan, and other than for purposes of Section 11.5 of the Plan, all exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

12. *No Prejudice*

Section 11.12 of the Plan provides that if the Confirmation Order is vacated or the Effective Date has not occurred by the Outside Date, then (a) the Confirmation Order shall be vacated, (b) the Plan shall be null and void in all respects, (c) no distributions under the Plan shall be made, (d) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date and (e) nothing contained in the Plan or the Solicitation and Disclosure Statement shall: (i) be deemed to constitute a waiver or release of (x) any Claims by any creditor or (y) any Claims against, or Equity Interests in, the Debtors;

(ii) prejudice in any manner the rights of the Debtors, the Senior Agent or Senior Lenders, the DIP Agent or DIP Lenders, the Exit Facility Agent or Exit Facility Lenders or the Subordinated Note Agent or Subordinated Noteholders; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Senior Agent or Senior Lenders, the DIP Agent or DIP Lenders, the Exit Facility Agent or Exit Facility Lenders or the Subordinated Note Agent or Subordinated Noteholders in any respect.

13. *Allocation of Payments*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest.

14. *Dissolution of Statutory Committees*

All Statutory Committees appointed in the Chapter 11 Cases, if any, shall be dissolved on the Confirmation Date.

## XI. CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain material U.S. federal income tax consequences of (i) the implementation of the Plan (the "Restructuring") to the Debtors and to Holders of Allowed Senior Credit Agreement Claims (the "Senior Claims") and Holders of Allowed Subordinated Note Claims (the "Subordinated Claims") and (ii) the ownership and sale, exchange or other disposition of the consideration to be received in the Restructuring by such Holders in exchange for their Senior Claims or their Subordinated Claims, as applicable. This summary does not address the U.S. federal income tax consequences to Holders of any other Claims.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No ruling has been (or will be) requested or obtained from the Internal Revenue Service (the "IRS") or any other taxing authority with respect to any tax aspects of the Plan, and no opinion of counsel has been (or will be) sought or obtained with respect thereto. This discussion assumes that the Plan will be consummated in accordance with its terms and that the Debtors will not effect any Restructuring Transactions under Section 4.12 of the Plan. Events occurring after the date of the Disclosure Statement, including changes to the terms of the Restructuring, the law and/or administrative positions, could affect the U.S. federal income tax consequences of the Plan. No representations are being made regarding the particular U.S. federal income tax consequences of the confirmation and consummation of the Plan to the Debtors or any Holder. This discussion is not binding on the IRS, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address any estate, gift, state, local, or foreign law tax consequences of the Plan. Furthermore, this discussion does not address all tax considerations that might be relevant to particular Holders in light of their personal circumstances. In addition, this summary does not address the tax treatment of special classes of Holders, such as financial institutions, regulated investment companies, real estate investment trusts, tax-exempt entities, insurance companies, persons holding debt as part of a hedging, integrated or conversion transaction, constructive sale or "straddle," U.S. expatriates, persons subject to the alternative minimum tax, and dealers or traders in securities or currencies.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

* * * *

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF TAX ISSUES HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY A HOLDER FOR THE PURPOSE OF AVOIDING ANY UNITED STATES FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS DESCRIBED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

* * * *

A. *U.S. Federal Income Tax Consequences of the Restructuring to the Debtors*

For U.S. federal income tax purposes, Parent is the common parent of an affiliated group of corporations (any such group, a "U.S. Consolidated Return Group") that includes certain of the Debtors that join in the filing of a consolidated U.S. federal income tax return (the "Parent Tax Group"). In addition to Parent, the Parent Tax Group includes Parent's wholly-owned subsidiary, Contec Acquisition Corp., and its wholly-owned subsidiary, Contec Holdings. For U.S. federal income tax purposes, Contec, LLC (the obligor under the Senior Credit Agreement) is disregarded as a separate entity from its sole owner, Contec Holdings, and, accordingly, Contec Holdings is treated as the obligor under the Senior Credit Agreement.

The Parent Tax Group has reported substantial consolidated net operating loss ("NOL") carryforwards for U.S. federal income tax purposes, as of December 31, 2011. The Debtors expect the Parent Tax Group to report additional NOLs during the taxable year ending December 31, 2012. In addition, as of December 31, 2011, the Parent Tax Group had a substantial amount of depreciable and amortizable tax basis for U.S. federal income tax purposes ("Depreciable Tax Basis"). The amount (and potential future utilization) of such NOLs, NOL carryforwards and Depreciable Tax Basis remain subject to review and possible adjustment by the IRS and to the application of Sections 108, 382, and 1017 of the IRC.

1. *Cancellation of Indebtedness Income*

Subject to certain exceptions, a debtor that is a United States taxpayer generally must include in its gross income the amount of cancellation of indebtedness income ("CODI") recognized during the taxable year. CODI generally equals the adjusted issue price of the indebtedness discharged over the sum of the amount of cash, the

issue price of any debt instrument and the fair market value of any other property (including stock and warrants) given in exchange therefor.

CODI is not required to be recognized, however, if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 and the discharge is granted, or is effected pursuant to a plan approved, by the court (the "Bankruptcy Exception"). Unless the debtor elects otherwise, the debtor must reduce certain of its tax attributes by the amount of CODI, generally in the following order: NOLs, general business and minimum tax credit carryforwards, capital loss carryforwards, the tax basis of the debtor's assets, and foreign tax credit carryforwards (collectively, "Tax Attributes"). Generally, the amount by which the debtor reduces asset tax basis may not be greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the debtor's aggregate liabilities immediately after the discharge. Alternatively, the debtor may elect, first, to reduce the tax basis of the debtor's depreciable assets, in accordance with Section 108(b)(5) of the IRC, in which case the rule described in the immediately preceding sentence would not apply.

Treasury Regulations provide rules for reducing Tax Attributes when a member of a U.S. Consolidated Return Group realizes excluded CODI. Under the ordering rules of the Treasury Regulations, generally, the attributes of the debtor corporation are reduced first (including its tax basis in the stock and assets of direct and indirect subsidiaries). In this regard, the Treasury Regulations adopt a "tier-down" approach such that, if the debtor reduces its tax basis in its stock in a subsidiary, corresponding reductions must be made to the attributes of that subsidiary. To the extent that the excluded CODI exceeds the tax attributes of the debtor member, the Treasury Regulations require the reduction of certain consolidated attributes (*e.g.*, NOLs, but not asset tax basis) attributable to other members of the U.S. Consolidated Return Group. Any required Tax Attribute reduction takes place after the U.S. Consolidated Return Group has determined its taxable income, and any U.S. federal income tax liability, for the taxable year in which the CODI is realized. The taxable year of the Parent Tax Group will not end as a result of the Restructuring; accordingly, any reduction in the Parent Tax Group's Tax Attributes shall affect tax years following the year in which the Restructuring is consummated.

The Debtors expect the Parent Tax Group to realize substantial CODI as a result of the Restructuring. The precise amount of CODI will depend on, among other things, the fair market value of the Reorganized Parent Common Stock and the Warrants and the "issue price" of the Second Lien Notes, which can only be determined with certainty after the Effective Date. The amount of CODI realized by the Parent Tax Group is likely to significantly exceed its consolidated NOLs. By applying these rules, the Debtors expect that the Parent Tax Group's NOLs will be eliminated and, therefore, unavailable to offset income of the Parent Tax Group for taxable years following the year of discharge. Further, the Debtors expect that a significant portion of the Parent Tax Group's Depreciable Tax Basis will be reduced, which may result in the Parent Tax Group having to pay U.S. federal income taxes for taxable years following the year in which the Restructuring is consummated sooner and in a greater amount than if the Parent Tax Group's Tax Attributes had not been reduced under the foregoing rules.

2. *Annual Section 382 Limitation on Use of NOLs and "Built-In" Losses and Deductions*

Section 382 of the IRC generally provides that, if a corporation undergoes an "ownership change," the amount of such corporation's pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in," (*i.e.*, economically accrued but unrecognized), as of the date of the ownership change) that may be utilized to offset future taxable income is subject to an annual limitation (the "Annual Section 382 Limitation"). In general, an ownership change occurs when the percentage of a loss corporation's stock owned by certain "5-percent shareholders" increases by more than 50 percentage points over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of the three-year period preceding the testing date or the period of time since the corporation's most recent ownership change). A 5-percent shareholder for these purposes generally includes an individual or entity that, directly or indirectly, owns at least 5% of a loss corporation's stock, and may include one or more groups of shareholders that, in the aggregate, own less than 5% of the value of such corporation's stock. Subject to certain anti-avoidance rules, an option to acquire stock is not treated as stock for purposes of testing an "ownership change" until such option is exercised. Under applicable Treasury Regulations, an ownership change with respect to a U.S. Consolidated Return Group generally is measured by changes in the stock ownership of the group's parent

corporation. A portion of the Parent Tax Group's NOL carryforwards are currently subject to an Annual Section 382 Limitation as a result of a prior ownership change.

As a general rule, the Annual Section 382 Limitation equals the product of (i) the fair market value of the stock of the loss corporation (with certain adjustments) (or, in the case of a U.S. Consolidated Return Group, the common parent) immediately before the ownership change, and (ii) the highest of the adjusted federal "long-term tax-exempt rates" in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs (3.06% for ownership changes that occur during August 2012). Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years. The Annual Section 382 Limitation is increased in the case of a corporation that has net unrealized built-in gains ("NUBIGs"), i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount. Such a corporation can increase its Annual Section 382 Limitation to the extent of NUBIGs recognized (or deemed recognized for U.S. federal income tax purposes) in the five years following the ownership change. To determine the Annual Section 382 Limitation for a U.S. Consolidated Return Group, NUBIG generally is calculated by netting the built-in losses and built-in gains of all group members.

The Annual Section 382 Limitation may also apply to certain net unrealized built-in losses ("NUBILs"), generally, the excess, if any, of the aggregate tax basis of the corporation's assets over the aggregate fair market value of such assets on the ownership change date. If a loss corporation (or the U.S. Consolidated Return Group) has a NUBIL that exceeds a threshold amount at the time of the ownership change, any built-in losses or deductions (which, for this purpose, includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) that are recognized during the following five years (up to the amount of the original built-in loss) generally will be subject to the Annual Section 382 Limitation. Section 382(h)(8) of the IRC provides that, if 80% or more of a corporation's stock, by value, is acquired in a single transaction (or in a series of related transactions during any 12-month period), for purposes of determining NUBIL, the fair market value of such corporation's assets shall not exceed the grossed-up amount paid for such stock properly adjusted for indebtedness of the corporation and other relevant items. Special rules apply to determine the NUBIL of a U.S. Consolidated Return Group that is subject to an Annual Section 382 Limitation, including requirements to compute NUBILs on a separate company basis for certain group members.

Unless a corporation affirmatively elects otherwise, where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50% of the reorganized corporation's stock immediately after the ownership change (the "Section 382(l)(5) Exception"). However, under the Section 382(l)(5) Exception, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced by the amount of any interest paid or accrued on certain debt converted to stock in the reorganization during the year of the ownership change and the three preceding taxable years. In addition, if the Section 382(l)(5) Exception applies, a second ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change. For these purposes, "qualified creditors" are creditors who owned "qualified indebtedness" immediately before the ownership change. In general, "qualified indebtedness" is either (i) debt that has been owned by the same person for at least 18 months before the bankruptcy filing, or (ii) debt that arose in the ordinary course of the corporation's business and has been owned at all times by the same creditor. For these purposes, absent knowledge to the contrary, a corporation may treat indebtedness as always having been owned by the beneficial owner of the indebtedness immediately before the ownership change if the beneficial owner is not, immediately after the ownership change, either a 5-percent shareholder or an entity through which a 5-percent shareholder owns an indirect ownership interest in the corporation. This presumption may be rebutted by Debtors' actual knowledge that the creditor has not owned the debt for the requisite period.

If a corporation in bankruptcy is not eligible for the Section 382(l)(5) Exception or elects out of that provision, Section 382(l)(6) of the IRC is used to calculate the Annual Section 382 Limitation. Under this rule, the Annual Section 382 Limitation is calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the debtor's assets (determined without regard to liabilities) immediately before the ownership change.

As stated above, we expect that the Parent Tax Group's NOLs will be eliminated going forward. It is uncertain whether the Section 382(l)(5) Exception would be available and, if so, whether the Parent Tax Group would rely on such exception with respect to the utilization of the Parent Tax Group's NOLs for the year in which the Restructuring occurs or the utilization of the Parent Tax Group's other Tax Attributes (including, in particular, Depreciable Tax Basis).

3. *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") of 20% is imposed on a corporation's alternative minimum taxable income ("AMTI") each year to the extent such tax exceeds the corporation's regular U.S. federal income tax liability for such year. To compute AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, although a corporation might otherwise be able to offset all of its taxable income by NOL carryovers from prior years, only 90% of a corporation's AMTI may be offset by available alternative minimum tax NOL carryforwards. Further, if a corporation with a NUBIL undergoes an ownership change within the meaning of Section 382 of the IRC, the corporation must use the fair market value, rather than the tax basis, of its assets to compute its AMTI. Any AMT that a corporation pays is generally allowed as a nonrefundable credit against the corporation's regular U.S. federal income tax liability in future taxable years to the extent that such corporation is no longer subject to the AMT.

B. *U.S. Federal Income Tax Consequences of the Restructuring to Holders of Senior Claims and Subordinated Claims*

1. *In General*

As mentioned above, the U.S. federal income tax consequences of the Restructuring to Holders of Senior Claims and Subordinated Claims are complex and subject to significant uncertainties. Such consequences may depend, among other things, on (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof); (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; and (6) the Holder's method of tax accounting.

EACH HOLDER OF A SENIOR CLAIM OR A SUBORDINATED CLAIM IS STRONGLY URGED TO CONSULT SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES TO SUCH HOLDER OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

2. *U.S. Federal Income Tax Consequences of the Restructuring to U.S. Holders of Senior Claims*

a. *In General*

Pursuant to the Plan, the Holders of Senior Claims will exchange directly with Contec, LLC (which, as explained above, is disregarded as a separate entity from Contec Holdings for U.S. federal income tax purposes) a portion of their Senior Claims for the Second Lien Notes (the "Claims-for-Notes Exchange") and the remainder of their Senior Claims for 80% of the shares of Reorganized Parent Common Stock (the "Claims-for-Shares Exchange," and together with the Claims-for-Notes Exchange, the "Exchange").

The U.S. federal income tax consequences to a U.S. Holder of the Exchange depend, among other things, on whether both the Senior Claims and Second Lien Notes are treated as "securities" of Contec Holdings and whether the form of the Claims-for-Shares Exchange is respected. If either the Senior Claims or the Second Lien Notes do not constitute "securities" of Contec Holdings for U.S. federal income tax purposes, the Claims-for-Notes Exchange will not qualify as a tax-free recapitalization. If the Claims-for-Notes Exchange does not qualify as a tax-free recapitalization and the form of the Claims-for-Shares Exchange is respected for U.S. federal income tax purposes, the Claims-for-Shares Exchange will not qualify as a tax-free transaction.

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. Treatment of an instrument with an initial term between five and ten years is unsettled. Numerous factors other than the term of an instrument could be considered in determining whether a debt instrument is a security, including whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the creditors have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or are accrued.

If the Exchange is treated as a fully taxable transaction, subject to the discussion below regarding the treatment of accrued but unpaid interest in section XI.B.2.b, *"—Accrued but Unpaid Interest"*, and the "market discount" rules described below in section XI.B.2.c, "—*Market Discount*", a U.S. Holder of Senior Claims will recognize gain or loss for U.S. federal income tax purposes on the Exchange equal to the difference between (i) the sum of (A) the fair market value of the shares of Reorganized Parent Common Stock received in the Exchange, and (B) the "issue price" of the Second Lien Notes received in the Exchange, and (ii) such U.S. Holder's adjusted tax basis in the Senior Claims surrendered, determined immediately prior to the Effective Date; and such gain or loss should be capital gain or loss and long-term capital gain or loss, if the Senior Claims were held for more than one year by the U.S. Holder on the Effective Date. Currently, long-term capital gains of an individual taxpayer generally are taxed at preferential rates, but the deductibility of capital losses is limited. A U.S. Holder's initial tax basis in the shares of Reorganized Parent Common Stock received in the Exchange will equal the fair market value of such shares on the Effective Date. A U.S. Holder's holding period in the shares of Reorganized Parent Common Stock and Second Lien Notes received in the Exchange (collectively, the "Restructuring Consideration") will commence on the day after the Effective Date.

Additionally, if the Exchange is treated as a fully taxable transaction, a U.S. Holder's initial tax basis in the Second Lien Notes received in the Exchange will equal the Second Lien Notes' "issue price" on the Effective Date. If either the Second Lien Notes or the Senior Claims are treated as "publicly traded" for U.S. federal income tax purposes, the "issue price" of the Second Lien Notes will equal the fair market value of the publicly-traded property on the Effective Date; if they are not publicly traded, the "issue price" of the Second Lien Notes is generally expected to equal their stated principal amount. For these purposes, either the Second Lien Notes or the Senior Claims generally will be treated as publicly traded if, at any time during the 60-day period ending 30 days after the exchange date, the Second Lien Notes or the Senior Claims are, respectively, treated as traded on an established market. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the relevant debt obligation appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, a debt obligation is considered to be publicly traded when price quotations for such debt are readily available from dealers, brokers or traders.

Alternatively, if both the Senior Claims and Second Lien Notes received in the Claims-for-Notes Exchange constitute "securities" of Contec Holdings for U.S. federal income tax purposes, the Claims-for-Notes Exchange may qualify as a tax-free recapitalization for U.S. federal income tax purposes. In such case, a U.S. Holder of such Senior Claims that realizes a loss on the Exchange will not be permitted to recognize such loss. If the Claims-for-Notes Exchange qualifies as a tax-free recapitalization and the form of the Claims-for-Shares Exchange is respected, subject to the discussion below regarding the treatment of accrued but unpaid interest in section XI.B.2.b, "—*Accrued but Unpaid Interest*", and the "market discount" rules described below in section XI.B.2.c, "—*Market Discount*", a U.S. Holder of such Senior Claims that realizes gain on the Exchange will recognize gain to the extent of the lesser of (i) the difference, if any, between (x) the sum of the fair market value of the Second Lien Notes and Reorganized Parent Common Stock received, and (y) such U.S. Holder's adjusted tax basis in its Senior Claims, and (ii) the fair market value of the shares of Reorganized Parent Common Stock received in the Exchange; and such gain or loss should be capital gain or loss and long-term capital gain or loss, if the Senior Claims were held for more than one year by the U.S. Holder on the Effective Date. Subject to the discussion below regarding the treatment of

accrued but unpaid interest in section XI.B.2.b, "—*Accrued but Unpaid Interest*", and the market discount rules described below in section XI.B.2.c, "—*Market Discount*", such U.S. Holder's (i) initial tax basis in the Second Lien Notes received in the Exchange will equal the sum of (x) such U.S. Holder's adjusted tax basis in the surrendered Senior Claims, and (y) the amount of gain such U.S. Holder recognizes in the Exchange, minus (z) the fair market value of the shares of Reorganized Parent Common Stock received by such U.S. Holder in the Exchange, and (ii) holding period in the Second Lien Notes received in the Exchange will include such U.S. Holder's holding period in the Senior Claims surrendered. The U.S. Holder's initial tax basis in the shares of Reorganized Parent Common Stock received in the Exchange will equal their fair market value on the Exchange Date and such U.S. Holder's holding period in the shares of Reorganized Parent Common Stock received will commence on the day after the Effective Date.

While the Senior Lenders will, pursuant to the Plan, effect the Exchange directly with Contec, LLC, the IRS could assert, among other things, that the Senior Lenders should instead be treated for U.S federal income tax purposes as contributing Senior Claims to Parent in exchange for 80% of the shares of Reorganized Parent Common Stock. If such challenge were successful, the Claims-for-Shares Exchange may be treated as a tax-free contribution of property under Section 351 of the IRC, subject to the discussion below regarding the treatment of accrued but unpaid interest in section XI.B.2.b, "—*Accrued but Unpaid Interest*", and the market discount rules described below in section XI.B.2.c, "—*Market Discount*". If Section 351 of the IRC applied to the Claims-for-Shares Exchange and the Claims-for-Notes Exchange is respected as a separate transaction, subject to the discussion below regarding the treatment of accrued but unpaid interest in section XI.B.2.b, "—*Accrued but Unpaid Interest*", and the market discount rules described below in section XI.B.2.c, "—*Market Discount*", a U.S. Holder will not recognize any loss or gain on the Claims-for-Shares Exchange, such U.S. Holder's initial tax basis in the shares of Reorganized Parent Common Stock received will equal such U.S. Holder's adjusted tax basis in the Senior Claims treated as contributed to Parent, and such U.S. Holder's holding period in the shares of Reorganized Parent Common Stock received will include the holding period of the Senior Claims surrendered in exchange therefor.

As mentioned above, this discussion is not binding on the IRS, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein including as to the characterization of the Exchange for U.S. federal income tax purposes. U.S. Holders of Senior Claims should consult their respective tax advisors regarding the appropriate treatment of the Exchange for U.S. federal income tax purposes, including whether Holders may recognize any gain or loss realized upon the Exchange.

b. *Accrued but Unpaid Interest*

A portion of the consideration received by a U.S. Holder in the Restructuring may be attributable to accrued but unpaid interest with respect to such U.S. Holder's Allowed Claims. Such amount should be taxable to a U.S. Holder as ordinary interest income if the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder may recognize a loss to the extent that any accrued interest was previously included in income and is not paid in full. Pursuant to the Restructuring, the Debtors will allocate all distributions in respect of any Allowed Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest. However, no assurance can be given that the IRS will respect such allocation. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on such Claim that was previously included in the U.S. Holder's gross income. U.S. Holders of Allowed Claims should consult their respective tax advisors regarding the proper allocation of the consideration received in the Restructuring and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

c. *Market Discount*

The market discount provisions of the IRC may apply to U.S. Holders of Allowed Claims. In general, a debt obligation acquired by a U.S. Holder in the secondary market is a "market discount bond" as to that U.S. Holder if the debt obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory *de minimis* amount, the debt obligation's tax basis in the U.S. Holder's hands immediately after its acquisition. A U.S. Holder that realizes gain

upon the Restructuring may be required to treat such gain as ordinary income to the extent of any accrued market discount with respect to such U.S. Holder's Allowed Claims.

If the Claims-for-Notes Exchange is treated as a tax-free recapitalization for U.S. federal income tax purposes, a U.S. Holder who receives Second Lien Notes in the Exchange may not be required to immediately include in income the accrued market discount to the extent of such realized gain. Instead, such accrued market discount, if any, may carry over to the Second Lien Notes received in the Exchange. The rules that may defer the recognition of accrued market discount upon a tax-free recapitalization (and certain other tax-free transactions) do not apply to tax-free contributions under Section 351 of the IRC. The market discount rules described in this paragraph, by their terms, would be implemented through the issuance of Treasury Regulations. To date, however, such Treasury Regulations have not been issued. U.S. Holders should consult their respective tax advisors regarding the potential application of the market discount rules to the Restructuring, including the application of such rules in the case of a tax-free recapitalization or other tax-free transaction.

3. *U.S. Federal Income Tax Consequences of the Restructuring to U.S. Holders of Subordinated Claims*

Pursuant to the Plan, the Holders of Subordinated Claims will exchange directly with Contec, LLC their Subordinated Claims for 100% of the Warrants. The exchange of the Subordinated Claims for the Warrants will be treated as a taxable transaction for U.S. Holders of Subordinated Claims. Subject to the discussion above regarding the treatment of accrued but unpaid interest in section XI.B.2.b, "—Accrued but Unpaid Interest", and the "market discount" rules described above in section XI.B.2.c, "—Market Discount", a U.S. Holder of Subordinated Claims will recognize gain or loss for U.S. federal income tax purposes on such exchange equal to the difference between (i) the fair market value of the Warrants received in the exchange, and (ii) such U.S. Holder's adjusted tax basis in the Subordinated Claims surrendered, determined immediately prior to the Effective Date; and such gain or loss should be capital gain or loss and long-term capital gain or loss, if the Subordinated Claims were held for more than one year by the U.S. Holder on the Effective Date. Currently, long-term capital gains of an individual taxpayer generally are taxed at preferential rates, but the deductibility of capital losses is limited. A U.S. Holder's initial tax basis in the Warrants received in exchange for such U.S. Holder's Subordinated Claims will equal the fair market value of such Warrants on the Effective Date. A U.S. Holder's holding period in the Warrants will commence on the day after the Effective Date.

U.S. Holders of Subordinated Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Restructuring to such Holders.

4. *U.S. Federal Income Tax Consequences of Owning and Disposing of Restructuring Consideration and Warrants to U.S. Holders*

a. *U.S. Federal Income Tax Consequences of Owning and Disposing of Shares of Reorganized Parent Common Stock*

i. *Distributions on Reorganized Parent Common Stock*

As discussed in section II.B.5 *"—Dividends on Reorganized Parent Common Stock,"* above, the Debtors do not anticipate that they will generate sufficient net profits to pay cash dividends on Reorganized Parent Common Stock for the foreseeable future. In addition, provisions in the Exit Facility Documents and the Second Lien Note Agreement may limit the Debtors' ability to pay dividends. However, if such distributions are made, the gross amount of any cash or property distributed with respect to Reorganized Parent Common Stock will be includible by a U.S. Holder in gross income as dividend income to the extent that such distributions are paid out of current or accumulated "earnings and profits" of Parent, as determined for U.S. federal income tax purposes.

A distribution in excess of Parent's current and accumulated earnings and profits will first be treated as a return of capital to the extent of a U.S. Holder's adjusted tax basis in Reorganized Parent Common Stock and then will be applied against and reduce such basis (thereby increasing the amount of gain and decreasing the amount of

loss recognized on a subsequent taxable disposition of the Reorganized Parent Common Stock). To the extent that such distribution exceeds the U.S. Holder's adjusted tax basis in Reorganized Parent Common Stock, the distribution generally will be treated as capital gain, and will be treated as long-term capital gain if the U.S. Holder's holding period in such stock exceeds one year as of the date of the distribution. Dividends, if any, received by non-corporate U.S. Holders in taxable years beginning before January 1, 2013, may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

ii. *Sale, Exchange or Other Taxable Disposition of Reorganized Parent Common Stock*

Unless a nonrecognition provision applies, upon the sale, exchange or other disposition of a share of Reorganized Parent Common Stock, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the sum of cash plus the fair market value of any property received, and the U.S. Holder's adjusted tax basis in such Reorganized Parent Common Stock. Such gain or loss generally will constitute capital gain or loss, and will be long-term capital gain or loss if, at the time of the sale, exchange, or other taxable disposition, the U.S. Holder held (or is treated as holding for U.S. federal income tax purposes) the shares of Reorganized Parent Common Stock for more than one year. Currently, long-term capital gains of individual taxpayers are taxed at preferential rates, but the deductibility of capital losses is limited. Additionally, any gain recognized by a U.S. Holder on a subsequent taxable disposition of Reorganized Parent Common Stock received in exchange for Senior Claims generally should constitute ordinary income to the extent of any (i) bad debt deductions or charges to bad debt reserves claimed with respect to such Senior Claims, (ii) ordinary loss taken on the exchange of such Senior Claims for Reorganized Parent Common Stock, and (iii) income not recognized due to the use of the cash method of tax accounting with respect to the Senior Claims exchanged.

b. *U.S. Federal Income Tax Consequences of Owning and Disposing of the Second Lien Notes*

i. *Stated Interest and OID*

Stated interest on the Second Lien Notes will generally be taxed to a U.S. Holder as ordinary income at the time it is paid or accrued, in accordance with such U.S. Holder's method of accounting for U.S. federal income tax purposes.

The Second Lien Notes will be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if the "issue price" (as discussed in section XI.B.2.a, *"—In General"* above) of the Second Lien Notes is less than their stated redemption price at maturity by more than a specified *de minimis* amount. Specifically, the Second Lien Notes will be treated as issued with OID if the difference between the stated redemption price at maturity and the issue price of the Second Lien Notes exceeds 0.25% of the stated redemption price at maturity, multiplied by the number of complete years to maturity. A U.S. Holder, irrespective of its regular method of accounting, must include OID as gross income as such OID accrues over the term of the applicable debt obligation and possibly before receiving cash payments attributable to that income.

ii. *Bond Premium*

If a U.S. Holder's initial tax basis in the Second Lien Notes exceeds their stated principal amount, such U.S. Holder will be considered to have acquired the Second Lien Notes with "bond premium" and will not be required to include OID, if any, in income. A U.S. Holder generally may elect to amortize the premium over the remaining term of the Second Lien Notes on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method. If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of the Second Lien Notes.

iii. *Sale, Exchange or Other Taxable Disposition of Second Lien Notes*

Unless a nonrecognition provision applies, upon the sale, exchange or other disposition of the Second Lien Notes, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of any property received, less any consideration allocable to accrued but unpaid interest, and (ii) such U.S. Holder's adjusted tax basis in the Second Lien Notes, other than any adjusted tax basis allocable to accrued but unpaid interest. A U.S. Holder's adjusted tax basis in the Second Lien Notes will, in general, be such U.S. Holder's initial tax basis in the Second Lien Notes, increased by any OID or market discount previously included in income, and reduced by any payments on the Second Lien Notes other than payments of qualified stated interest. Any gain or loss recognized on the sale, exchange or other disposition of Second Lien Notes should be capital gain or loss (subject to the market discount rules discussed in section XI.B.2.c, *"—Market Discount,"* above). Such gain or loss will be long-term capital gain or loss if the applicable U.S. Holder has a holding period in the Second Lien Notes of more than one year at the time of the sale, exchange or retirement. Currently, long-term capital gains of individual taxpayers generally are taxed at preferential rates, but the deductibility of capital losses is limited.

c. *U.S. Federal Income Tax Consequences of Owning and Disposing of the Warrants.*

i. *Exercise or Expiration of the Warrants*

A U.S. Holder generally will not recognize gain or loss upon the exercise of a Warrant. The shares of Reorganized Parent Common Stock that a Holder acquires pursuant to the exercise of the Warrants will have a tax basis equal to the U.S. Holder's adjusted basis in the Warrants so exercised, increased by any amount paid to exercise the Warrants. The exercise of the Warrants will begin a new holding period for the Reorganized Parent Common Stock received pursuant thereto. Each U.S. Holder should consult the discussion above in section XI.B.4.a, *"—U.S. Federal Income Tax Consequences of Owning and Disposing of Shares of Reorganized Parent Common Stock,"* for a summary of certain material U.S. federal income tax consequences of owning and disposing of shares of Reorganized Parent Common Stock following such exercise.

If the terms of the Warrants provide for any adjustment to the number of shares of Reorganized Parent Common Stock for which the Warrants may be exercised or to the exercise price of the Warrants, such adjustment may, under limited circumstances, result in a constructive distribution to a U.S. Holder of the Warrants. Conversely, the absence of an appropriate adjustment may result in a constructive distribution to U.S. Holders of Warrants. A U.S. Holder should review the discussion above in section XI.B.4.a.i. *"—Distributions on Reorganized Parent Common Stock*," for a summary of certain material U.S. federal income tax consequences of distributions on shares of Reorganized Parent Common Stock.

If the Warrants are allowed to lapse unexercised, a U.S. Holder will have a capital loss equal to the U.S. Holder's adjusted basis in the Warrants, which will be treated as a long-term capital loss if the U.S. Holder's holding period in the Warrants exceeds one year as of the date of the expiration. The deductibility of capital losses is subject to certain limitations.

ii. *Sale, Exchange or Other Taxable Disposition of the Warrants*

Unless a nonrecognition provision applies, upon the sale, exchange or other disposition of Warrants, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the sum of the cash plus the fair market value of any property received, and the U.S. Holder's adjusted tax basis in such Warrants, as the case may be. Such gain or loss generally will constitute capital gain or loss, and will be long-term capital gain or loss if, at the time of the sale, exchange, or other taxable disposition, the U.S. Holder held the Warrants for more than one year. Currently, long-term capital gains of individual taxpayers are taxed at preferential rates, but the deductibility of capital losses is limited.

5. *U.S. Federal Income Tax Consequences of the Restructuring to Non-U.S. Holders*

The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state and local and the foreign tax consequences to such Non-U.S. Holder of the Restructuring and the ownership and disposition of the Restructuring Consideration or the Warrants, as applicable.

Subject to the discussion below in section XI.B.7, *"—Information Reporting and Backup Withholding,"* a Non-U.S. Holder should not be subject to U.S. federal income tax on gain realized in connection with the Restructuring, unless: (i) the gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment), in which case the gain or loss will be treated in the manner described in section XI.B.6.c, *"—Effectively Connected Income and Loss,"* below (such gain or loss "ECI" and such U.S. federal income tax treatment, "ECI Treatment"), (ii) the Non-U.S. Holder is an individual who is a "non-resident" and who is present in the United States for 183 days or more during the taxable year of the Restructuring, and certain other conditions are met (the "183-Day Test"), in which case the gain (as may be reduced by any U.S.-source capital losses) will be subject to 30% tax (or such lower rate as may be provided by an applicable income tax treaty) (the "Exempt Individual Treatment"), or (iii) a portion of the consideration received by such Non-U.S. Holder is attributable to accrued but unpaid interest, in which case such amounts will be subject to the rules governing interest discussed in section XI.B.2.b, *"—Accrued but Unpaid Interest,"* above.

6. *U.S. Federal Income Tax Consequences of Owning and Disposing of Restructuring Consideration and Warrants to Non-U.S. Holders*

a. *U.S. Federal Income Tax Consequences of Owning and Disposing of Shares of Reorganized Parent Common Stock*

i. *Distributions on Reorganized Parent Common Stock*

Distributions of cash and property that constitute dividends for U.S. federal income tax purposes, if any, generally will be subject to U.S. federal withholding at a 30% rate (unless a reduced rate is prescribed by an applicable income tax treaty) or treated as ECI. If the amount of a distribution exceeds Parent's current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the shares of Reorganized Parent Common Stock and thereafter will be treated as gain from the disposition of such shares of Reorganized Parent Common Stock and subject to tax as described below in section XI.B.6.a.ii, *"—Sale, Exchange or Other Taxable Disposition of Reorganized Parent Common Stock and Warrants."*

To obtain a reduced rate of U.S. federal withholding tax under an applicable income tax treaty, a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or other applicable form), certifying that such Non-U.S. Holder is entitled to treaty benefits. Each Non-U.S. Holder should consult its respective tax advisor regarding such Non-U.S. Holder's possible entitlement to benefits under an income tax treaty and under what circumstances such Non-U.S. Holder may be treated as receiving constructive distributions.

ii. *Sale, Exchange or Other Taxable Disposition of Reorganized Parent Common Stock and Warrants*

Subject to the discussions below under section XI.B.6.e, *"—FATCA"* and under section XI.B.7, *"—Information Reporting and Backup Withholding,"* in general, a Non-U.S. Holder will not be subject to U.S. federal income tax or withholding tax on gain realized upon such Holder's sale, exchange or other taxable disposition of shares of Reorganized Parent Common Stock or Warrants, as applicable, unless (i) such gain is ECI, in which case the ECI Treatment will apply; (ii) such Non-U.S. Holder is an individual who meets the 183-Day Test, in which case the Exempt Individual Treatment will apply; or (iii) Parent is treated as "United States real property holding corporation" for U.S. federal income tax purposes (a "USRPHC") at any time during the lesser of (x) the five-year

period preceding the disposition, and (y) the Non-U.S. Holder's holding period in shares of Reorganized Parent Common Stock or Warrants, as applicable, and certain other requirements are met.

Generally, a U.S. corporation is a USRPHC only if the fair market value of such corporation's U.S. real property interests (as defined in the IRC and the Treasury Regulations) equals or exceeds 50% of the sum of the fair market value of such corporation's worldwide real property interests and other assets used or held for use in a trade or business. Although there can be no assurance in this regard, Parent believes that it is not, and does not anticipate becoming, a USRPHC. Non-U.S. Holders should consult their respective tax advisors regarding the consequences of Parent's treatment as a USRPHC.

b. *U.S. Federal Income Tax Consequences of Owning and Disposing of Shares of the Second Lien Notes*

i. *Stated Interest and OID*

Subject to the discussion below under section XI.B.6.e, *"—FATCA,"* in general, U.S. federal withholding tax will not apply to any payment of interest or OID on the Second Lien Notes under the so-called "portfolio interest" rule, provided that, for U.S. federal income tax purposes, (i) such payment is not ECI, in which case the ECI Treatment will apply; (ii) the Non-U.S. Holder does not actually or constructively own 10% or more of Parent's voting stock; (iii) the Non-U.S. Holder is not a "controlled foreign corporation" that is "related" to Parent through stock ownership; (iv) the Non-U.S. Holder is not a bank receiving interest on a loan agreement entered into in the ordinary course of such Non-U.S. Holder's trade or business; and (v) the Non-U.S. Holder provides a validly completed IRS Form W-8BEN (or other applicable form).

If a Non-U.S. Holder cannot satisfy the requirements described above, payments of interest (including OID) on the Second Lien Notes made to such Non-U.S. Holder will be subject to a 30% U.S. federal withholding tax, unless such Non-U.S. Holder provides Parent with a properly executed (i) IRS Form W-8BEN (or other applicable form) claiming an exemption from or reduction in withholding under the benefit of an applicable income tax treaty; or (ii) IRS Form W-8ECI (or other applicable form), certifying that interest (including OID) paid on the Second Lien Notes is not subject to U.S. federal withholding tax because such interest is ECI.

ii. *Sale, Exchange or Other Taxable Disposition of Second Lien Notes*

Subject to the discussion below under section XI.B.6.e, *"—FATCA"* and under section XI.B.7,*"—Information Reporting and Back Withholding,"* in general, a Non-U.S. Holder will not be subject to U.S. federal income tax or withholding tax on gain realized upon such Non-U.S. Holder's sale, exchange or other taxable disposition of Second Lien Notes, unless (i) such gain is ECI, in which case the ECI Treatment will apply; or (ii) such Non-U.S. Holder is an individual who meets the 183-Day Test, in which case the Exempt Individual Treatment will apply.

c. *U.S. Federal Income Tax Consequences of Owning and Disposing of the Warrants.*

i. *Exercise or Expiration of the Warrants*

A Non-U.S. Holder generally will not recognize gain or loss upon the exercise of a Warrant. Reorganized Parent Common Stock that a Holder acquires pursuant to the exercise of the Warrants will have a tax basis equal to the Non-U.S. Holder's adjusted basis in the Warrants so exercised, increased by any amount paid to exercise the Warrants. The exercise of the Warrant will begin a new holding period for the Reorganized Parent Common Stock received pursuant thereto. Each Non-U.S. Holder should review the discussion above in section XI.B.6.a, *"—U.S. Federal Income Tax Consequences of Owning and Disposing of Shares of Reorganized Parent Common Stock and Warrants,"* for a summary of certain material U.S. federal income tax consequences of owning and disposing of shares of Reorganized Parent Common Stock received upon the exercise of the Warrants.

Each Non-U.S. Holder should review the discussion above in section XI.B.4.c.i. "*—Exercise or Expiration of the Warrants,*" for a summary of certain material U.S. federal income tax rules concerning possible constructive distributions on the Warrants and in section XI.B.6.a.i. "*—Distributions on Reorganized Parent Common Stock,*" for a summary of certain material U.S. federal income tax consequences of distributions on shares of Reorganized Parent Common Stock.

ii. *Sale, Exchange or Other Taxable Disposition of Warrants*

A summary of certain material U.S. federal income tax consequences of a sale, exchange or other taxable disposition of the Warrants is included above in section XI.B.6.a.ii. "*—Sale, Exchange or Other Taxable Disposition of Reorganized Parent Common Stock and Warrants.*"

d. *Effectively Connected Income and Loss*

If a Non-U.S. Holder is engaged in a trade or business in the United States and if dividends received (or deemed received) in respect of Reorganized Parent Common Stock, interest received in respect of Second Lien Notes, or gain or loss realized on the disposition of any portion of the Reorganized Consideration or the Warrants are ECI, any such interest or dividends included in income, or gain or loss recognized by a Non-U.S. Holder, will be subject to taxation in the same manner as if such Non-U.S. Holder were a U.S. Holder. In addition, if the Non-U.S. Holder is a foreign corporation, such Non-U.S. Holder may be subject to a 30% "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments). Notwithstanding the foregoing, taxation on income that is ECI may be reduced or eliminated by an applicable income tax treaty. Non-U.S. Holders should consult their respective tax advisors regarding the applicability of the ECI rules.

e. *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), which was enacted in 2010, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments". For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including payments of interest on the Second Lien Notes and dividends, if any, on shares of Reorganized Parent Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include the Restructuring Consideration and may include the Warrants). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, the FATCA withholding rules would apply to U.S.-source payments made after December 31, 2013, and to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2014. Further, currently proposed Treasury Regulations provide, in general, that payment on, and gross proceeds from, the disposition of debt obligations that are outstanding on January 1, 2013 will not be subject to withholding under FATCA. Although administrative guidance and proposed Treasury Regulations have been issued, Treasury Regulations implementing the new FATCA regime have not yet been finalized and the exact scope of these rules remains unclear and potentially subject to material changes.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership and disposition of Restructuring Consideration or Warrants, as applicable.

7. *Information Reporting and Backup Withholding*

Unless certain exceptions apply, Parent must report annually to the IRS and to each applicable Holder any interest or dividends paid during the taxable year, and copies of these information returns may be made available pursuant to a treaty or other agreement to the tax authorities of the country in which an applicable Non-U.S. Holder resides.

In addition, U.S. federal backup withholding may apply to such payments unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). In general, corporations are exempt from these requirements, provided that their exemptions are properly established. The current backup withholding rate is 28% through 2012 and 31% thereafter. Backup withholding is not an additional tax. Any amounts withheld from a payment to a Holder under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the Holder to a refund, provided that such Holder timely furnishes the required information to the IRS.

Each Holder should consult its own tax advisor regarding the application of information reporting and backup withholding in such Holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining any such exemption.

C. *Importance of Obtaining Professional Tax Assistance*

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE RESTRUCTURING ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR RESPECTIVE TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL AND APPLICABLE FOREIGN AND OTHER TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

## XII. THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS

A. *Proposed Debtor in Possession Financing*

On August 23, 2012, we entered into the DIP Commitment Letter, attached as Exhibit D, pursuant to which Barclays Bank PLC agreed to backstop a $35 million debtor-in-possession revolving credit facility. On the Petition Date, we intend to enter into the DIP Credit Agreement, a form of which is attached as Exhibit C. Pursuant to the DIP Credit Agreement, the DIP Lenders will provide up to $35 million under the DIP Credit Agreement to the Prospective Debtors. The proceeds from the DIP Facility will be used (i) for post-petition operating expenses of the Prospective Debtors incurred in the ordinary course of business, (ii) to pay transaction fees and expenses, and (iii) for certain other costs and expenses of administration of the Chapter 11 Cases. If the closing with respect to the DIP Facility does not occur by September 1, 2012, the DIP Commitment Letter will terminate, unless extended by the DIP Agent.

Certain of the principal terms of the DIP Facility are summarized below, and the material terms of the DIP Facility are set forth in the form of DIP Credit Agreement attached as Exhibit C. Capitalized terms used in this Article XII.A. but not otherwise defined in Annex II shall have the meanings assigned such terms in the Form of DIP Credit Agreement.

| | |
|---|---|
| **Borrower:** | Contec, LLC. |
| **Guarantors:** | All of the Prospective Debtors other than Contec, LLC. |
| **DIP Backstop Lender:** | Barclays Bank PLC. |
| **DIP Facility Agent:** | Barclays Bank PLC. |
| **DIP Facility:** | A senior secured revolving credit facility with a maximum credit amount of $35 million. |

| | |
|---|---|
| **Term:** | No later than November 30, 2012. |
| **Interest Rate:** | Base rate (with a 2% floor) plus 8%, or LIBOR (with a 2% floor) plus 9%. |
| **Collateral:** | First priority liens on all of the Issuer's and the Guarantors' assets (subject to exceptions for certain permitted liens). |

B. *First Day Orders*

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, we intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to various matters, certain of which are described below. We believe each of the requests, if granted, would facilitate the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant any such relief. The following "first day orders" are not exhaustive, and we reserve the right (a) to seek further orders and additional relief from the Bankruptcy Court if we determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or (b) to not seek portions of the relief described below.

1. *Employees' Wages and Benefits*

We believe we have a valuable asset in our workforce and that the efforts of our employees are critical to a successful reorganization. We intend to seek the approval of the Bankruptcy Court to honor payroll checks outstanding as of the Petition Date and to make payments under medical, severance, retirement and all other employee benefit programs. We also will seek to make certain payments to contract personnel providers.

2. *Trade Vendors and Other Unsecured Creditors*

We believe that good relationships with our vendors are necessary to the continued viability of our business during the Chapter 11 Cases. We intend to seek an order from the Bankruptcy Court authorizing us to pay certain claims of vendors and certain other unsecured creditors, including certain claims that arose prior to our bankruptcy filing, as they become due in the ordinary course of business, subject to the continuation of ordinary trade terms.

3. *Cash Management*

We believe it would be disruptive to our operations if we were forced to implement significant changes to our cash management system upon the commencement of the Chapter 11 Cases. We intend to seek relief from the Bankruptcy Court authorizing us to maintain our cash management system.

4. *DIP Financing Motion*

We intend to seek an order authorizing us to (i) enter into the DIP Facility and (ii) use cash collateral.

5. *Customer Programs*

We intend to seek authority to honor any prepetition customer programs that we determine to be essential to the operation of our business. We believe that continuing these services is essential to maintaining customer loyalty.

6. *Taxes*

We intend to seek authority to pay prepetition tax claims owed to various taxing authorities.

7. *Utility Service*

We intend to seek an order restraining utilities from discontinuing, altering or refusing service and establishing procedures for the provision of adequate assurance to such providers.

8. *Scheduling Order*

We intend to file a motion seeking, among other things, entry of an order (i) scheduling hearings to confirm the Plan, to find that this Solicitation and Disclosure Statement complies with sections 1126(b)(1) and 1126(b)(2) of the Bankruptcy Code and to approve the prepetition solicitation procedures and (ii) establishing deadlines and procedures for filing objections to confirmation of the Plan, this Solicitation and Disclosure Statement and the solicitation procedures.

C. *Second Day Orders*

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, we also intend to seek relief, after notice and, if necessary, a hearing in the form of various "second day orders" from the Bankruptcy Court as to various matters, certain of which are described below. There can be no assurance that the Bankruptcy Court will grant any such relief. The following "second day orders" are not exhaustive and we reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that we determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or to not seek portions of the relief described below.

1. *Retention of Professionals*

We intend to seek authority to employ Ropes & Gray LLP, as our bankruptcy counsel, Pepper Hamilton LLP, as our local and conflicts counsel, Moelis, as our financial advisor and investment banker, and AlixPartners, as our restructuring advisor.

## XIII. CONFIRMATION

A. *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing to consider confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization.

If we commence the Chapter 11 Cases and seek confirmation of the Plan, the Bankruptcy Court will schedule a Confirmation Hearing to consider whether the Plan satisfies the various requirements of the Bankruptcy Code. At that time, the Debtors will submit a report to the Bankruptcy Court concerning the vote for acceptance or rejection of the Plan by the parties entitled to vote thereon. We intend to seek a "first day order" scheduling the Confirmation Hearing, at which the Debtors will seek approval of this Solicitation and Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128 and 1129 of the Bankruptcy Code. The Confirmation Hearing Notice will be provided to all Holders of Claims and Equity Interests or their representatives as required by Bankruptcy Rule 2002. Objections to confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THE CONFIRMATION HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B. *Requirements for Confirmation*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the provisions of section 1129 of the Bankruptcy Code. If all of the provisions of section 1129 of the Bankruptcy Code are met, the

Bankruptcy Court may enter an order confirming the Plan. We believe that all of the requirements of section 1129 of the Bankruptcy Code will be satisfied.

C. *Class Acceptance of the Plan*

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or equity interests accept a plan, subject to the exceptions described in the section entitled "cram down" below. At least one impaired class of claims must accept a plan in order for the plan to be confirmed.

For a class of claims to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by creditors that hold at least two-thirds in dollar amount and a majority in number of the allowed claims of such class, in both cases counting only those claims actually voting to accept or reject the plan. The holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

For a class of equity interests to accept a plan, section 1126 of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those equity interests actually voting to accept or reject the plan. The holders of equity interests who fail to vote are not counted as either accepting or rejecting a plan.

If the Plan is confirmed, the Plan will be binding on all Holders of Claims and Equity Interests of each Class, including Classes and members of such Classes that did not vote or that voted to reject the Plan.

We believe that the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that we have complied or will have complied with all of the requirements of chapter 11 and that the Plan has been proposed and made in good faith.

D. *Cram Down*

A court may confirm a plan, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cram down" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires the court to find that the plan is "fair and equitable" and does not "discriminate unfairly" against any nonaccepting impaired class of claims or equity interests. With respect to a dissenting class of claims, the "fair and equitable" standard requires, among other things, that, pursuant to the Plan, either (i) each holder of a claim in such dissenting class will receive or retain property having a value, as of the effective date of a plan, equal to the allowed amount of its claim, or (ii) no holder of allowed claims or equity interests in any junior class will receive or retain any property on account of such claims or equity interests. With respect to a dissenting class of equity interests, the "fair and equitable" standard requires that pursuant to the Plan, either (i) each holder of an equity interest in the dissenting class will receive or retain property having a value, as of the effective date, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of such equity interests or (ii) no holder of an equity interest in any junior class will receive or retain any property on account of such equity interests. The strict requirement of the allocation of full value to dissenting classes before junior classes can receive a distribution is known as the "absolute priority rule."

We will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to any Impaired Classes of Claims or Equity Interests that reject, or are deemed to reject, the Plan; *provided*, that we reserve the right to modify the Plan in accordance with the terms thereof. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

E. *Plan Meets Requirements for Confirmation*

1. *Best Interests of Creditors—Liquidation Analysis*

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, that is, that the Plan is in the best interests of each Holder of a Claim or Equity Interest in an Impaired Class that has not voted to accept the Plan. To satisfy this "best interests" test, the Bankruptcy Court must find that the Plan provides each non-consenting Holder in such Impaired class with a recovery, on account of such Holder's Claim or Equity Interest, that has a value at least equal to the value of the distribution that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

We believe that confirmation of the Plan is in the best interests of the Holders of Claims and Equity Interests because it provides distributions to such Holders having a present value, as of the Effective Date, of not less than the value such Holders likely would receive if the Prospective Debtors were liquidated under chapter 7 of the Bankruptcy Code. <u>See</u> Article VII. "FINANCIAL PROJECTIONS AND VALUATION ANALYSIS" and Article VIII. "LIQUIDATION ANALYSIS."

To estimate what members of each Impaired Class of Claims or Equity Interests would receive if the Prospective Debtors were liquidated pursuant to chapter 7 of the Bankruptcy Code, we must first determine the aggregate dollar amount that would be available to such member for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Prospective Debtors' assets were liquidated by a chapter 7 trustee. The resulting Liquidation Value of the Debtors would consist of the net proceeds from the disposition of assets of the Prospective Debtors, augmented by any cash held by the Prospective Debtors.

We believe that chapter 7 liquidation would result in a diminution in the value to be realized by Holders of Claims and Equity Interests due to, among other factors, (i) the failure to realize the maximum going-concern value of the Prospective Debtors' assets, (ii) the incurrence of additional tax liabilities in the event of a liquidation, (iii) additional costs and expenses involved in the appointment of a chapter 7 trustee and attorneys, accountants and other professionals to assist such trustee in the chapter 7 case, (iv) additional expenses and Claims, some of which would be entitled to priority in payment, which would arise by reason of the liquidation, including Claims resulting from the rejection of unexpired real estate leases and other leases and executory contracts in connection with a cessation of the Prospective Debtors' operations, and (v) the substantial time that would elapse before creditors would receive any distribution in respect of their Claims. Consequently, we believe that the Plan, which provides for the continuation of our business, will provide a greater ultimate return to Holders of Claims and Equity Interests than would a chapter 7 liquidation. Further, the Plan provides that the General Unsecured Claims in Class 4, which include all of the Debtors' trade debt, will be either, at the election of the Debtors or the Reorganized Debtors, reinstated or paid in full in the ordinary course of business, and the Subordinated Note Claims in Class 6 will receive the Warrants, while our liquidation analysis shows that there would be <u>no</u> distribution to General Unsecured Claims or Subordinated Note Claims if we were liquidated in a chapter 7 case.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the non-consenting Holders of Claims (if any) in Impaired Classes will receive distributions under the Plan that are at least as great as the distributions that such Holders would receive upon a liquidation of the Prospective Debtors pursuant to chapter 7 of the Bankruptcy Code.

2. *Feasibility of the Plan*

We believe that confirmation of the Plan is not likely to be followed by a liquidation of the Reorganized Debtors or a need for a further financial reorganization of the Reorganized Debtors. Upon consummation of the Exit Facility, the Reorganized Debtors will have sufficient cash to fund distributions under the Plan and to support and meet their ongoing financial needs. The Projections indicate that the Plan as proposed is feasible and that the Reorganized Debtors will be financially viable after confirmation of the Plan.

F. *Alternatives to Confirmation and Consummation of the Plan*

If we commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives available to the Debtor would include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) an out-of-court restructuring involving a dismissal of the proceedings, or (iii) liquidation under chapter 7 or chapter 11 of the Bankruptcy Code. If the Plan is not confirmed, we will decide which alternative to pursue by weighing each of the available options and choosing the alternative or alternatives that are in the best interests of the Prospective Debtors, their stakeholders and other parties in interest.

1. *Alternative Plans of Reorganization*

If the chapter 11 petitions are filed and the Plan is not confirmed, the Debtors (or, if the exclusive period in which to file a plan of reorganization has expired or is terminated by the Bankruptcy Court, any other party in interest) could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization or continuation of our business or an orderly liquidation of our assets.

We believe that the Plan is a significantly more attractive alternative than those alternatives, because it could, among other things, minimize disputes during the reorganization of the Prospective Debtors, significantly shorten the time required to accomplish the reorganization, reduce the expenses of cases under chapter 11 of the Bankruptcy Code, minimize the disruption of our business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 or chapter 11 of the Bankruptcy Code. In addition, the Plan preserves relationships with the Debtors' customers and vendors.

2. *Dismissal of the Debtors' Chapter 11 Cases*

Dismissal of our Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of our Chapter 11 Cases, we would lose the protections afforded by the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with our creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of our Chapter 11 Cases would permit secured prepetition lenders that have not been paid in full to foreclose upon the assets that are subject to their liens. Moreover, the Subordinated Notes would be in default and subject to enforcement in accordance with the Note Purchase Agreement. Dismissal also will permit unpaid unsecured creditors to obtain and enforce judgments against us. We believe that these actions would seriously undermine our ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Therefore, we believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

3. *Liquidation Under Chapter 7 or Chapter 11*

If chapter 11 petitions are filed and no plan of reorganization is confirmed (and in certain other circumstances), the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Prospective Debtors for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. A discussion of the potential effects that a chapter 7 liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth under Article VIII. "LIQUIDATION ANALYSIS." In a liquidation, the assets of the Prospective Debtors would be sold in exchange for cash, securities or other property, which would then be distributed to creditors. In contrast to the Plan (or an alternative reorganization under chapter 11 of the Bankruptcy Code), in which certain creditors would receive debt or equity securities of the Reorganized Debtors and would be subject to the risks associated with holding such securities, in a liquidation creditors might receive cash or other assets which are not subject to those risks. <u>See</u> Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases." We believe, however, that liquidation under chapter 7 would result in smaller distributions to Holders of Claims in certain Classes (and, as to certain Classes, no distributions) as compared to those provided for in the Plan because of, among other things, (i) failure to

realize the greater going-concern value of the Prospective Debtors' assets and the erosion in value of assets in a chapter 7 case due to the expeditious liquidation required and the "forced sale" atmosphere that would prevail, (ii) administrative expenses involved in the appointment of a trustee and professional advisors to such trustee and (iii) expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations of the Prospective Debtors. In addition, a chapter 7 liquidation is likely to result in substantial litigation and delays in ultimate distributions to creditors. If a chapter 7 liquidation occurs, we believe that there would not be sufficient assets to make any distribution to unsecured creditors, priority claimants, or the Subordinated Note Claims.

In a liquidation under chapter 11, the Prospective Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, potentially resulting in somewhat greater (but indeterminate) recoveries. Although preferable to a chapter 7 liquidation, we believe that a liquidation under chapter 11 still would not realize the full going-concern value of the Prospective Debtors' assets or the value of any accumulated net operating losses. The going-concern value is predicated upon the Debtors continuing in operation. In contrast, liquidation value assumes that the Prospective Debtors would be unable to continue functioning as a going concern and their assets would be sold separately. Consequently, the Prospective Debtors believe that a liquidation under chapter 11 is a less attractive alternative to creditors than the Plan because of the likelihood of a greater recovery provided for by the Plan. See Article V. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION" and Article VIII. "LIQUIDATION ANALYSIS.

## RECOMMENDATION AND CONCLUSION

We believe that confirmation of the Plan is in the best interests of creditors and that the Plan should be confirmed. We recommend that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

Dated: August 23, 2012

Respectfully Submitted,

CHL, LTD.
/s/ Lawrence E. Young
Lawrence E. Young

CONTEC ACQUISITION CORP.
/s/ Lawrence E. Young
Lawrence E. Young

CONTEC HOLDINGS, LTD.
/s/ Lawrence E. Young
Lawrence E. Young

CONTEC, LLC
/s/ Lawrence E. Young
Lawrence E. Young

CONTEC LICENSES, LLC
/s/ Lawrence E. Young
Lawrence E. Young

WORLDWIDE DIGITAL COMPANY, LLC
/s/ Lawrence E. Young
Lawrence E. Young

CONTEC DE MEXICO, S. DE R.L. DE C.V.
/s/ Lawrence E. Young
Lawrence E. Young

ENSAMBLADORA DE MATAMOROS, S. DE R.L. DE C.V.
/s/ Lawrence E. Young
Lawrence E. Young

**ANNEX I**

**List of Prospective Debtors**

CHL, LTD.

CONTEC ACQUISITION CORP.

CONTEC HOLDINGS, LTD.

CONTEC, LLC

CONTEC LICENSES, LLC

WORLDWIDE DIGITAL COMPANY, LLC

CONTEC DE MEXICO, S. DE R.L. DE C.V.

ENSAMBLADORA DE MATAMOROS, S. DE R.L. DE C.V.

**ANNEX II**

**Terms**

“183-Day Test” shall have the meaning given in Article XI.A.3.

“Administrative Claims” shall have the meaning ascribed in the Plan.

“Affiliate” – Under section 2(a)(11) of the Securities Act, an “issuer” includes any person directly or indirectly controlling or controlled by the issuer or any person under direct or indirect common control of the issuer. Such a person is an “affiliate” of the issuer.

“AlixPartners” means AP Services, LLC, the Company’s restructuring advisor.

“Allowed” shall have the meaning ascribed in the Plan.

“American Capital” means American Capital, Ltd. (f/k/a American Capital Financial Services, Inc.).

“AMT” shall have the meaning given in Article XI.A.3.

“AMTI” shall have the meaning given in Article XI.A.3.

“Annual Section 382 Limitation” shall have the meaning given in Article XI.A.2

“Assets” shall have the meaning ascribed in the Plan.

“Ballot” shall have the meaning ascribed in the Plan.

“Bankruptcy Code” shall have the meaning ascribed in the Plan.

“Bankruptcy Court” shall have the meaning ascribed in the Plan.

“Bankruptcy Exception” shall have the meaning given in Article XI.A.

“Bankruptcy Rules” shall have the meaning ascribed in the Plan.

“Business Day” shall have the meaning ascribed in the Plan.

“Cash” shall have the meaning ascribed in the Plan.

“Causes of Action” shall have the meaning ascribed in the Plan.

“CERCLA” means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

“Chapter 11 Cases” shall have the meaning ascribed in the Plan.

“Chapter 11 Parties” shall have the meaning ascribed in the Plan.

“Claim” shall have the meaning ascribed in the Plan.

“Claims-for-Notes Exchange” shall have the meaning given in Article XI.A.3.

“Claims-for-Shares Exchange” shall have the meaning given in Article XI.A.3.

“Class” shall have the meaning ascribed in the Plan.

"Closing Date" means the Effective Date.

"COD" means cancellation of indebtedness.

"CODI" shall have the meaning given in Article XI.A.

"Company" means the Prospective Debtors.

"Confirmation Date" shall have the meaning ascribed in the Plan.

"Confirmation Hearing Notice" means a notice of the Confirmation Hearing.

"Confirmation Hearing" shall have the meaning ascribed in the Plan.

"Confirmation Order" shall have the meaning ascribed in the Plan.

"Contec de Mexico" means Contec de Mexico, S. de R.L. de C.V., a Debtor in the Chapter 11 Cases.

"Contec Holdings" shall have the meaning ascribed in the Plan.

"Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

"Covered Persons" shall have the meaning ascribed in the Plan.

"DCF" means discounted cash flow.

"Debtors" shall have the meaning ascribed in the Plan.

"Depreciable Tax Basis" shall have the meaning given in Article XI.A.

"DIP Agent" shall have the meaning ascribed in the Plan.

"DIP Credit Agreement" shall have the meaning ascribed in the Plan.

"DIP Credit Agreement Claims" shall have the meaning ascribed in the Plan.

"DIP Facility" means the $35 million debtor-in-possession financing to be provided under the DIP Credit Agreement.

"DIP Lenders" shall have the meaning ascribed in the Plan.

"DIP Order" shall have the meaning ascribed in the Plan.

"Disallowed" shall have the meaning ascribed in the Plan.

"Disbursing Agent" shall have the meaning ascribed in the Plan.

"Disputed" shall have the meaning ascribed in the Plan.

"Distribution Record Date" shall have the meaning ascribed in the Plan.

"EBITDA" means earnings before interest, taxes, depreciation and amortization.

"ECI Treatment" shall have the meaning given in Article XI.A.3.

"Effective Date" shall have the meaning ascribed in the Plan.

"Ensambladora" means Ensambladora de Matamoros, S. de R.L. de C.V., a Debtor in the Chapter 11 Cases.

"Entity" shall have the meaning ascribed in the Plan.

"Equity Interests" shall have the meaning ascribed in the Plan.

"Equity Value" shall have the meaning ascribed in the Plan.

"Estates" shall have the meaning ascribed in the Plan.

"Exchange" shall have the meaning given in Article XI.A.3.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Claim" shall have the meaning ascribed in the Plan.

"Exempt Individual Treatment" shall have the meaning given in Article XI.A.3.

"Exit Backstop Lenders" shall have the meaning ascribed in the Plan.

"Exit Commitment Letter" shall have the meaning ascribed in the Plan.

"Exit Credit Agreement" shall have the meaning ascribed in the Plan.

"Exit Facility Agent" shall have the meaning ascribed in the Plan.

"Exit Facility Documents" shall have the meaning ascribed in the Plan.

"Exit Facility Lenders" shall have the meaning ascribed in the Plan.

"Exit Facility" means the secured revolving loan provided pursuant to the Exit Credit Agreement.

"FATCA" means the Foreign Account Tax Compliance Act.

"File," "Filed" or "Filing" shall have the meaning ascribed in the Plan.

"Final Order" shall have the meaning ascribed in the Plan.

"Financial Information" shall have the meaning given in Article VI.D.3.

"Former Executive Compensation Agreements" shall have the meaning ascribed in the Plan.

"Former Executive Compensation Claims" shall have the meaning ascribed in the Plan.

"Former Executives" shall have the meaning ascribed in the Plan.

"Forward-Looking Statements" shall have the meaning as defined in the Private Securities Litigation Reform Act of 1995 or by the U.S. Securities and Exchange Commission in its rules, regulations and releases.

"FTI" means FTI Consulting, LLC.

"General Unsecured Claims" shall have the meaning ascribed in the Plan.

"Holder" shall have the meaning ascribed in the Plan.

"Impaired" shall have the meaning ascribed in the Plan.

"Intercompany Claims" shall have the meaning ascribed in the Plan.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of July 28, 2008.

"IRC" means the Internal Revenue Code of 1986.

"IRS" means the Internal Revenue Service.

"Lien" shall have the meaning ascribed in the Plan.

"Liquidation Analysis" means the liquidation analysis prepared by AlixPartners attached as Exhibit G.

"Liquidation Value" means the aggregate dollar amount that would be available for distribution if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee.

"Material Adverse Effect" shall have the meaning given in Article II.A.9.

"Moelis" means Moelis & Company LLC, the Company's financial advisor.

"New Constituent Documents" shall have the meaning ascribed in the Plan.

"New Intercreditor Agreement" shall have the meaning ascribed in the Plan.

"New Management Cash Incentive Plan" shall have the meaning ascribed in the Plan.

"New Management Equity Incentive Plan" shall have the meaning ascribed in the Plan.

"New Management Incentive Plans" means the New Management Cash Incentive Plan and the New Management Equity Incentive Plan.

"New Officers" shall have the meaning ascribed in the Plan.

"New Securities" means, collectively, Reorganized Parent Common Stock, Warrants, and the Second Lien Notes.

"NOL" shall have the meaning given in Article XI.A.

"Note Purchase Agreement" shall have the meaning ascribed in the Plan.

"NUBIGs" shall have the meaning given in Article XI.A.2.

"NUBILs" shall have the meaning given in Article XI.A.2.

"OEM" shall have the meaning given in Article IV.D.

"OID" shall have the meaning given in Article XI.B.4.b.iXI.A.3.

"Operating Debtors" means Contec Holdings, Ltd., Contec, LLC, Contec Licenses, LLC, Worldwide Digital Company, LLC, Contec de Mexico, S. de R.L. de C.V., and Ensambladora de Matamoros, S. de R.L. de C.V., as debtors and debtors in possession in the Chapter 11 Cases.

"Other Priority Claims" shall have the meaning ascribed in the Plan.

"Other Secured Claims" shall have the meaning ascribed in the Plan.

"Outside Date" shall have the meaning ascribed in the Plan.

"Parent" shall have the meaning ascribed in the Plan.

"Parent Equity Interests" shall have the meaning ascribed in the Plan.

"Parent Other Priority Claims" shall have the meaning ascribed in the Plan.

"Parent Subsidiaries" shall have the meaning ascribed in the Plan.

"Parent Subsidiaries' Equity Interests" shall have the meaning ascribed in the Plan.

"Parent Tax Group" shall have the meaning given in Article XI.A.

"Parent Unsecured Claims" shall have the meaning ascribed in the Plan.

"Person" shall have the meaning ascribed in the Plan.

"Petition Date" shall have the meaning ascribed in the Plan.

"Plan Documents" shall have the meaning ascribed in the Plan.

"Plan Supplement" shall have the meaning ascribed in the Plan.

"Plan Support Agreement" shall have the meaning ascribed in the Plan.

"Plan Support Party" shall have the meaning ascribed in the Plan.

"Plan" shall have the meaning ascribed in the Plan. A copy of the Plan, as of the date hereof, is attached hereto as Exhibit A.

"Prepetition Equity Agreements" shall have the meaning ascribed in the Plan.

"Prepetition Long Term Incentive Plan" shall have the meaning ascribed in the Plan.

"Priority Tax Claims" shall have the meaning ascribed in the Plan.

"Professional Fee Claims" means claims by Professionals for compensation for services rendered in connection with the Chapter 11 Cases pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code.

"Professionals" shall have the meaning ascribed in the Plan.

"Projections" means the financial projections prepared by the Company and described in Article VIII hereof.

"Pro-Rata Share" shall have the meaning ascribed in the Plan.

"Prospective Debtors" means the prospective Debtors as defined in Annex I.

"Record Holder" shall have the meaning ascribed in the Plan.

"Reg. D" shall have the meaning given in Article IX.A. hereof.

"Registration Rights Agreement" shall have the meaning ascribed in the Plan.

"Releasees" shall have the meaning ascribed in the Plan.

"Releasors" shall have the meaning ascribed in the Plan.

"Reorganized Debtor" shall have the meaning ascribed in the Plan.

"Reorganized Operating Debtors" means the Operating Debtors and any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

"Reorganized Parent" means Parent and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

"Reorganized Parent Board of Directors" shall have the meaning ascribed in the Plan.

"Reorganized Parent By-Laws" shall have the meaning ascribed in the Plan.

"Reorganized Parent Certificate of Incorporation" shall have the meaning ascribed in the Plan.

"Reorganized Parent Common Stock" shall have the meaning ascribed in the Plan.

"Reorganized Parent Constituent Documents" shall have the meaning ascribed in the Plan.

"Reorganized Parent Common Stock" shall have the meaning ascribed in the Plan.

"Reorganized Parent Subsidiaries" shall have the meaning ascribed in the Plan.

"Reorganized Parent Subsidiaries' Boards of Directors" shall have the meaning ascribed in the Plan.

"Reserved Actions" shall have the meaning ascribed in the Plan.

"Restructuring" shall have the meaning given in Article XI.

"Restructuring Consideration" shall have the meaning given in Article XI.B.2.a.

"Restructuring Transactions" shall have the meaning ascribed in the Plan.

"Second Lien Note Agent" shall have the meaning ascribed in the Plan.

"Second Lien Note Agreement" shall have the meaning ascribed in the Plan.

"Second Lien Documents" shall have the meaning ascribed in the Plan.

"Second Lien Notes" shall have the meaning ascribed in the Plan.

"Second Lien Noteholders" means the beneficial holders of the Second Lien Notes.

“Section 382(1)(5) Exception” shall have the meaning given in Article XI.A.2.

“Secured Claims” shall have the meaning ascribed in the Plan.

“Securities Act” shall have the meaning ascribed in the Plan.

“Senior Agent” shall have the meaning ascribed in the Plan.

“Senior Agent Professionals” shall have the meaning ascribed in the Plan.

“Senior Claims” shall have the meaning given in Article XI.

“Senior Credit Agreement” shall have the meaning ascribed in the Plan.

“Senior Credit Agreement Claims” shall have the meaning ascribed in the Plan.

“Senior Lenders” shall have the meaning ascribed in the Plan.

“Solicitation and Disclosure Statement” means this Solicitation and Disclosure Statement.

“Solicitation” means the solicitation of votes to accept or reject the Plan pursuant to this Solicitation and Disclosure Statement.

“Sponsor” shall have the meaning ascribed in the Plan.

“Statutory Committees” shall have the meaning ascribed in the Plan.

“Steering Committee” means a steering committee of the Senior Lenders.

“Stockholders’ Agreement” shall have the meaning ascribed in the Plan.

“Subordinated Claims” shall have the meaning given in Article XI.

“Subordinated Note Agent” shall have the meaning ascribed in the Plan.

“Subordinated Note Amount” shall have the meaning ascribed in the Plan.

“Subordinated Note Claims” shall have the meaning ascribed in the Plan.

“Subordinated Noteholder” shall have the meaning ascribed in the Plan.

“Subordinated Notes” shall have the meaning ascribed in the Plan.

“Subordinated Securities Claims” shall have the meaning ascribed in the Plan.

“Tax Attributes” shall have the meaning given in Article XI.A.

“Tax Code” means the Internal Revenue Code of 1986, as may be amended or modified from time to time.

“U.S. Consolidated Return Group” shall have the meaning given in Article XI.A.

“USRPHC” shall have the meaning given in Article XI.B.6.a.ii.

“Unimpaired” shall have the meaning ascribed in the Plan.

"Voting Agent" means The Garden City Group, in its capacity as the voting and tabulation agent for the Solicitation.

"Voting Deadline" means 4:00 p.m. Prevailing Eastern Time, on September 24, 2012, unless extended.

"Voting Instructions" means the voting instructions described in Article I hereof, together with the instructions contained in the Ballot.

"Voting Record Date" means the close of business on August 23, 2012, unless extended.

"Warrants" shall have the meaning ascribed in the Plan.